**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., | |
| Plaintiff, | |
| v. | **NON-CONFIDENTIAL** |
| UNITED STATES, | Proprietary Information Removed from Pages 12, 18, 21, 23, 27, 29 – 30, 32, and 35 |
| Defendant, | |
| and | Court No. 23-00055 |
| NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenors. | |

**PLAINTIFF KG DONGBU STEEL CO., LTD.'S OPENING BRIEF**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

July 21, 2023

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff KG Dongbu Steel Co.,*

**TABLE OF CONTENTS**

I.      RULE 56.2 STATEMENT .................................................................................... 1

II.     ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
        ADMINISTRATIVE DETERMINATION .......................................................... 2

III.    STATEMENT OF FACTS ................................................................................. 2

IV.     SUMMARY OF ARGUMENT ......................................................................... 11

V.      STANDARD OF REVIEW .............................................................................. 13

VI.     ARGUMENT ................................................................................................... 13

        A.      Commerce's Determination That The First Three D/E Swaps Provided A
                Countervailable Subsidy To Dongbu Is Not Supported By Substantial Evidence
                And Is Otherwise Not In Accordance With Law .................................... 13

                1.      This Court's Recent Decision In KG Dongbu's Appeal Of The 2019
                        Review Of This Order Should Be Applied Here ....................... 13

                2.      Commerce's Abrupt And Unexplained Change In Established Agency
                        Practice Is Arbitrary And Unlawful ......................................... 15

        B.      Commerce's Determination That The Sale of Dongbu Steel Was Not Arm's
                Length For Fair Market Value Is Unsupported By Substantial Evidence And Is
                Otherwise Not In Accordance With Law ............................................... 24

                1.      Commerce's Fair Market Value Analysis Is Not Supported By Substantial
                        Evidence And Is Otherwise Not In Accordance With Law ..................... 26

                2.      Commerce's Analysis of its Four-Factor Test And Conclusion That The
                        Sales of Dongbu Steel Was Not Arm's Length for Fair Market Value Is
                        Unsupported by Substantial Evidence and is Otherwise Not in Accordance
                        with Law ................................................................................. 32

        C.      Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The
                Unequityworthy Discount Rates .......................................................... 36

                1.      Uncreditworthy Benchmark Rate ........................................... 36

                2.      Unequityworthy Discount Rates ............................................. 40

VII.    CONCLUSION ................................................................................................ 43

CERTIFICATE OF COMPLIANCE ............................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156, 83 S. Ct. 239 (1962)...................................................................30

*Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*,
  415 F. Supp. 3d 1216 (Ct. Int'l Trade 2019) ....................................38, 39, 40, 42

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*,
  181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016) ...................................................39

*Hynix Semiconductor Inc. v. United States*,
  30 C.I.T. 288, 425 F. Supp. 2d 1287 (2006) ....................................................20

*Hyundai Steel Company v. United States*,
  415 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ...................................................18

*KG Dongbu Steel v. United States*,
  No. 22-00047, Slip Op. 23-98 (Ct. Int'l Trade July 7, 2023) ......................... *passim*

*Save Domestic Oil, Inc. v. United States*,
  357 F.3d 1278 (Fed. Cir. 2004)........................................................................18

*SKF USA, Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)........................................................................17

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994)...........................................................................................39

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................13

19 U.S.C. § 1677(5)(F) ..........................................................................................25

**Regulations**

19 C.F.R. § 351.505(a)(1) .......................................................................................37

19 C.F.R. § 351.505(a)(3)(iii).............................................................................38, 39

19 C.F.R. § 351.507(a)(1) .......................................................................................15

19 C.F.R. § 351.507(a)(2) .......................................................................................19

19 C.F.R. § 351.507(a)(2)(i) ...............................................................................15, 20

19 C.F.R. § 351.507(a)(2)(ii) .....................................................................................20

19 C.F.R. § 351.507(a)(2)(iii) ....................................................................................21

19 C.F.R. § 351.507(a)(3)(i) .......................................................................................16

19 C.F.R. § 351.507(a)(4) ...........................................................................................40

19 C.F.R. § 351.507(a)(6) ...........................................................................................40

19 C.F.R. § 351.507(c) ................................................................................................42

19 C.F.R. § 351.524(d)(1) ...........................................................................................41

19 C.F.R. § 351.524(d)(2) ...........................................................................................42

19 C.F.R. § 351.524(d)(3)(ii) ......................................................................................41

**Other Authorities**

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final*
*Results and Partial Rescission of Countervailing Duty Administrative Review;*
*2015-2016*, 84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2019) ...................................3, 15

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final*
*Results and Partial Rescission of Countervailing Duty Administrative Review;*
*2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) .............................................4, 15

*Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final*
*Results and Partial Rescission of Countervailing Duty Administrative Review;*
*2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) .....................................................5

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final*
*Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg.
15,112 (Dep't Commerce Mar. 17, 2020) ............................................................................4, 15

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:*
*Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85
Fed. Reg. 74,692 (Dep't Commerce Nov. 23, 2020) ...................................................................5

*Certain Corrosion-Resistant Steel Products from the Republic of Korea:*
*Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86
Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) ...................................................................5

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:
Preliminary Results of Countervailing Duty Administrative Review, and
Rescission of Review, In Part; 2017*, 84 Fed. Reg. 48,107 (Dep't Commerce
Sept. 12, 2019) .................................................................................................................4

*Certain Corrosion-Resistant Steel Products From India, Italy, the Republic of
Korea and the People's Republic of China:  Countervailing Duty Order*, 81
Fed. Reg. 48,387 (Dep't Commerce July 25, 2016) .................................................2

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:
Preliminary Results of Countervailing Duty Administrative Review, Rescission
of Review, In Part, and Intent to Rescind, In Part; 2015-16*, 83 Fed. Reg.
39,671 (Dep't Commerce Aug. 10, 2018) ...............................................................3

*Certain Cut-to-Length Carbon Steel Plate from Mexico Preliminary Results of
Countervailing Duty Administrative Review*, 68 Fed. Reg. 52,895 (Dep't
Commerce Sept. 8, 2003)..................................................................................36, 37

*Certain Pasta From Italy: Preliminary Results and Partial Rescission of the
Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971
(Dep't Commerce Apr. 8, 2005) .............................................................................25

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative
Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce
Oct. 25, 2007) ...................................................................................................24, 36

*Countervailing Duties*, 62 Fed. Reg. 8,818 (Dep't Commerce Feb. 26, 1997) ............................20

*Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998) ........................39

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products
From the Republic of Korea:  Final Affirmative Countervailing Duty
Determination, and Final Affirmative Critical Circumstances Determination,
in Part,* 81 Fed. Reg. 35,308 (Dep't Commerce June 2, 2016) ..............................3

*Drill Pipe From the People's Republic of China: Final Results of Countervailing
Duty Administrative Review; 2011*, 78 Fed. Reg. 47,275 (Dep't Commerce
Aug. 5, 2013) ..........................................................................................................37

*Notice of Final Modification of Agency Practice Under Section 123 of the
Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't Commerce June
23, 2003) ..................................................................................................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., <br><br>    Plaintiff, <br><br> v. <br><br>UNITED STATES, <br><br>    Defendant, <br><br>  and <br><br>NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA, <br><br>    Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br>Proprietary Information Removed from Pages 12, 18, 21, 23, 27, 29 – 30, 32, and 35 <br><br>Court No. 23-00055 |

## PLAINTIFF KG DONGBU STEEL CO., LTD.'S OPENING BRIEF

In accordance with Rule 56.2 of the Rules of this Court, and the May 23, 2023 scheduling order, Plaintiff KG Dongbu Steel Co., Ltd. ("KG Dongbu" or "Plaintiff") (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd, collectively "Dongbu") files this brief in support of its Rule 56.2 motion for judgment upon the agency record. Scheduling Order, *KG Dongbu Steel Co., Ltd., v. United States* (Ct. Int'l Trade May 23, 2023), ECF No. 25. As discussed below, the U.S. Department of Commerce's ("Commerce") *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law.

## I. RULE 56.2 STATEMENT

The administrative determination under review is Commerce's *Final Results* in the countervailing duty ("CVD") administrative review of certain corrosion-resistant steel products ("CORE" or "subject merchandise") from the Republic of Korea, which covered entries of

subject merchandise into the United States between January 1, 2020 and December 31, 2020.

*See Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023) ("CORE 2020 Final Results"), PR 180, and accompanying Issues and Decision Memorandum ("CORE 2020 IDM"), PR 181.

## II.     ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1)      Whether Commerce's determination that the first three debt-to-equity swaps ("D/E swaps") provided a countervailable subsidy to Dongbu is unsupported by substantial evidence and is otherwise not in accordance with law?

2)      Whether Commerce's determination that the benefits from Dongbu's first three D/E swaps passed through to KG Dongbu Steel despite the change in ownership is unsupported by substantial evidence and is otherwise not in accordance with law?

3)      Whether Commerce's calculation of the uncreditworthiness benchmark for purposes of measuring the benefit from Dongbu's restructured financing, and Commerce's calculation of the uncreditworthy discount rate for purposes of measuring the benefits from the D/E swaps, is unsupported by substantial evidence and is otherwise not in accordance with law?

## III.     STATEMENT OF FACTS

On July 25, 2016, Commerce published a CVD order on CORE from Korea with a subsidy rate for Dongbu Steel/Dongbu Incheon of 1.19 percent.  *Certain Corrosion-Resistant Steel Products From India, Italy, the Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 Fed. Reg. 48,387, 48,388 (Dep't Commerce July 25, 2016) ("CVD Order").  Dongbu's subsidy rate, based on certain recurring subsidy programs used during the calendar year 2014 period of investigation, consisted almost entirely (*i.e.*, 1.13

2

percent) of benefits from the 2014 restructuring of Dongbu's outstanding long-term loans and bonds by its Creditors Council under its corporate workout program. *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Countervailing Duty Determination, and Final Affirmative Critical Circumstances Determination, in Part,* 81 Fed. Reg. 35,308 (Dep't Commerce June 2, 2016) and accompanying Issues and Decision Memorandum at 7.

On March 28, 2019, Commerce published the final results of its first (2015-2016) administrative review with subsidy rates for Dongbu Steel/Dongbu Incheon of 7.63 percent for the 2015 portion of the period of review ("POR") and 8.47 percent for the 2016 portion of the POR. *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016*, 84 Fed. Reg. 11,749, 11,750 (Dep't Commerce Mar. 28, 2019) ("CORE 2015-2016 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2015-2016 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, In Part, and Intent to Rescind, In Part; 2015-16*, 83 Fed. Reg. 39,671 (Dep't Commerce Aug. 10, 2018), and accompanying Preliminary Decision Memorandum ("CORE 2015-2016 PDM"). Dongbu's subsidy rates, based on certain recurring subsidy programs used during the 2015 to 2016 POR, consisted almost entirely (*i.e.*, 7.62 percent and 8.45 percent, respectively) of benefits from the restructuring of Dongbu's outstanding long-term loans and bonds by its Creditors Council under its corporate workout program. CORE 2015-2016 IDM at 5.

In 2015 and again in 2016, Dongbu's Creditors Council approved D/E swaps by both government-controlled and private commercial banks as part of Dongbu's corporate workout

program.  CR 100-154 (PR 69-75) at 44-46.  Despite Petitioners' objections and their claim that Dongbu was unequityworthy at the time of these transactions, Commerce found that these two D/E swaps were consistent with the usual investment practice of private investors and thus did not confer a benefit to Dongbu.  CORE 2015-2016 IDM at 5 and 34.

On March 17, 2020, Commerce published the final results of its second (2017) administrative review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 7.16 percent. *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020) ("CORE 2017 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2017 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, In Part; 2017*, 84 Fed. Reg. 48,107 (Dep't Commerce Sept. 12, 2019), and accompanying Preliminary Decision Memorandum at 12-15 ("CORE 2017 PDM").  Dongbu's subsidy rate consisted entirely of recurring benefits from the prior restructuring of Dongbu's outstanding long-term loans and bonds.  CORE 2017 IDM at 5-6.  Again, despite Petitioners' objections and claim that Dongbu was unequityworthy, Commerce found that the 2015 and 2016 D/E swaps were consistent with usual investment practice of private investors and did not confer a benefit to Dongbu.  *Id.* at 4-5 and 36-37.

On June 1, 2021, Commerce published the final results of its third (2018) administrative review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 6.83 percent.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) ("CORE 2018 Final Results") and accompanying Issues and Decision

Memorandum ("CORE 2018 IDM"); *see also Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 Fed. Reg. 74,692 (Dep't Commerce Nov. 23, 2020), and accompanying Preliminary Decision Memorandum at 4 ("CORE 2018 PDM").  Dongbu's subsidy rate consisted entirely of recurring benefits from the 2018 restructuring of Dongbu's outstanding long-term loans and bonds.  CORE 2018 IDM at 6.  Again, despite Petitioners' objections and claim that Dongbu was unequityworthy, Commerce found that the D/E swaps (including a third D/E swap that occurred in 2018) were consistent with usual investment practice of private investors and thus did not confer a benefit to Dongbu.  *Id.* at 5-6, 37-38.

Commerce then changed its practice with respect to the D/E swaps in the next review. Specifically, Commerce published the final results of its fourth (2019) administrative review with a subsidy rate for Dongbu Steel/Dongbu Incheon of 10.51 percent.  *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) ("CORE 2019 Final Results") and accompanying Issues and Decision Memorandum ("CORE 2019 IDM"); *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021), and accompanying Preliminary Decision Memorandum ("CORE 2019 PDM").  In the 2019 review, Commerce reversed its consistent findings in the first, second, and third reviews that the first three (2015, 2016, 2018) D/E swaps were not countervailable.  Instead, Commerce claimed that "{a}fter further analysis of the facts on the record of this immediate review, we have determined not to rely on the private investor prices for the first, second, and third equity infusions, because they were not 'significant' within the

meaning of 19 C.F.R. § 351.507(a)(2)(ii)." CORE 2019 PDM at 16. Yet, based on the exact same evidence, Commerce had previously found the private creditors in the D/E swaps were significant in all prior reviews. *E.g.*, CORE 2018 IDM at 37-38. Commerce did not identify any new record evidence that prompted this change. *See* CORE 2019 PDM at 15-18.

KG Dongbu appealed the CORE 2019 Final Results to this Court, which remanded the issue to Commerce for reconsideration or further explanation. *See KG Dongbu Steel v. United States*, No. 22-00047, Slip Op. 23-98 (Ct. Int'l Trade July 7, 2023) ("*KG Dongbu Steel*"). Specifically, this Court found that "Commerce has a standard practice regarding not reexamining the countervailability of Dongbu Steel's equity infusions," and that "Commerce has neither provided a sufficient explanation nor cited new information on the record {regarding} whether the first three debt-to-equity restructurings provided a countervailable benefit." *Id.* at 9-11. Accordingly, this Court held that "Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations," concluding that "Commerce's determination is arbitrary and not in accordance with the law." *Id.* at 13.

On September 7, 2021, Commerce initiated an administrative review of the CVD order on CORE from Korea covering calendar year 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034 (Dep't Commerce Sept. 7, 2021), PR 16. This is the review at issue in this appeal. On September 9, 2021, Commerce issued its initial CVD questionnaire to KG Dongbu as a mandatory respondent in this review. PR 23. On page III-1 of Section III of the questionnaire, Commerce instructed that:

> Absent new information warranting a program reexamination, we will not reevaluate prior determinations regarding the countervailability of programs. This

includes determinations that previously examined programs are or are not countervailable.

*Id.* (emphasis added).  Commerce's questionnaire also included a question about any change in ownership during the fifteen-year average useful life ("AUL") period and whether the company wished to challenge Commerce's baseline presumption that *non-recurring* subsidies continue to benefit the recipient during the fifteen-year allocation period.  *Id.* at 12; CR 100-154 (PR 69-75) at 16.

On November 29, 2021, KG Dongbu submitted its initial questionnaire response to Commerce, including a change-in-ownership appendix that KG Dongbu submitted to challenge the baseline presumption that non-recurring subsidies were not extinguished by a change-in-ownership during the AUL period.  CR 100-154 (PR 69-75).  As in prior reviews, Commerce's questionnaire asked the exact same questions regarding KG Dongbu's debt restructuring, which included questions about the restructuring of its outstanding long-term loans and bonds and the D/E swaps that occurred under its corporate workout program.  *Id.* at 20-64.  As in the third (2018) administrative review, KG Dongbu provided the same responses and accompanying exhibits with respect to the restructuring of its long-term loans and bonds, including the third restructuring in 2018, as well as the two 2015 and 2016 D/E swaps and the third D/E swap that occurred in 2018.  *Id.* at Exhibit B-1 to Exhibit B-6; CR 298 (PR 171) at 8, 11-12.

In that same response, KG Dongbu reported that the Creditors Council had agreed in December 2018 to proceed with the business normalization process for Dongbu through a merger and acquisition ("M&A").  CR 100-154 (PR 69-75) at 37.  KG Dongbu provided a detailed explanation of this process stretching from the initial decision to proceed with an M&A transaction through to final approval of the transaction at its general shareholders meeting, which

resulted in the change in ownership of Dongbu during the AUL period.  *Id.* at 37 to 49, Exhibit B-16 to Exhibit B-36.

Early in 2019, the Creditors Council selected financial advisors for the M&A transaction, and they decided to use an open bidding process as the means for executing the M&A.  *Id.* at 38. A public notice announcing the bidding process stated that the purpose of the M&A transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights.  *Id.*  Potential investors that submitted a confidentiality agreement received private and confidential information of Dongbu to assist them in determining whether to participate in the bidding process.  *Id.*  Among the potential investors that received the bidding materials, three submitted preliminary bids, including the KG Consortium.  *Id.* These bids were reviewed by the financial advisors and all qualified for the final bidding process, but only the KG Consortium submitted a final bid.  *Id.* at 38-39.  Following counteroffers and negotiations between the financial advisors and the KG Consortium, the final investment amount bid by the KG Consortium was accepted.  *Id.* at 41.  In separate agreements, the Creditors Council agreed to a fourth D/E swap and a fourth restructuring of Dongbu's outstanding long-term loans and bonds.  *Id.* at 41-42.  Finally, the Creditors Council, Dongbu's board of directors, and its general shareholders each approved the entire package.  *Id.*

On August 5, 2022, Commerce published the *Preliminary Results* of the 2020 review with a preliminary subsidy rate for KG Dongbu of 9.51 percent.  *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2020*, 87 Fed. Reg. 47,973 (Dep't Commerce Aug. 5, 2022) ("CORE 2020 Preliminary Results"), PR 145, and accompanying Preliminary Decision Memorandum ("CORE 2020 PDM"), PR 140.  As part of the overall subsidy rate, Commerce calculated a 5.17

percent subsidy based on the 2019 restructuring of Dongbu's outstanding long-term loans and bonds by its Creditors Council under its corporate workout program.  *Id.* at 17.

Commerce continued down the path it had started with the fourth review, departing from its consistent findings in the first, second and third reviews that the first three D/E swaps (in 2015, 2016, 2018) were not countervailable.  Instead, Commerce claimed that while private creditors participated in the first, second, and third D/E swaps, it could not rely on the prices paid by the private creditors.  PR 140 at 12.  Thus, Commerce determined that Dongbu had received a non-recurring subsidy from the first three D/E swaps and allocated the benefits over the fifteen-year AUL period.

In the *Preliminary Results*, Commerce also found that Dongbu was uncreditworthy.  PR 140 at 12.  Commerce stated that in accordance with 19 C.F.R. § 351.505(a)(3)(iii) it calculated an uncreditworthy benchmark, including historical default rates to determine the risk premium.  *Id.* at 11.  This uncreditworthy benchmark was then used to calculate the benefit from Dongbu's restructured long-term loans and bonds.  *Id.* at 15-16; CR 262-63 (PR 141) at 3.  When applying the formula for calculating an uncreditworthy benchmark, Commerce used as the creditworthy benchmark variable in the formula provided in 19 C.F.R. § 351.505(a)(3)(iii) the three-year corporate bond rate from the Bank of Korea.  CR 262-63 (PR 141) at 3.  However, in completing the calculation of its uncreditworthy benchmark, Commerce based the variables for the default rates required by the formula on the three-year term of the creditworthy benchmark instead of the actual six-year terms of the restructured loans.  *Id.* at Attachment IV, tab "UCW BM."

Additionally, because Commerce found Dongbu to be uncreditworthy, Commerce applied uncreditworthy discount rates to calculate the benefit from the D/E swaps, using the same formula and methodology as applied for calculating the uncreditworthy benchmark.  CR

262-63 (PR 141) at 5-6.  However, in completing the calculation of its uncreditworthy discount

rates, Commerce again based the variables for the default rates required by the formula on the

three-year term of the creditworthy benchmark instead of the fifteen-year AUL allocation period

used for measuring the benefits from the government-provided equity infusions as mandated by

its regulations.  *Id.* at Attachment IV, tab "UCW BM."

On December 16, 2022, Dongbu filed its case brief addressing errors in the *Preliminary

Results*.  CR 298 (PR 171).  Dongbu argued that:

(1) in finding that the first three D/E swaps provided a benefit to Dongbu, Commerce

violated its own clearly-articulated standard practice of not reexamining a subsidy

program previously found non-countervailable in the absence of any new information on

the record, *id.* at 4-17;

(2) Commerce improperly found that any benefits from the first three D/E swaps passed

through to KG Dongbu despite its change in ownership, *id.* at 17-21; and

(3) Commerce calculated the uncreditworthy and unequityworthy benchmarks for KG

Dongbu's loans, bonds, and equity infusions contrary to the plain language of its

regulations that require the default rates to correspond to the length of the countervailable

loan (or allocation period for a non-recurring subsidy).  *Id.* at 35-40.  Thus, Commerce

improperly calculated the uncreditworthy benchmark for purposes of measuring the

benefits from Dongbu's restructured long-term loans and bonds.  Similarly, Commerce

improperly calculated the uncreditworthy discount rate for purposes of measuring the

benefits from the D/E swaps.

On February 7, 2023, Commerce published the *Final Results* of the 2020 administrative

review with a subsidy rate of 9.47 percent for KG Dongbu.  PR 188.  Commerce rejected

Dongbu's arguments concerning the errors identified in Dongbu's case brief and the *Final Results* with respect to these issues were unchanged from the *Preliminary Results*.  PR 181 at Comment 6 to Comment 9.  This appeal followed.

## IV.  <u>SUMMARY OF ARGUMENT</u>

The *Final Results* are contrary to Commerce's determinations, made in three prior administrative reviews, where Commerce had carefully reviewed all record information and concluded that Dongbu's first three D/E swaps provided no benefit to Dongbu because private investors had participated in the D/E swaps and that participation was "significant" for purposes of 19 C.F.R. § 351.507(a)(2)(iii).  The failure of Commerce to provide a reasonable explanation for its change in practice and its determination to treat similar situations differently renders that determination arbitrary and therefore not in accordance with law.  This Court recently agreed and held that Commerce's abrupt change in practice regarding the first three D/E swaps was arbitrary and unlawful.  *KG Dongbu Steel*, Slip Op. 23-98 at 13.  The facts are the same in this appeal and thus Court should reach the same conclusion here.

The record evidence also demonstrates that the benefits from any alleged subsidies from the D/E swaps were extinguished by the fair market value paid by the KG Consortium in its purchase of Dongbu in an arm's-length transaction.  In finding that the sale was not for fair market value, Commerce makes a number of analytical errors that completely undermine its conclusion.  For example, Commerce focuses on the fact that Dongbu's creditors agreed to certain interest rate reductions, loan extensions, and an additional fourth D/E swap.  Commerce interprets the provision of these so-called "concurrent subsidies" as evidence that the sale was *not* for fair market value because the creditors did not maximize the sale price.  But this reflects a fundamental misunderstanding of the impact of these concurrent subsidies on the final sales price, as articulated by Commerce in its own *Final Modification* of its practice addressing the

extinguishment of subsidies in connection with the sale of assets.  As Commerce explained in the *Final Modification*, concurrent subsidies "*increase* the value and, therefore, in a normally functioning market, *increase* the price the purchaser pays."  *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003) ("*Final Modification*") (emphasis added).  This logic is borne out by the facts in this case, which show that the final sales price increased by **[      ]** percent after the creditors agreed to the interest rate reductions and fourth D/E swap.

Another example that highlights Commerce's faulty analysis is its discussion of the impact of so-called "committed investments" as support for its conclusion that the sale was not for fair market value.  As discussed in the *Final Modification*, Commerce considers whether the <u>seller</u> requires the buyer to undertake certain "committed investments" in connection with the sale and whether these committed investments were communicated to all potential buyers so they could be taken into account in the purchase price.  *See Final Modification*, 68 Fed. Reg. at 37,133.  As support for its conclusion that the sale was not for fair market value, Commerce points to the fact that the <u>buyer</u> required the seller to provide certain interest rate reductions and the fourth D/E swap and that these "committed investments" were not fully transparent to all potential bidders.  Commerce has it exactly backwards.  The committed investment factor from the *Final Modification* focuses on commitments that the seller imposes on the buyer, and not vice versa.  The interest rate reductions and fourth D/E swap were commitments that the <u>buyer</u> (KG Consortium) imposed on the seller.  This misapplication of its own standard further demonstrates the fundamental flaws in Commerce's fair market value analysis and demonstrates that its finding that the non-recurring subsidies were not extinguished is unlawful.

Lastly, Commerce incorrectly calculated the uncreditworthy benchmark rate used to measure the benefit for Dongbu's outstanding six-year loans and bonds by using three-year default rates instead of default rates based on the loans' terms as required by Commerce's regulations. Commerce made a similar mistake by also using a three-year term to calculate the uncreditworthy discount rates used when allocating the non-recurring benefit it found for Dongbu's D/E swaps, where the proper basis of the discount rates is the AUL period (here fifteen years). Commerce's claims that the three-year period is "consistent" with the creditworthy benchmark interest rate and therefore should be used in its calculations in place of the loan term or the AUL period contradicts the express requirements of its own regulations, and is not in supported by substantial evidence and is otherwise not in accordance with law.

## V.      STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an administrative review, the Court "shall hold unlawful any determination, finding or conclusion found… to be unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.     ARGUMENT

### A.      Commerce's Determination That The First Three D/E Swaps Provided A Countervailable Subsidy To Dongbu Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law

#### 1.      This Court's Recent Decision In KG Dongbu's Appeal Of The 2019 Review Of This Order Should Be Applied Here

As part of Dongbu's corporate workout process, there were various measures taken by Dongbu's Creditors Council to try and return the company to financial health and thus improve the chances of Dongbu's creditors recovering their outstanding debts. D/E swaps were one such measure and were undertaken in 2015, 2016, 2018 and 2019. The first three of these D/E swaps

13

have been examined by Commerce in administrative reviews that predated the 2020 review period at issue in this appeal.  In each of these reviews, Commerce determined that the first three D/E swaps were *not* countervailable because the private creditors on the Creditors Council had participated in these D/E swaps and had swapped debt for equity on the same terms as the government creditors.  In the 2019 administrative review of this order, Commerce for the first time treated the first three D/E swaps as countervailable.  KG Dongbu appealed that decision and argued that Commerce's abrupt change in practice was unlawful because the facts that had led to the finding that the first three D/E swaps were not countervailable had not changed and Commerce had not given an adequate explanation for this change in practice.  On July 7, 2023, this Court issued a decision remanding the issue regarding Commerce's decision to treat the first three D/E swaps as countervailable.  This Court held that: "{b}ecause Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations, the Court concludes that Commerce's determination is arbitrary and not in accordance with the law." *KG Dongbu Steel*, Slip Op. 23-98 at 13.

In this appeal of the 2020 review of the same order, KG Dongbu again challenges Commerce's unexplained change in agency practice.  The facts are the exact same but for the fact that in the 2019 review Commerce changed its practice and for the first time treated the first three D/E swaps as countervailable.  However, given this Court's finding in the appeal of that 2019 review that this change in practice was arbitrary and unlawful, it is KG Dongbu's position that the 2019 review and finding that the first three D/E swaps were countervailable does not disturb KG Dongbu's change in agency practice argument.  Given this Court's familiarity with the change in agency practice argument, KG Dongbu has included an abbreviated version of that argument below.  KG Dongbu believes the Court should reach the same conclusion here.

14

### 2.   Commerce's Abrupt And Unexplained Change In Established Agency Practice Is Arbitrary And Unlawful

Government-provided equity infusions such as Dongbu's D/E swaps provide a countervailable benefit "to the extent that the investment decision is inconsistent with the usual investment practice of private investors." 19 C.F.R. § 351.507(a)(1).  In general, Commerce considers an equity infusion to be inconsistent with the usual investment practice of private investors if "the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."  19 C.F.R. § 351.507(a)(2)(i).  However, even if the price paid by government and private investors is the same (or the government price is not higher) Commerce will not use private investor prices if "private investor purchases of newly issued shares are not significant."  *Id.* at (a)(2)(iii).  If private investor prices are not available (because the purchases are not significant), Commerce will make a determination as to whether the firm receiving the equity infusion was equityworthy or unequityworthy at the time of the infusion.  *Id.* at (a)(3)(i).

As discussed, in three separate consecutive administrative reviews, Commerce carefully reviewed all record information and concluded that Dongbu's 2015, 2016, and 2018 D/E swaps provided no benefit to Dongbu because private investor participation in the swaps was "significant" for purposes of 19 C.F.R. § 351.507(a)(2)(iii).  Therefore, the equity infusions from government-controlled banks in the swaps, which were made at the same share prices as private creditors in the same transaction, were consistent with usual investment practice of private investors.  *See* CORE 2015-2016 Final Results, CORE 2015-2016 IDM, CORE 2017 Final Results, CORE 2017 IDM, CORE 2018 Final Results, CORE 2018 IDM.

In the *Final Results*, Commerce ignored its well-established and clearly stated practice of not reexamining a subsidy program in the absence of new information and found that the first

three D/E swaps were countervailable despite the absence of any new or conflicting evidence. The failure of Commerce to provide a reasonable explanation for its change in practice and its determination to treat similar situations differently renders that determination arbitrary and therefore not in accordance with law.  Furthermore, even if its change in practice and inconsistent treatment of the first three D/E swaps was reasonable, the record demonstrates that private investor participation was significant and thus these D/E swaps are not countervailable. Accordingly, Commerce's determination that these first three D/E swaps were countervailable is unsupported by substantial evidence and is otherwise not in accordance with law.

     **a.  Commerce's Treatment Of The First Three D/E Swaps As Countervailable Is Inconsistent With Its Consistent Prior Practice And The Instructions In Its Questionnaire**

For three consecutive reviews, Commerce thoroughly examined the <u>same</u> record evidence that is on the record of the underlying review in this case with regard to the issue of private investor purchases in the first three D/E swaps and concluded that private investor participation was significant.  CR 298 (PR 171) at 4-8.  No equityworthiness analysis was thus necessary.[1]  For example, in the 2018 review, Commerce stated:

> {C}onsistent with our findings in the underlying investigation and prior administrative reviews, the participating banks for the debt conversions included both GOK-controlled policy banks (*i.e.*, KDB, KEXIM, Woori, IBK, and KoFC), and private commercial banks (*i.e.*, the Nonghyup Bank, Shihan Bank, Hana Bank, Korea Exchange Bank).  In addition, information on the instant record indicates that private commercial banks:  (1) participated in the three equity infusions at issue; (2) paid the same per share price as the government-controlled policy banks; and (3) purchased a significant percentage of the shares of debt that were converted to equity.  Because of the private commercial banks actively participated and paid

---

[1] As discussed, Commerce will only conduct an equityworthy analysis of the company if private investor prices are not significant and therefore not available.  19 C.F.R. § 351.507(a)(3)(i).

the same price as government banks, we find that Dongbu's equity infusions are consistent with usual investment practice of private investors.

CORE 2018 IDM at 37-38 (citations omitted).  Yet in the *Final Results*, Commerce made the opposite determination and found that those exact same purchases were no longer significant and thus an equityworthiness analysis was necessary even though the information on the record in the instant review and the claims made with respect to that information are exactly the same as in the prior reviews.  Commerce thus treated the exact same D/E swaps differently without adequate explanation.  This was arbitrary and unlawful.  *See SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

Commerce had a consistent practice, based on three consecutive prior reviews, in which it determined that the significant participation of private investors in the first three D/E swaps rendered them not countervailable.  Commerce also had a more general practice as reflected in its questionnaire instructions of not re-examining prior countervailability determinations.  This Court agreed and found that "Commerce has a standard practice regarding not reexamining the countervailability of Dongbu Steel's equity infusions."  *KG Dongbu Steel*, Slip Op. 23-98 at 9-11.  Commerce also stated in this review that it would not reevaluate its prior determinations regarding the countervailability of programs:

> <u>Absent new information warranting a program reexamination</u>, we will not reevaluate prior determinations regarding the countervailability of programs.  This includes determinations that previously examined programs are or are not countervailable.

PR 23 at Section II p. 1, Section III, p.1 (emphasis added).  Pursuant to its own statements, the only reason for Commerce to re-examine the countervailability of the prior D/E swaps would be "new information."  Yet in the *Final Results*, Commerce cited no new information or evidence regarding the first three D/E swaps that would justify a reexamination of its prior findings that the first three D/E swaps did not confer a benefit to Dongbu.

Instead, the only "new" information referenced by Commerce was limited to the fourth D/E swap in 2019, PR 181 at 47, which is unrelated to the first three D/E swaps that Commerce reexamined in this review.  Specifically, in the *Final Results* Commerce determined that "unlike in the prior reviews, there were private investors independent from the creditors' committee involved in the <u>fourth</u> equity infusion during the 2019 POR." *Id.* at 47 (emphasis added).  However, all of the information cited by Commerce about the first three D/E swaps was on the record and thoroughly reviewed in the previous reviews, and that information is not impacted by the facts surrounding the fourth D/E swap.[2]  As the Court recently found, "the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice." *KG Dongbu Steel*, Slip Op. 23-98 at 12.

Commerce thus failed to sufficiently explain why the same record evidence in the prior three administrative reviews supported the conclusion that Dongbu received no countervailable benefit from the D/E swaps, but the same evidence in the instant review now supports the opposite conclusion.  As the court has held, "{i}f Commerce acted differently than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions are arbitrary." *Hyundai Steel Company v. United States*, 415 F. Supp. 3d 1293, 1302 (Ct. Int'l Trade 2019).  Commerce must provide a reasonable explanation for departing from its established practice.  *See Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004).  Commerce's disregard of its own established practice and its previous

---

[2] That record evidence shows that private creditors accounted for **[     ]** percent of the D/E swap amounts in the 2015 D/E swaps, **[     ]** percent for the 2016 D/E swaps, and **[     ]** percent for the 2018 D/E swaps.  CR 100-154 (PR 69-75) at Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit B-15 (Attachment 2).

determinations that there was no benefit from the first three D/E swaps is thus arbitrary and not in accordance with law.  This Court should thus follow its recent decision in the appeal of the 2019 review of this same order, and find that Commerce's unexplained change in agency practice is arbitrary and unlawful.  *KG Dongbu Steel*, Slip Op. 23-98 at 13.

> **b.  Even If Commerce's Explanation For Its Change In Practice Was Reasonable, There Is No Substantial Evidence That Dongbu's First Three D/E Swaps Were Countervailable**

Even if Commerce's determination to ignore its consistent and explicitly stated practice was reasonable, which it is not, there is no basis to treat the first three D/E swaps as countervailable.  The record shows that the D/E swaps provided no countervailable benefit to Dongbu because the equity infusions were consistent with the usual investment practice of private investors.  As explained, Commerce will consider an equity infusion inconsistent with usual investment practice if the price paid by the government for shares is higher than the price paid by private investors for similar, contemporaneous shares or private investor purchases of such shares are not significant.  19 C.F.R. § 351.507(a)(2).  Because both private and government financial institutions participated on the same terms, and the private investor participation was significant, Commerce should have used the private investor prices as the benchmark and concluded that the D/E swaps were consistent with the usual investment practice of private investors and thus provided no benefit as per 19 C.F.R. § 351.507(a).  Commerce's claim that private investor prices were not available, and thus that it had to proceed to examine whether Dongbu was equityworthy or unequityworthy at the time of the equity infusion, is factually untenable.

First, the record evidence clearly demonstrates that the private financial institutions paid the same per share price as the GOK-controlled policy banks.  CR 100-154 (PR 69-75) at 43-47. All shares were priced at the same price for each D/E swap: KRW 5,711, KRW 10,000, and

KRW 15,000, respectively, for the first three D/E swaps. *Id.* This evidence fully supports a determination that the newly issued shares were valued identically for both private and government creditors. *See* 19 C.F.R. § 351.507(a)(2)(i) (providing that an equity infusion will be found to be inconsistent with usual investment practice or private investors if price paid by the government is higher than price paid by private investor).

Second, the timing of the new share issuance was the same for both private and government financial institutions, thereby satisfying the regulatory requirement that Commerce "rely on sales of newly issued shares made reasonably concurrent with the newly issued shares purchased by the government." 19 C.F.R. § 351.507(a)(2)(ii).

Third, there was significant private investor participation because private commercial financial institutions purchased a significant percentage of the shares of debt converted to equity. "Significant" is defined as "of a noticeably or measurably large amount." *Significant*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/significant (last visited August 24, 2022). Accordingly, Commerce has consistently "rested its significance determination on the percent interest held by private investors," and the Court has agreed with this interpretation of significance because the "{a}nalysis of percent interest appears to provide a controlled and predictable way for Commerce to evaluate the significance of equity investments across different industries and investigations." *E.g.*, *Hynix Semiconductor Inc. v. United States*, 30 C.I.T. 288, 317, 425 F. Supp. 2d 1287, 1312 (2006). Indeed, Commerce created the significant investment standard in 19 C.F.R. § 351.507(a)(2)(iii) to preclude use of private investor benchmarks where "the *volume* of a firm's traded shares are so low as to preclude the use of those shares as a benchmark." *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,832 (Dep't Commerce Feb. 26, 1997) (emphasis added).

Here, private creditors accounted for [      ] percent, [      ] percent, and [      ] percent of the first three D/E swaps, respectively.  CR 100-154 (PR 69-75) at Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit B-15 (Attachment 2).  Commerce has previously concluded that those very same percentages are significant and has found proportions as low as 18.3 percent to be significant.  Defendant's Memorandum in Opposition to Plaintiff's and Consolidated Plaintiffs' Rule 56.2 Motions for Judgment Upon the Agency Record at 20, *Nucor Corp. v. United States*, No. 19-00042 (Dec. 19, 2019), ECF No. 60 (again relying on the relative proportion of private investors involved).  This evidence thus supports the regulatory requirements of significant private investor participation.  *See* 19 C.F.R. § 351.507(a)(2)(iii).

Commerce's conclusion to the contrary in the Equity Infusions Analysis Memo appears to be that when the government creditors have a supermajority on a creditors council, Commerce does not need to consider the participating private banks to be acting as actual private investors, and thus their participation cannot serve as the benchmark for purposes of 19 C.F.R. § 351.507(a).  Specifically, Commerce asserts that the private creditors had no alternative but to accept the terms imposed upon them by the Korean Development Bank ("KDB") since the KDB along with other government-owned policy banks owned a substantial majority of shares in Dongbu.  *See* CR 260 (PR 138) at 11-12; PR 181 at 47.  This is simply not true.  Any of the creditors—including the private creditors—had the option of selling their credits to the other creditors if they wanted to opt out of the voluntary restructuring or corporate workout program. The Corporate Restructuring Promotion Act ("CRPA") provides that any creditor financial institution can opt out if it does not agree with any decision made by the Creditors Council by requesting the other creditors to purchase its credits.  CR 32-51 (PR 52-68) at Exhibit Debt

Restructuring-15 (CRPA, Article 20).  Private creditors thus had an alternative, namely, they

could opt out if they did not agree with the terms approved by the Creditors Council.

To be sure, at the time of Dongbu's decision in July 2014 to enter into a Voluntary

Restructuring Program, its creditors included a number of GOK-owned banks that held a

substantial majority of its outstanding debt, and the KDB was Dongbu's single largest creditor.

*See* CR 100-154 (PR 69-75) at Exhibit B-5, Attachment 1.  That situation did not change

materially during the course of the workout program.  *Id.* at 50-55.  It is common practice in

Korea that a company's largest creditor is normally recognized as its "lead bank" or "main

creditor bank" which, when necessary, may take the initiative in coordinating with the

company's other creditors in addressing issues of importance to the company.  However, this

does not imply any special authority or control of the lead bank over the other creditors.  Thus,

the fact that the KDB was Dongbu's lead bank does not mean that the KDB, in particular, and

other GOK-owned banks, collectively, dictated the terms of the various restructurings that have

occurred under the workout program.

Instead, at each step during the workout program, all of the creditors—GOK-owned and

private alike—agreed to the restructuring measures on the same terms.  *Id.* at 27-37.  These

decisions were not motivated or influenced by the GOK, but were based on the commercial

considerations of all creditors and the recommendations of an independent auditor.  *Id.*

Rather than proffering actual evidence of GOK influence or control of the decision-

making of the Creditors Council, Commerce simply plays a numbers game.  Specifically,

Commerce points out that the percentage of voting rights, based on shares of outstanding secured

debt that were held by the KDB and other GOK-owned banks was a substantial majority and

asserts that the Creditors Council was thus controlled by GOK policy banks, such as the KDB.

According to Commerce, "the private creditors had no alternative but to accept the terms imposed by the KDB and other GOK-owned policy banks." CR 260 (PR 138) at 11-12. Yet Commerce cannot point to any actual evidence that Dongbu's Creditors Council provided any preferences to Dongbu or that the GOK-controlled banks acted differently from Dongbu's private creditors.

Indeed, Commerce's references to the high percentage of Dongbu's <u>secured</u> debt owned by GOK-owned banks is misleading and disingenuous because Commerce knows well that voting rights are determined on the basis of total outstanding debt and not just secured debt. *Id.* at 6, 7; *see also* CR 100-154 (PR 69-75) at Exhibit B-8 (Attachment 1), Exhibit B-11 (Attachment 1) and Exhibit B-15 (Attachment 1). Moreover, the fact that the GOK-owned banks held a much higher percentage of Dongbu's <u>secured</u> debt than their percentage of Dongbu's total debt demonstrates nothing in terms of the alleged influence of the GOK-owned creditors in the decisions by the private creditors to convert debt to equity. In fact, it supports the opposite conclusion because the D/E swaps only included unsecured debt and resulted in conversion ratios of debt that were collectively higher for the private creditors than for the GOK-owned creditors in relation to the share of voting rights.[3] CR 100-154 (PR 69-75) at Exhibit B-8 (Attachments 1 and 2), Exhibit B-11 (Attachments 1 and 2), and Exhibit B-15 (Attachments 1 and 2). There is thus no evidence to support the conclusion that the decisions of the private creditors were subject to GOK control and were thus not commercial decisions. To the contrary,

---

[3] For example, the KDB was Dongbu's largest creditor and held a substantial portion of Dongbu's secured debt. Thus, the KDB's percentage shares of Dongbu's secured debt were [                    ], respectively, for the first three D/E swaps, and its shares of total credit were [                              ], respectively, while its shares of the D/E swaps were [                          ], respectively. CR 100-154 (PR 69-75) at Exhibit B-8 (Attachments 1 and 2), Exhibit B-11 (Attachments 1 and 2), and Exhibit B-15 (Attachments 1 and 2).

the creditor banks' decisions regarding the D/E swaps were made of their own accord, and the private creditor banks (notwithstanding the fact that some GOK-owned banks were included among the creditors) did not have the terms dictated to them by the GOK creditors.

In addition, Commerce precedent does not support the proposition that GOK creditors' majority status on the Creditors Council renders private investor participation insignificant.  In *CFS Paper from Korea*, Commerce found in the context of a voluntary restructuring similar to the one here, that even though the government financial institutions on the creditors council in that case accounted for <u>more</u> than 75 percent of the voting rights, the debt-to-equity conversions and loans provided by the private creditors <u>could</u> serve as benchmarks.  *See Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ("*Coated Free Sheet Paper from the Republic of Korea*"), and accompanying Issues and Decision Memorandum at 43 ("CFS Paper from Korea IDM") (emphasis added).  Commerce's finding that there was no significant private investor participation for benchmark purposes was thus inconsistent with the principles discussed in *CFS Paper from Korea.*

Accordingly, Commerce's determination that private investor participation was not significant and that actual private investor prices were not available is not supported by substantial evidence and is otherwise not in accordance with law.

> **B.  Commerce's Determination That The Sale of Dongbu Steel Was Not Arm's Length For Fair Market Value Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law**

Even if the Court finds that Commerce's disregard of its prior practice is lawful and that private investor participation was not significant such that the first three D/E swaps are countervailable, the record shows that any benefits associated with the first three D/E swaps did not pass through from Dongbu to KG Dongbu.  Rather, any alleged benefits were extinguished

by the arm's-length purchase of Dongbu by the KG Consortium. Commerce's treatment of them as countervailable subsidies that passed through to KG Dongbu is thus unsupported by substantial evidence and is otherwise not in accordance with law.

D/E swaps are non-recurring subsidies. Commerce presumes that a non-recurring subsidy will benefit a recipient over the AUL of the relevant assets and Commerce thus allocates the subsidy over that period of time ("allocation period"). 19 U.S.C. § 1677(5)(F); *Final Modification*, 68 Fed. Reg. at 37,127.[4] A respondent may rebut the presumption by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was at arm's-length and for fair market value.[5] *Final Modification*, 68 Fed. Reg. at 37,127. In such situations, the subsidy is reflected in the fair market price of the arm's-length transaction and the pre-sale subsidy is "extinguished," or does not "pass through" to the new owner. In the *Final Modification*, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's-length and for fair market value. These factors are: (1) whether an objective analysis was performed in determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay. *Final Modification*, 68 Fed. Reg. at 37,127.

---

[4] Here, the AUL period for the equity infusions is 15 years. CR 100-154 (PR 69-75) at 16.

[5] While the *Notice of Final Modification* explicitly addresses privatization of government-owned companies, Commerce later determined to apply this methodology to private-to-private sales. *See, e.g.*, *Certain Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971, 17,972 n.2 (Dep't Commerce Apr. 8, 2005) ("*Pasta from Italy*").

In the underlying review, KG Dongbu argued that any non-recurring subsidies associated with the first three D/E swaps that occurred prior to the KG Consortium's purchase of Dongbu's assets were "extinguished" by the purchase of those assets in an arm's-length transaction for fair market value.  CR 298 (PR 171) at 21-35.  In the *Final Results*, Commerce determined that "the record does not support a finding that the M&A transaction price was arm's-length and at fair market value" and thus found that alleged subsidies from the first three D/E swaps were not extinguished by the KG Consortium's purchase of Dongbu's assets.  PR 181 at 61.  In reaching this conclusion, Commerce engaged in a bifurcated analysis whereby it first addressed whether the sale of Dongbu was made in an arm's-length transaction for fair market value without regard to its own four-factor test.  Commerce then proceeded to separately address the four-factor test as outlined in the *Final Modification* as this was the analytical framework used by KG Dongbu to support its extinguishment argument.  CR 298 (PR 171) at 23-30.  Although these analyses overlap, KG Dongbu addresses them separately below to track the analysis used by Commerce in the *Final Results*.  As discussed below, Commerce's analysis and overall conclusions are not supported by substantial evidence and are otherwise not in accordance with law.

**1.    Commerce's Fair Market Value Analysis Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law**

In the *Final Results*, Commerce found that the record did not support the conclusion that the sale of Dongbu's assets to the KG Consortium was arm's-length and for fair market value.  PR 181 at 58.[6]  To support this conclusion, Commerce relied on its findings that (1) the Creditors

---

[6] Commerce does not dispute or provide analysis of the fact that the transaction was arm's-length and so KG Dongbu does not separately address it here.  Suffice to say, however, the sale of Dongbu's assets was between Dongbu's Creditors Council and a private unrelated consortium known as the KG Consortium.  CR 100-154 (PR 69-75) at 37-38; Exhibit B-35 at 3; Exhibit B-19.  The record thus amply supports the conclusion that the sale was arm's-length.

Council agreed to extend existing loans and reduce interest rates, and to the fourth D/E swap, (2)

PricewaterhouseCoopers's evaluation of the acquisition focused on creditor recovery, and (3) the

Creditors Council paid a higher price per share in the fourth swap than the KG Consortium paid

in the acquisition. *Id.* at 58. Commerce determined that the transaction price was not for fair

market value allegedly because the "Creditors Council did not maximize its return when selling

Dongbu Steel," but "rather, the sale was made for the purpose of graduating Dongbu Steel from

the debt restructuring program." *Id.* at 58-59. This analysis and conclusions are unsupported by

substantial evidence and are otherwise not in accordance with law.

　　　　As to the first factor relied upon by Commerce, there is absolutely no basis to conclude

that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair

market value for Dongbu. The Preliminary Bidding Guide issued to potential bidders, in its

"Estimated Transaction Amount" section, requested that the bidder provide a purchase price for

the acquisition of new shares as well as include any request, such as debt adjustment, that should

be part of the transaction. CR 100-154 (PR 69-75) at Exhibit B-20. Consistently, in its

preliminary bid, the KG Consortium submitted a definitive purchase price of KRW [

　　　　] and noted that its price was conditioned on "a certain level of debt restructuring." *Id.*

Exhibit B-23. Then, in its final bid, the KG Consortium submitted an increased price of KRW

[　　　　　　] as well as a proposed D/E swap, interest rate adjustment and maturity adjustment

as conditions for its bid. *Id.* at 39-40. The KG Consortium conditioned its bid on the D/E swap

where it stated that, [

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　].

*Id.* at Exhibit B-26. The KG Consortium stated that it believed "the company's sustainable

management will be possible in the future if the consortium's paid-in capital increase of 360

billion won and the debt-equity swap amount of 680 billion won are accompanied by a total

financial structure improvement effect of 1.04 trillion won." *Id.* Accordingly, the KG

Consortium's final bid contemplated (1) its assessment of the current condition of Dongbu that

was reflective of the amounts of the first three D/E swaps that publicly occurred well ahead of

the announcement of the open bidding process, and (2) its request for an additional D/E swap,

interest rate reduction, and the maturity extension upon which its bidding price was expressly

conditioned.

Nothing about the loan modifications and fourth D/E swap suggests that the Creditors

Council was accepting less value for Dongbu than it would otherwise receive in the absence of

these incentives. To the contrary, the loan modifications and fourth swap that occurred

concurrently with the sale actually would be expected to, and actually did, result in an *increase*

in the sale price of Dongbu. In the *Final Modification*, Commerce specifically addressed the

treatment of so-called "concurrent subsidies" that are provided as incentives to close the sale.

Commerce explained that it "would expect that potential investors would be willing to increase

the value of their offer prices to reflect the additional value" that "concurrent subsidies are

expected to contribute to the overall value of the company." *Final Modification*, 68 Fed. Reg. at

37,137. Commerce also recognized that concurrent subsidies "*increase* the value and, therefore,

in a normally functioning market, *increase* the price the purchaser pays." *Id.* (emphasis added).

Following the logic of the *Final Modification*, the loan extensions, interest rate reduction

and the fourth D/E swap that Commerce relied upon in the *Final Results* do not evidence a

failure by the Creditors Council to maximize the Creditors Council's return. Instead, these so-

called concurrent subsidies would be expected to *increase* the sale price and the record shows

that they did increase the sale price. Specifically, the increase in the KG Consortium's final bid

price from KRW [          ] to KRW [          ] evidences that these incentives, which the KG Consortium finalized in its final bid, increased the price that the KG Consortium was willing to pay for Dongbu.  CR 100-154 (PR 69-75) at 38-40.  The final price paid for the Dongbu assets thus increased by [    ] percent as a result of the loan modifications and fourth D/E swap. Commerce's determination that these concurrent subsidies support the conclusion that the Creditors Council failed to maximize its return is thus illogical and contradictory to its own statements in the *Final Modification*.  *See Final Modification*, 68 Fed. Reg. at 37,137 ("There would be no reason to believe that a concurrent subsidy would lead a purchaser to paying less than fair market value.").

The second factor relied upon by Commerce to support its decision is also unavailing. Specifically, Commerce claims that the Creditors Council did not maximize its return on the sale because PricewaterhouseCoopers' "evaluation of the acquisition was mainly focused on how much money the creditors can recover from this acquisition."  PR 181 at 58.  However, the fact that PricewaterhouseCoopers "focused on creditor recovery" suggests that the transaction price and the creditors' return on the sale <u>was maximized</u>.  *Id.* at 58.  After all, the creditors were the sellers of Dongbu's assets and thus a focus on their recovery as creditors is a focus on maximizing the sellers' return.  This focus on creditor recovery thus actually supports the conclusion that the Creditors Council as the sellers were seeking to maximize their return on the sale of Dongbu's assets.

In this regard, PricewaterhouseCoopers evaluated four scenarios regarding the KG Consortium's bid: Scenario 1 assumed that Dongbu continued with no changes to its prior pre-acquisition structure.  CR 100-154 (PR 69-75) at 40-41.  Scenario 2 assumed that Dongbu Incheon and Dongbu Steel would merge.  Scenario 3 assumed the conditions of the KG

Consortium's proposals, [

].

*Id.* at Exhibit B-29.  Scenario 4 assumed total liquidation of Dongbu.  *Id.* at Exhibit B-35 p. 5,

n.2.  PricewaterhouseCoopers concluded that Scenario 1 had a value of [

], Scenario 2 had a value of [                          ], Scenario 3 (acquisition) had

a value of [                 ], and Scenario 4 (liquidation) had a value of [                 ].

*Id.* at Exhibit B-35 p. 6.  Through these valuations, the PricewaterhouseCoopers report

demonstrated [



].  CR 9-12 (PR 52-68) at 9.

Thus, the PricewaterhouseCoopers report evidences that the KG Consortium's investment

and acquisition of Dongbu was the most valuable scenario available to the Creditors Council.

CR 100-154 (PR 69-75) at Exhibit B-35 p. 12.  The report also demonstrates that, had the

Creditors Council declined to accept the KG Consortium's bid, the Creditors Council would *not*

be maximizing value because the alternative scenarios available, specifically maintaining

Dongbu's pre-acquisition structure with no changes or its liquidation, were valued lower than the

sale to KG Consortium.  Therefore, in the *Final Results*, Commerce's conclusion lacks

substantial evidence and fails to articulate any rational connection between the facts found—that

the PricewaterhouseCoopers report focused on how much money the creditors can recover—and

the choice made—that the Creditors Council did not maximize its return when selling Dongbu.

*See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Commerce's reliance on the fact that the Creditors Council paid a higher price per share in the fourth swap than the KG Consortium paid also does not support the conclusion that the sale was not for fair market value.  The *Final Results* note that the creditors paid KRW 25,000 per share in the fourth swap whereas the KG Consortium paid KRW 5,000 per share for its acquisition shares.  PR 181 at 58.  But, the higher prices paid by the creditors in the swap represent measures that the Creditors Council took, as concurrent subsidies, to *increase* the market value of Dongbu and secure the successful sale of the company.  Furthermore, Commerce separately countervailed the additional KRW 20,000 per share paid by the creditors in the fourth D/E swap (CORE 2020 PDM at 16-17) and thus it is not relevant to the extinguishment analysis that is focused on whether the sale of Dongbu extinguished any alleged subsidies received in connection with the first three D/E swaps.

Lastly, Commerce also notes in the *Final Results* that the Creditors Council's concern that Dongbu could not meet the requirements to graduate from the workout program somehow suggested that the sale price was not for fair market value.  PR 181 at 59-60.  But there is nothing incompatible with the Creditors Council wanting Dongbu to graduate from the workout program and also wanting to obtain fair market value for its sale.  The reality is that this case involves the sale of a distressed company's assets and its creditors trying to maximize the return on what they were owed from Dongbu.

Accordingly, Commerce's conclusion that the sale of Dongbu to the KG Consortium was not for fair value is unsupported by substantial evidence and is not in accordance with law.

>    **2.    Commerce's Analysis of its Four-Factor Test And Conclusion That
>           The Sales of Dongbu Steel Was Not Arm's Length for Fair Market
>           Value Is Unsupported by Substantial Evidence and is Otherwise Not
>           in Accordance with Law**

As discussed, after conducting a stand-alone analysis of whether the sale of Dongbu's assets was for fair market value, Commerce separately addressed its four-factor test regarding the extinguishment of non-recurring subsidies since KG Dongbu had framed its extinguishment argument using this framework.  These factors are:  (1) whether an objective analysis was performed in determining the appropriate sale price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  *Final Modification*, 68 Fed. Reg. at 37,127.  Commerce's analysis of these factors is unsupported by substantial evidence and is contrary to the framework and reasoning behind the *Final Modification* test.

First, regarding the objective analysis factor, Commerce disagreed with KG Dongbu that the price acceptance was based on an objective analysis by the Creditors Council.  PR 181 at 59. Commerce's conclusion is wrong.  As explained above, PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the [                    ] acquisition price in Scenario 3, and compared the proposal with alternative scenarios that assumed the Creditors Council either made no changes to Dongbu's pre-acquisition structure or liquidated Dongbu.  CR 100-154 (PR 69-75) at Exhibit B-29.  Based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the Creditors Council of the available alternative scenarios and [

   ].  *Id.* at 40-41; CR 9-12 (PR 52-68) at 9.  This was thus an objective analysis.

Commerce also cites the PricewaterhouseCoopers 2018 Feasibility Report to support that no objective analysis was performed regarding the acquisition sale price. *Id.* at 59-60. But the 2018 Feasibility Report, CR 100-154 (PR 69-75) at Exhibit B-16, is distinct from PricewaterhouseCoopers' 2019 evaluation of whether the Creditors Council should accept the KG Consortium's bid proposal, CR 100-154 (PR 69-75) at Exhibit B-29. The 2018 Feasibility Report was not prepared for the purpose of evaluating Dongbu Steel's value for purposes of sale. *Compare* CR 100-154 (PR 69-75) at Exhibit B-35 p. 10, *with* Exhibit B-35 p. 15. The value of the acquisition transaction was determined through an opening bidding process in which the bidders were provided with Dongbu Steel's business, financial and legal information, CR 100-154 (PR 69-75) at Exhibit B-35 p. 10-11, and the highest bid price (the KG Consortium's bid), along with the debt restructuring conditions on which it was based and possible alternative scenarios, were independently evaluated by PricewaterhouseCoopers to determine if the bid should be accepted, CR 100-154 (PR 69-75) at Exhibit B-29. Therefore, the concern about whether Dongbu could not meet the requirements to graduate from the workout program that resulted from the Feasibility Report does not evidence that the acquisition price was not objectively analyzed. Commerce's determination that an objective analysis was not performed to determine whether the sale price was appropriate is thus unsupported by substantial evidence.

Second, Commerce does not challenge the fact that there were no artificial barriers to entry and thus this factor is not in dispute. In fact, Commerce admits in the *Final Results* that "the KG Consortium acquired Dongbu Steel <u>through an open bidding process</u> as the highest bidder." PR 181 at 60 (emphasis added). Additionally, this conclusion is supported by the fact that, on January 7, 2019, the financial advisors published in a newspaper the public investment attraction announcement for an open bidding process to acquire Dongbu, providing equal access

and free competition for all interested parties.  CR 100-154 (PR 69-75) at 38 Exhibit B-19, Exhibit B-20, Exhibit B-21.

Third, regarding whether the highest bid was accepted, as mentioned above, Commerce admits in the *Final Results* that "the KG Consortium acquired Dongbu Steel through an open bidding process <u>as the highest bidder</u>."  PR 181 at 60 (emphasis added).  Nevertheless, Commerce seeks to distract from this factor by focusing again on whether the sale was for fair market value and discussing the interest rate reductions and fourth D/E swap as evidence that the Creditors Council did not maximize its return when selling Dongbu.  *See id.*  In particular, Commerce discusses the fact that the Creditors Council paid KRW 25,000 per share while the KG Consortium paid KRW 5,000 and states this is relevant because, according to the *Final Modification*, Commerce will "scrutinize any sale where the face or exchange value of a financial or other instrument given as payment differs from its fair market value."  *Id.* at 60. Commerce's focus on the price paid in the fourth D/E swap by the creditors, rather than the bid from the KG Consortium, is a strawman and irrelevant to whether the highest bid was accepted.

The *Final Modification* analysis asks, "was the highest bid accepted and was the price paid in cash or close equivalent?"  *Final Modification*, 68 Fed. Reg. at 37,127.  Therefore, the *Final Modification* is concerned with the face or exchange value of the instrument used to pay the highest bid price, not concurrent subsidies offered by the seller such as the fourth D/E swap, which increase rather than decrease the bid price.  *Final Modification*, 68 Fed. Reg. at 37,137. Indeed, the *Final Modification* states that its "primary consideration" is "whether the *government* maximized its return on what it sold," and the highest bid factor "is an important consideration in whether the *government* acted like a private, commercial *seller*."  *Final Modification*, 68 Fed. Reg. at 37,132 (emphasis added).  Similarly, it states that the "cash or close equivalent" element

34

is "concerned with… forms of payment to which the *government* ascribes a value that is different

from the monetary value that a private, commercial *seller* would ascribe to the payment." *Id.*

(emphasis added).  Here, the highest bid was accepted by the Creditors Council as the seller,

PR 181 at 60, and KG Consortium [                              ].  CR 100-154 (PR 69-75) at 42

("The KG Consortium fully paid its investment amount and registered the capital increase to

Dongbu's court register."), Exhibit B-26 ("[

  ].").

     Fourth, Commerce's analysis of the final committed investment factor also reveals a

fundamental misunderstanding of its own *Final Modification*.  Specifically, in the *Final Results*,

Commerce determined that the Creditors Council made a committed investment that was not

reflected in the KG Consortium's bid price.  PR 181 at 61.  In particular, Commerce determined

that the Creditors Council agreed "to extend existing loans and reduce the interest rates" and that

"such inducements are not indicative of the committed investment of the Creditors Council being

fully reflected in the transaction price."  *Id.*  But Commerce's focus on committed investments

imposed on the seller by the buyer is contrary to the *Final Modification*, which focuses on

committed investments that the government seller imposes on buyers of privatized companies.

*See Final Modification*, 68 Fed. Reg. at 37,133 (clarifying that "by the term committed

investment, we are referring to a range of possible restrictions or requirements that the

*government, as the seller*, *imposes* on the future operation of, or investment in, the company or

its assets.") (emphasis added).  This makes sense because this analysis seeks to prevent situations

where, "as a result of the *government's imposition* of requirements or restrictions that private,

commercial sellers would not normally impose, a buyer might pay a lower price for a company

or its assets than that buyer would otherwise pay," *i.e.*, that the sale price would be less than fair market value.  *Id.* (emphasis added).  Commerce has it exactly backwards.

In conclusion, Commerce's analysis of the *Final Modification* factors fails to demonstrate that the KG Consortium's acquisition of Dongbu was not at fair market value.  Accordingly, Commerce's determination that the alleged non-recurring subsidies received by Dongbu in the first three D/E swaps were not extinguished by the KG Consortium's purchase of Dongbu is unsupported by substantial evidence and is otherwise contrary to law.

### C.   Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rates

In the *Final Results*, Commerce found that Dongbu was uncreditworthy in 2020 and calculated the benefit from Dongbu's restructured long-term loans and bonds using an uncreditworthy benchmark rate.  PR 181 at 6.  Similarly, Commerce found that the government equity infusions received by Dongbu were non-recurring subsidies that were allocable over the AUL period and calculated the benefit using unequityworthy discount rates.  *See id.* at 6 (citing PR 140 at 12-13).  However, in doing so, Commerce incorrectly applied the formula for calculating the uncreditworthy benchmark rate and the unequityworthy discount rates.  These errors render the *Final Results* unsupported by substantial evidence and otherwise not in accordance with law.  This Court recently remanded these issues to Commerce for further consideration based on the exact same facts and arguments.  *See KG Dongbu Steel*, Slip Op. 23-98 at 15-18.  The Court should do the same thing here.

#### 1.   Uncreditworthy Benchmark Rate

In 2019, Dongbu's outstanding long-term loans and bonds were restructured with revised interest rates and an extension of the maturity date until December 31, 2025.  CR 100-154 (PR 69-75) at 48 and Exhibit B-44.  They thereby became "new" loans under Commerce's practice

with a term of six years (from 2019 to 2025) because they were renegotiated in 2019 and mature in 2025.  *Id.* at 41-42 (noting the amended loan agreements became effective September 7, 2019 and that the loan maturity was extended to 2025); *see also Coated Free Sheet Paper from the Republic of Korea* and CFS Paper from Korea IDM at 9 (Treating loans that "were extended" as "new loans"); *Certain Cut-to-Length Carbon Steel Plate from Mexico Preliminary Results of Countervailing Duty Administrative Review*, 68 Fed. Reg. 52,895, 52,901 (Dep't Commerce Sept. 8, 2003) ("Pursuant to a May 2, 2000 agreement,… the terms of AHMSA's Bancomext loan were renegotiated… Thus, in keeping with the Department's practice, we find that, for purposes of these preliminary results, May 2000 was the effective issuance date of the Bancomext loan."); *Drill Pipe From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 47,275 (Dep't Commerce Aug. 5, 2013) and accompanying Decision Memorandum at Comment 2 ("It is the Department's practice to treat the year in which the loans were renewed (i.e., the date of loan agreement) as the year of receipt.").

In calculating the benefit from these new loans, Commerce calculated the uncreditworthy benchmark interest rate used to measure the benefit of these countervailable loans and bonds, based on a 3-year period rather than the actual 6-year (2019 to 2025) term of KG Dongbu's "new loans."  *See* CR 307-308 (PR 184) at Attachment 2, tabs "UCW BM", "LT(2020)", and "Bonds(2020)."  This determination was unsupported by substantial evidence and was otherwise not in accordance with law.

Commerce's regulations provide that in the case of a government-provided loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually

obtain on the market.  *See* 19 C.F.R. § 351.505(a)(1).  In making this comparison, Commerce will normally rely on effective interest rates.  *See id.*  However, the regulations provide an exception for uncreditworthy companies in 19 C.F.R. § 351.505(a)(3)(iii).  In the *Final Results*, Commerce determined that Dongbu was uncreditworthy and therefore used the formula provided in 19 C.F.R. § 351.505(a)(3)(iii) to calculate the benefit received from Dongbu's government-provided long term loans and bonds:

$$i_b = [(1 - q_n)(1 + i_f)_n / (1 - p_n)]^{1/n} - 1,$$
where:
$n$ = the term of the loan;
$i_b$ = the benchmark interest rate for uncreditworthy companies;
$i_f$ = the long-term interest rate that would be paid by a creditworthy company;
$p_n$ = the probability of default by an uncreditworthy company within n years; and
$q_n$ = the probability of default by a creditworthy company within n years.

19 C.F.R. § 351.505(a)(3)(iii).

Based on that formula, Commerce selected a long-term creditworthy interest rate (variable "$i_f$") based on the national average yield on 3-year, KRW-denominated AA-rated corporate bonds published by the Bank of Korea.  CR 307-308 (PR 184) at Attachment III, tab "UCW BM."  However, even though the term of Dongbu's loans (variable "$n$") was *6 years*, Commerce incorrectly used *3-year* default rates as the default rates of creditworthy and uncreditworthy companies (variables "$q_n$" and "$p_n$", respectively).  PR 181 at 63; CR 307-308 (PR 184) at Attachment II, Attachment IV tab "KRW, UCW BM."

In the *Final Results*, Commerce's explanation for using a three-year instead of a six-year default rates was that:

Commerce used a three-year AA-rated KRW interest rate as the long-term interest rate paid by a creditworthy company because it was the only long-term interest rate on the record.  This three-year AA-interest rate is published by the Bank of Korea.  No other long-term KRW interest rates were provided on the record by parties in this review.  *Therefore, to be consistent, Commerce used three years for the term of the loan variable and the three-year creditworthy default and uncreditworthy default rates.*

38

PR 181 at 62 (emphasis added).

This explanation cannot reasonably justify Commerce ignoring the plain language of its own regulations.  As the Court has held, Commerce's determinations must be in accordance with the plain language of its regulations.  *See*, *e.g.*, *Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*, 415 F. Supp. 3d 1216, 1230 (Ct. Int'l Trade 2019) ("Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference."); *Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265, 1280 (Ct. Int'l Trade 2016) ("Commerce's *per se* restriction of its scope ruling to a particular interested party rather than to a particular product is contrary to the plain language of the regulation."); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretations of its own regulations… The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.").

There is no basis to substitute the actual term of the loan, which, as the record demonstrates, is 6 years for any other term in the service of purported "consistency." Commerce's regulation specifies: "if the Secretary finds that a firm that received a *government-provided long-term loan* was uncreditworthy,… the Secretary normally will calculate the interest rate… where: n = *the term of the loan*."  19 C.F.R. § 351.505(a)(3)(iii) (emphasis added). Furthermore, the *Preamble* to Commerce's regulations specifies the selection of the default rates used in calculating an uncreditworthy benchmark and provides that Commerce:

> . . . will use *the average cumulate default rate for the number of years corresponding to the length of the loan*, as reported in Moody's study of historical corporate bond default rates.  In other words, we would use a five-year default rate for a five-year loan, as so forth.  We believe that using a default rate that is *directly*

*linked to the term of the loan* is a better reflection of the risk associated with long-term lending to uncreditworthy borrowers.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't Commerce Nov. 25, 1998) (emphasis added) ("*Preamble*").  As the *Preamble* correctly notes, the default rate is a measurement of risk and the level of risk for KG Dongbu to default "within *n* years" can only be properly calculated using the actual term of the loan at issue, which is on the record (6 years).  There is no basis to throw out an actual data point in favor of a 3-year term unrelated to the term of the loan.  Commerce's calculation directly contradicts the plain language of its own regulations with respect to the appropriate period for the applicable default rates.

Therefore, since the term of the restructured long-term loans and bonds is 6 years, the term of the loan (variable "n") and default rates ("$p_n$" and $q_n$") used in the calculation must match the 6-year term of Dongbu's loans and bonds.  Accordingly, Commerce's decision to ignore the plain requirements of its regulation renders its decision unlawful.  *See Eregli Demir Ve Çelik Fabrikalari T.A.S.*, 415 F. Supp. 3d at 1230.  The Court should thus direct Commerce to revise the calculation of the uncreditworthy benchmark rate by using the 6-year term and default rates on the record for variables "n," "$p_n$," and "$q_n$" as set out in the plain language of its regulations.

### 2.    Unequityworthy Discount Rates

Once Commerce determines that a company receives a benefit through an equity infusion and that firm is unequityworthy, it will calculate the amount of the benefit as equal to the amount of the equity infusion.  19 C.F.R. § 351.507(a)(4) and (6).  Commerce's regulations, at 19 C.F.R. § 351.507(c), dictate that Commerce will then allocate the benefit amount conferred by an equity infusion (a non-recurring subsidy) over the same time period as the non-recurring subsidy, in accordance with 19 C.F.R. § 351.524(d).  19 C.F.R. § 351.524(d)(1) sets out the formula to be used for allocating non-recurring benefits over time:

Ak=y/n+[y−(y/n)(k−1)]d1+dAk=y/n+[y−(y/n)(k−1)]d1+d

Where:
Ak = the amount of the benefit allocated to year k,
y = the face value of the subsidy,
n = the AUL (see paragraph (d)(2) of this section),
d = the discount rate (see paragraph (d)(3) of this section), and
k = the year of allocation, where the year of receipt = 1 and 1 ≤k ≤n.

19 C.F.R. § 351.524(d)(1).

19 C.F.R. § 351.524(d)(3)(ii) sets out an exception for selection of the discount rate for uncreditworthy firms (such as Dongbu, pursuant to Commerce's determination).  For uncreditworthy firms, Commerce "will use as a discount rate the interest rate described in § 351.505(a)(3)(iii)," *i.e.*, use the same formula for the calculation of the uncreditworthy benchmark interest rate described above.  19 C.F.R. § 351.524(d)(3)(ii).  In other words, the regulations require that Commerce calculate the unequityworthy discount rate (listed as variable "d" in 19 C.F.R. § 351.524(d)(1)) using the formula from 19 C.F.R. § 351.505(a)(3)(iii) but it must use the AUL period as variable "n" as specified in 19 C.F.R. § 351.524(d).

Since the AUL period is 15 years, Commerce allocated the amounts of the 2015, 2016, 2018, and 2019 government equity infusions on that basis pursuant to 19 C.F.R. § 351.507(c) and 19 C.F.R. § 351.524(b) and (d)(1).  CR 100-154 (PR 69-75) at 16.  But, in determining the amount of the benefit in each year of the 15-year allocation period, Commerce incorrectly calculated the discount rates (variable "d" in Commerce's equation) based on a 3-year period, because it incorrectly applied the formula from 19 C.F.R. § 351.505(a)(3)(iii) as discussed above for the uncreditworthy benchmark interest rate.  CR 307-308 (PR 184) at Attachment IV tab "UCW BM" and "Equity Infusions."

As discussed above with respect to the uncreditworthy benchmark interest rate, Commerce's regulation and *Preamble* are clear that the default rates should be tied to the term of

41

the loan or, in the case of an equity benefit, to the same period as a non-recurring subsidy, *i.e.*, the 15-year AUL period.  *See* 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c) ("The benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy.").  Thus, the "n" variable (number of years) in the formula for calculating the unequityworthy discount rates should match the 15-year allocation period, just as the "n" variable for calculating an uncreditworthy benchmark interest rate must match the term of the uncreditworthy loan.  Commerce's failure to follow the plain language of its own regulations is thus unlawful.  *See Eregli Demir Ve Çelik Fabrikalari T.A.S.*, 415 F. Supp. 3d at 1230.  The Court should direct Commerce to revise the calculation of the unequityworthy discount rates by using the 15-year AUL period and default rates for variables "n," "$p_n$," and "$q_n$" as set out in the regulations.

## VII.   <u>CONCLUSION</u>

Based on the foregoing, Plaintiff respectfully requests this Court hold that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law for the reasons set forth above.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff KG Dongbu Steel Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 12,945 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills