**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | | |
|---|---|---|
| KG DONGBU STEEL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00055 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION and THE | ) | |
| GOVERNMENT OF THE REPUBLIC OF | ) | |
| KOREA, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## ORDER

Upon consideration of the plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.


Dated: _____          _____
      New York, New York                              JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

| | | |
|---|---|---|
| KG DONGBU STEEL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00055 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | Business Proprietary |
| | ) | Information Removed from |
| | ) | Pages  5, 15, 17-18, 27-28, 31, 36 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION and THE | ) | |
| GOVERNMENT OF THE REPUBLIC OF | ) | |
| KOREA, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

---

**BRIAN M. BOYNTON**
**Principal Deputy Assistant Attorney General**

**PATRICIA M. McCARTHY**
**Director**

**OF COUNSEL:**
**Leslie M. Lewis**
**Attorney**
**U.S. Department of Commerce**
**Office of the Chief Counsel for**
**Trade Enforcement & Compliance**
**Washington, D.C. 20230**

**CLAUDIA BURKE**
**Deputy Director**

**ELIZABETH SPECK**
**Senior Trial Counsel**
**United States Department of Justice**
**Civil Division**
**Commercial Litigation Branch**
**P.O. Box 480**
**Ben Franklin Station**
**Washington, D.C. 20044**
**Tel:  (202) 307-0369**
**Fax:  (202) 514-7965**
*Attorneys for Defendant*

**October 19, 2023**

## TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ................................................................... 3

    I.    Administrative Determination Under Review ........................................... 3

    II.   Issues Presented For Review ................................................................... 3

STATEMENT OF FACTS ........................................................................................... 4

SUMMARY OF ARGUMENT ..................................................................................... 8

ARGUMENT ............................................................................................................. 10

    I.    Standard Of Review ............................................................................... 10

    II.   Commerce's Finding That The First Three Debt-To-Equity Swaps
        Provided A Countervailable Benefit To Dongbu Steel Is Supported
        By Substantial Evidence And In Accordance With Law ...................... 11

        A.    Legal Framework ........................................................................ 12

        B.    Commerce Reasonably Concluded That Private Investor
               Prices Were Not Significant And Thus Did Not Rely On
               Those Prices For Its Benefit Calculation ................................... 14

               1.    Record Evidence Supports Commerce's Conclusion
                    That Private Investor Prices For The First Three
                    Debt-To-Equity Swaps Were Not Significant And
                    Thus Not Reliable ....................................................... 14

               2.    Commerce Reasonably Re-examined The
                      Countervailability Of The Three Debt-To-Equity
                      Conversions.................................................................. 19

    III.   Commerce's Determination That The Benefits From Dongbu
         Steel's Debt-To- Equity Swaps Passed Through To KG Dongbu Is
         Supported By Substantial Evidence And In Accordance With Law ................... 24

        A.    Legal Framework ........................................................................ 12

        B.    Commerce's Fair Market Value Analysis Is Supported By
               Substantial Evidence And Is In Accordance With Law............................. 26

        C.    Commerce's Analysis Of The Non-Exhaustive Factors Is
               Supported By Substantial Evidence And In Accordance
               With Law ..................................................................................... 32

i

IV.   Commerce's Calculation Of The Uncreditworthy Benchmark And
       Unequityworthy Discount Rate Is Supported By Substantial
       Evidence And In Accordance With Law ............................................................. 35

       A.    Legal Framework ..................................................................................... 36

       B.    Commerce Correctly Calculated The Unequityworthy
             Discount Rate Used For Allocating The Benefits From
             Long-Term Loans, Bonds, And Equity Infusions.................................... 37

CONCLUSION ...................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                        **PAGES**

*Atlantic Sugar, Ltd. v. United States*,
 744 F.2d 1556 (Fed. Cir. 1984)............................................................................ 10

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
 419 U.S. 281 (1974)........................................................................................... 11

*Burlington Truck Lines, Inc. v. United States*,
 371 U.S. 156 (1962)........................................................................................... 32

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
 975 F.3d 1318 (Fed. Cir. 2020)....................................................................... 16, 35

*Consol. Edison Maritime Comm'n v. N.L.R.B.*,
 383 U.S. 607 (1966)............................................................................................. 9

*Consolidated Bearings Co. v. United States*,
 412 F.3d 1266 (Fed. Cir. 2005)........................................................................... 19

*Consolo v. Fed'l Maritime Comm'n*,
 383 U.S. 607 (1966)................................................................................... 9, 10, 35

*Delverde, SrL v. United States*,
 202 F.3d 1360 (Fed. Cir. 2000).............................................................. 26, 27, 30, 31

*Elkem Metals Co. v. United States*,
 193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002) ...................................................... 22, 23

*Fujitsu Gen. Ltd. v. United States*,
 88 F.3d 1034 (Fed. Cir. 1996)............................................................................. 10

*Goldlink Indus. Co. v. United States*,
 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......................................................... 10

*Huvis Corp. v. United States*,
 570 F.3d 1347 (Fed. Cir. 2009)........................................................................... 19

*Hyundai Steel Co. v. United States*,
 319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .......................................................... 20

*Magnola Metallurgy, Inc. v. United States*,
 508 F.3d 1349 (Fed. Cir. 2007)........................................................................... 20

*Mannesmannrohren–Werke AG v. United States*,
 120 F. Supp. 2d 1075 (Ct. Int'l Trade 2000) .......................................................... 38

*Matsuhita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ........................................................................ 16, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................................. 11

*Nucor v. United States,*
   494 F. Supp. 3d 1377, 1381 (Ct Int'l Trade 2021) ...................................... 38

*Pakfood Public Co., Ltd. v. United States*,
   453 Fed. App'x 986 (Fed. Cir. 2011) .............................................................. 19

*Pierce v. Underwood*,
   487 U.S. 552 (1988) ............................................................................................ 10

*Ranchers-Cattleman Action Legal Found. v. United States*,
   74 F. Supp. 2d 1353 ........................................................................................... 19

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................................................................ 11

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ................................................... 10

*Shandong Huarong Mach. Co. v. United States*,
   29 CIT 484 (2005) .............................................................................................. 22

*Uttam Galva Steels Ltd. v. United States*,
   No. 21-2119, 2022 WL 1419596 (Fed. Cir. May 5, 2022) ........................ 23

*Yama Ribbons & Bows Co. v. United States,*
   865 F. Supp. 2d 1294 (Ct. Int'l Trade 2021) ...................................... 20, 22, 38

**Statutes**

19 U.S.C. § 1675(a)(1)(A) ......................................................................................... 20

19 U.S.C. § 1677 ............................................................................................... *passim*

**Federal Register**

*Antidumping or Countervailing Duty Order, Finding or*
  *Suspended Investigation; Opportunity to Request Administrative Review*,
  86 Fed. Reg. 35,065 (Dep't of Commerce July 1, 2021)..............................................4

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  88 Fed. Reg. 7,946 (Dep't of Commerce Feb. 7, 2023) ..............................................3

*Certain Corrosion Resistant Steel Products from India,*
  *Italy, Republic of Korea and the People's Republic of China*,
  81 Fed. Reg. 48,387 (Dep't of Commerce July 25, 2016).............................................4

*CFS Paper from Korea*,
  72 Fed. Reg. at 60,639 .....................................................................................18

*CORE AR4 Preliminary Results*,
  86 Fed. Reg. at 37,740, .......................................................................... *passim*

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  86 Fed. Reg. 29, 237 (Dep't of Commerce June 1, 2021).........................................22

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  87 Fed. Reg. 47,973 (Dep't of Commerce August 5, 2022).........................................4

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  87 Fed. Reg. 2,759 (Dep't of Commerce Jan. 19, 2022) ..........................................4

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  88 Fed. Reg. 7,946 (Dep't of Commerce Feb. 7, 2023) ............................................3

*Coated Free Sheet Paper from the Republic of Korea*,
  72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007)....................................... find

*Countervailing Duties:  Final Rule*,
  63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)..........................................20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  86 Fed. Reg. 50,034 (Dep't Commerce Sept. 7, 2021)..............................................4

*Notice of Final Modification of Agency Practice Under*
  *Section 123 of the Uruguay Round Agreements Act*,
  68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003) ..........................................................24

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| KG DONGBU STEEL CO., LTD.,      ) | |
|      ) | |
|        Plaintiff,      ) | |
|      ) | Court No. 23-00055 |
|        v.      ) | **PUBLIC VERSION** |
|      ) | |
| UNITED STATES,      ) | Business Proprietary |
|      ) | Information Removed from |
|        Defendant,      ) | Pages  5, 15, 17-18, 27-28, 31, 36 |
|      ) | |
|        and      ) | |
|      ) | |
| NUCOR CORPORATION and THE      ) | |
| GOVERNMENT OF THE REPUBLIC OF      ) | |
| KOREA,      ) | |
|      ) | |
|        Defendant-Intervenors.      ) | |
|      ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully

responds to the motion for judgment upon the agency record filed by plaintiff KG Dongbu Steel

Co., Ltd. (KG Dongbu or plaintiff) (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon Steel

Co., Ltd.).  Plaintiff challenges the final results of the U.S. Department of Commerce's

(Commerce) countervailing duty administrative review covering certain corrosion-resistant steel

products (CORE) from Korea.  Specifically, plaintiff challenges Commerce's determination that

the first through third debt-to-equity swaps provided a countervailable subsidy to Dongbu Steel;

Commerce's determination that the benefits from Dongbu Steel's debt-to-equity swaps passed

through to KG Dongbu despite the change in ownership (*i.e.*, the acquisition of Dongbu Steel by

KG Dongbu); and Commerce's calculation of the uncreditworthy benchmark and unequityworthy discount rate.

Contrary to plaintiff's assertions, Commerce's determinations are supported by substantial evidence and otherwise in accordance with the law, and, as such, the final results should be sustained. Accordingly, we respectfully request that the Court deny plaintiff's motion and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.      Administrative Determination Under Review

The administrative determination under review is *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 88 Fed. Reg. 7,946 (Dep't of Commerce Feb. 7, 2023) (*Final Results*), P.R. 180, and accompanying Issues and Decision Memorandum (IDM), P.R. 181. The period of review is January 1, 2020, through December 31, 2020.

### II.     Issues Presented For Review

1.   Whether Commerce's determination that the first through third debt-to-equity swaps provided a countervailable benefit to Dongbu Steel is supported by substantial evidence and is otherwise in accordance with law.

2.   Whether Commerce's determination that the benefits from the debt-to-equity swaps passed through to KG Dongbu despite the change in ownership is supported by substantial evidence and is otherwise in accordance with law.

3.   Whether Commerce's calculations of the uncreditworthy benchmark rate and unequityworthy discount rate are supported by substantial evidence and are otherwise in accordance with law.

## STATEMENT OF FACTS

On July 25, 2016, Commerce published the countervailing duty order for CORE from

Korea.  *Certain Corrosion Resistant Steel Products from India, Italy, Republic of Korea and the*

*People's Republic of China*, 81 Fed. Reg. 48,387, 48,388 (Dep't of Commerce July 25, 2016)

(*CORE Order*).  On July 1, 2021, Commerce published a notice of opportunity to request an

administrative review.  *Antidumping or Countervailing Duty Order, Finding or Suspended*

*Investigation; Opportunity to Request Administrative Review*, 86 Fed. Reg. 35,065, 35,066

(Dep't of Commerce July 1, 2021).  Upon initiating the review, *see Initiation of Antidumping*

*and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034, 50,043-44 (Dep't

Commerce Sept. 7, 2021), P.R. 16, Commerce selected KG Dongbu[1] as a mandatory respondent

in this administrative review.  *Certain Corrosion-Resistant Steel Products from the Republic of*

*Korea*, 87 Fed. Reg. 47,973 (Dep't of Commerce August 5, 2022) (*Preliminary Results*), P.R.

145, and accompanying Preliminary Decision Memorandum (PDM) at 1, P.R. 140.

A change-in-ownership of Dongbu Steel occurred in 2019, when KG Steel acquired

Dongbu Steel (an acquisition which resulted in Dongbu Steel becoming KG Dongbu).  *See*

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759

(Dep't of Commerce Jan. 19, 2022) (final results and partial rescission of CVD admin review)

(*CORE AR4 Final Results*), and accompanying IDM at 54; *see also* Dongbu Initial Questionnaire

(IQR), Nov. 29, 2021 (Dongbu IQR), P.R. 69-75; C.R. 100-154 at Exh. B-35 (change in

ownership response) (CIO response), C.R. 146 at 9; KG Dongbu Affiliation Questionnaire

---

[1]  In 2019, Dongbu Steel was acquired by KG Steel (*i.e.*, KG Consortium), which
ultimately resulted in Dongbu Steel becoming KG Dongbu.  *See* Respondent Selection
Memorandum, Sept. 28, 2021, P.R. 22, C.R. 3 at 1 and 1 n.1; *see also* PDM, P.R. 140 at 7 (citing
KG Dongbu Affiliation Questionnaire Response, Oct. 27, 2021, P.R. 42; C.R. 6 at 11); Dongbu
Br. at 7-8.

Response, P.R. 42, C.R. 6 at 11.  On November 29, 2021, KG Dongbu submitted its initial

questionnaire response, including a change-in-ownership appendix which indicated KG

Dongbu's intent to challenge Commerce's baseline presumption that non-recurring subsidies are

not extinguished by a company's change-in-ownership during the average useful life (AUL)

period.  Dongbu Initial Questionnaire (IQR), Nov. 29, 2021 (Dongbu IQR), P.R. 69-75; C.R.

100-154 at Exh. B-35, CIO response, C.R. 146.  The circumstances which led to the acquisition

began years earlier.  Equity Infusions Memorandum, C.R. 260 at 1-2.

Beginning in 2012, Dongbu Steel struggled financially, and sought to improve its

financial posture.  *See* Equity Infusions Memorandum, July 29, 2022, C.R. 260 at 1 (citing

Dongbu IQR, P.R. 69-75, C.R. 100-154 at 21 and Exh. 21; PDM, P.R. 140 at 12-13 and 13 n.64.

Due to its poor financial posture, Dongbu Steel struggled to secure funding on commercial terms,

such as loans; however, Dongbu Steel was able to acquire loans from the Korea Development

Bank (KDB), a state-owned bank.  Equity Infusions Memorandum at 2.[2]  As a part of this loan

process, the KDB agreed to refinance several of Dongbu Steel's bonds and entered into a

█████████████████████████████████████████████████████████  to secure

repayment of the loans, as discussed at length below.  *Id.*  Dongbu Steel continued to receive

loans from the KDB through 2014.  *Id.*  Dongbu Steel, however, was unable to repay these loans,

and thus had to apply for a financial restructuring program through the Government of Korea

(GOK), headed by the Creditor Bank Committee (CBC), which was made up of several state-

owned banks, as laid out below.  *Id.* at 3.[3]  Under this program, Dongbu Steel underwent four

---

[2]  This page of the Equity Infusions Memorandum cites Dongbu IQR, P.R. 69-75, C.R. 100-154 at 22-24, 56, Exh. B-2 at 2.

[3]  This page of the Equity Infusions Memorandum cites Dongbu IQR, P.R. 69-75, C.R. 100-154 at 26, 29. 47, Exh. B-5, Exh. B-4 at 1, Exh. B-6, Exh. B-7 at 189, 193, Exh. B-8 at

debt-to-equity conversions to improve its financial posture and enable it to repay the KDB.  *Id.*

The first conversion occurred in February 2015, the second in May 2016, the third in April 2018,

and the fourth as part of the merger and acquisition agreement in August 2019.  PDM at 16

(citing *CORE AR4 Final Results*, 87 Fed. Reg. at 2,759  and accompanying IDM at cmt. 7, and

Dongbu IQR, C.R. 100 at 31, 34, 46, 51).

    Commerce published its preliminary results on August 5, 2022.  *Preliminary Results,*

P.R. 145 and PDM, P.R. 140.  In the prior (fourth) administrative review of the *CORE Order*,

Commerce found that Dongbu Steel was not creditworthy, or a company which was able to

obtain loans from conventional commercial sources, at the time of the first three debt-to-equity

conversions (*i.e.*, the debt-to-equity conversions on February 16, 2015; May 9, 2016; and April

3, 2018), and that the entire amount of the equity infusions for these three conversions

constituted a benefit to Dongbu Steel pursuant to 19 U.S.C. § 1677(5)(E)(ii).  *See* PDM at 12-13

and 16, P.R. 140; *see also Certain Corrosion-Resistant Steel Products from the Republic of*

*Korea*, 86 Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) (preliminary CVD Results)

(*CORE AR4 Preliminary Results*), and accompanying PDM at 11-12, unchanged in *CORE AR4*

*Final Results*, 87 Fed. Reg. at 2,759; Equity Infusions Memo at 21, C.R. 260.  Because no new

information on the record caused Commerce to reevaluate its creditworthiness determination, in

the preliminary results, unchanged in the final results, Commerce determined that Dongbu Steel

was uncreditworthy, and that the entire amount of the first three debt-to-equity infusions

constituted the benefit pursuant to 19 C.F.R. § 351.507(a)(6).  PDM, P.R. 140 at 12-13; Equity

Infusions Memo, C.R. 260 at 10-14; IDM, P.R. 181 at 6.

---

Attachment 1, ; Government of Korea Initial Questionnaire Response (GOK IQR), Nov. 29,
2021, P.R. 52-68, C.R. 32-51 at 16.

In the preliminary results, Commerce also determined that KG Dongbu had received a non-recurring subsidy from the first three debt-to-equity conversions and allocated the benefits over the fifteen-year AUL period.  PDM, P.R. 140 at 16-17 (citing Dongbu IQR, P.R. 69-75; C.R. 100-154 at 34, 46, 51 and Kg Dongbu Preliminary Calc. Memorandum, Aug. 1, 2022, P.R. 141, C.R. 264).  Because it found KG Dongbu uncreditworthy, Commerce calculated an uncreditworthy benchmark, under 19 C.F.R. § 351.505(a)(3)(iii), to determine the benefit from KG Dongbu's restructured long-term loans and bonds, using a three-year corporate bond rate published by the Bank of Korea.  *Id*.  Commerce also applied unequityworthy discount rates to calculate the benefit from the debt-to-equity conversions consistent with the uncreditworthy benchmark.  PDM, P.R. 140 at 16-17.

On February 7, 2023, Commerce published its *Final Results* of the fifth administrative review.  *See Final Results*, 88 Fed. Reg. at 7,946, P.R. 188, and IDM, P.R. 181.  KG Dongbu appealed.  ECF No. 1.

On July 7, 2023, this Court remanded Commerce's final results in the previous fourth administrative review of the *CORE Order*.  *KG Dongbu Steel Co., Ltd. v. United States*, No. 22-0047, Slip Op. No. 23-98 (Ct. Int'l Trade July 7, 2023) (*KG Dongbu Steel*).  In its remand opinion, the Court ordered Commerce to reconsider or further explain its determinations that: (1) the first three debt-to-equity restructurings provided a countervailable benefit; (2) that the benefits from the debt-to-equity restructurings passed through from Dongbu Steel to KG Dongbu upon the change-in-ownership; and (3) that Commerce's uncreditworthy benchmark and discount rates are supported by substantial evidence.  *Id*. at 13.  Specifically, the Court held that Commerce did not sufficiently explain or cite to new information on the record of the fourth administrative review to support the agency's departure from prior decisions that the first three

debt-to-equity conversions provided a countervailable benefit. *Id*. at 8-12. With respect to the

countervailability of the three debt-to-equity conversions, the Court held that Commerce may, on

remand, reconsider or further explain its pass-through determination. *Id*. at 14-15. Finally, the

Court ordered that Commerce must reconsider record evidence and further substantiate the loan

term used to calculate the uncreditworthy benchmark interest and discount rates. *Id*. at 18. The

Court's decision in *KG Dongbu Steel* is not yet final.

## SUMMARY OF ARGUMENT

In this fifth administrative review of the *CORE Order*, Commerce's conclusions are

supported by substantial evidence and otherwise lawful.

First, substantial evidence supports Commerce's conclusion that private investor prices

for the first three debt-to-equity swaps were unavailable to use as a benchmark for the debt-to-

equity conversions. As Commerce explained in the *Final Results*, and as it explained in more

detail in the Equity Infusions Memorandum, Commerce could not rely on the prices paid by the

private creditors and private investors for purposes of determining a benchmark because of the

significant influence of GOK-controlled entities, such as the KDB, in the debt restructuring

process. KG Dongbu primarily contends that Commerce could not re-examine the

countervailability of the prior debt-to-equity swaps because of Commerce's purported

"established practice" in prior reviews. *E.g.*, Dongbu Br. at 11. But, KG Dongbu's argument is

misplaced because in both the fourth administrative review and in this review, Commerce had

information before it which prompted a reexamination. Commerce conducted a thorough

analysis of this information when rendering its determination. *See generally* Equity Infusions

Memorandum, C.R. 260. Having no information in this review to cause Commerce to doubt the

analysis that it performed in the fourth administrative review, Commerce reasonably declined to

change its position. KG Dongbu claims that this Court's recent *KG Dongbu Steel* decision must apply to the Court's review in this case. Dongbu Br. at 13-19. The Court, however, has not issued a final judgment in *KG Dongbu Steel*. Also, this is a different administrative review and the records and the fourth and fifth review are not identical. Thus, while acknowledging the Court's decision in *KG Dongbu Steel*, we respectfully submit that Commerce's determination in this review is supported by substantial evidence and is in accordance with law and, therefore, should be sustained.

Second, Commerce reasonably concluded that KG Dongbu failed to rebut the baseline presumption that subsidies, existing prior to Dongbu Steel's change in ownership, passed through to KG Dongbu Steel. As Commerce explained in the *Final Results*, although in this review, KG Dongbu submitted a change-in-ownership appendix response to Commerce's questionnaire, KG Dongbu failed to rebut the presumption with record information that would enable Commerce to conclude that the subsidy benefits were extinguished by the acquisition. In fact, Commerce identified substantial evidence to support that the acquisition was *not* made at arm's length for fair market value. Consequently, Commerce's baseline presumption prevailed. That KG Dongbu can draw different conclusions from the record evidence to support its preferred outcome fails to establish that Commerce's determination is unsupported by substantial evidence. *See Consolo v. Fed'l Maritime Comm'n*, 383 U.S. 607, 619-620 (1966) (holding that the ability to reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence).

Third, Commerce correctly calculated the uncreditworthy benchmark rate and unequityworthy discount rate used for allocating the benefits from long-term loans, bonds, and equity infusions. Specifically, in accordance with the uncreditworthy benchmark formula in 19

C.F.R. § 351.505(a)(3)(iii), Commerce appropriately used a three-year Korean Won (KRW)-denominated AA rate corporate bond rate published by the Bank of Korea as the long-term interest rate paid by a creditworthy company because it was the only long-term rate available on the record consistent with legal standards.  Accordingly, the Court should sustain Commerce's determination in the final results.

## ARGUMENT

### I.   Standard Of Review

In conducting its review, the Court "must sustain 'any determination, finding or conclusion {}' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence "does not mean a large or considerable amount of evidence."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).  Rather, substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo*, 383 U.S. at 620; *see also Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) ("{s}ubstantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); *accord Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,1562 (Fed. Cir. 1984); *see also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not

substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the {C}ourt would justifiably have made a different choice had the matter been before it *de novo.*") (internal quotes and citations omitted).

"{The reviewing court} may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). However, the reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

## II.   Commerce's Finding That The First Three Debt-To-Equity Swaps Provided A Countervailable Benefit To Dongbu Steel Is Supported By Substantial Evidence And In Accordance With Law

During the 15-year AUL period for the non-recurring subsidies at issue in this review, Dongbu Steel[4] had four debt-to-equity conversions as part of its debt restructuring:  the first in February 2015, the second in May 2016, the third in April 2018, and the fourth in August 2019. PDM, P.R. 140 at 16 (citing *CORE AR4 Final Results*, 87 Fed. Reg. at 2,759 and IDM, P.R. 181 at cmt. 7, and Dongbu IQR, C.R. 100 at 31, 34, 46, 51).  As discussed further below, Commerce could not rely on private investor prices to determine the benefit for the first three debt-to-equity infusions because Commerce found that private investor share prices for these swaps were not significant within the meaning of 19 C.F.R. § 351.507(a)(2)(iii) (*i.e.*, actual private investor prices were not available within the meaning of 19 C.F.R. 351.507(a)(2)(i)).  Accordingly, Commerce analyzed whether Dongbu Steel was equityworthy pursuant to 19 C.F.R.

---

[4]  As explained in detail below, Commerce found that the benefit from the first, second, and third debt-to-equity conversions passed through to KG Dongbu. Thus, reference to the benefit from these equity conversions applies to KG Dongbu.

§ 351.507(a)(3), finding that it was unequityworthy—which constitutes a determination that the equity infusions were inconsistent with usual investment practice of private investors.  PDM, P.R. 140 at 16; IDM, P.R. 181 at 47-48; Equity Infusions Memo, C.R. 260 at 10.  Thus, in accordance with 19 C.F.R. § 351.507(a)(6), Commerce found the benefit to be the entire amount of the debt-to-equity infusions (*i.e.,* the amount of the first, second, and third conversions) made by the GOK-owned or controlled financial institutions.  IDM, P.R. 181 at 52.

We recognize that in *KG Dongbu Steel*, No. 22-0047, Slip Op. No. 23-98 at 13, this Court held Commerce's determination that the first three debt-to-equity restructurings provided a countervailable subsidy in the fourth administrative review was not in accordance with law.  In that decision, this Court also remanded in order for Commerce to consider whether its decision is supported by substantial evidence.  *Id.*  Despite this, we respectfully submit that Commerce's finding in this review is supported by substantial evidence, is in accordance with law, and should be sustained.

A.  **Legal Framework**

Commerce determines that a countervailable subsidy exists in circumstances when an "authority" provides a "financial contribution," which results in a "benefit conferred" to the recipient, and that the subsidy is specific.  19 U.S.C. § 1677(5-5A).  Section 1677(5)(E) of Title 19 provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy.  For equity infusions, it states that a benefit is conferred "if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  *Id.* at § 1677(5)(E)(i); *see also* 19 C.F.R. § 351.507(a)(1) (defining benefit for equity infusions).

12

Further, 19 C.F.R. § 351.507(a)(2)(i) states that the "Secretary will consider an equity infusion as being inconsistent with usual investment practice…if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares."  If the private investor purchases are not significant, Commerce will not use private investor prices.  19 C.F.R. § 351.507(a)(2)(i).  In those cases where the private investor prices are not available because they are not significant, pursuant to 19 C.F.R. § 351.507(a)(3), Commerce will "determine whether the firm funded by the government-provided equity was equityworthy or unequityworthy at the time of the equity infusion{.}"  If Commerce determines that a firm was "unequityworthy," this will also constitute a determination that the equity infusion was inconsistent with the usual investment prices of private investors, and Commerce will apply 19 C.F.R. § 351.507(a)(6) to measure the benefit attributable to the equity infusion.  Pursuant to that provision, Commerce considers the benefit to be the entire amount of the equity infusion.

To determine whether a company is equityworthy or unequityworthy, Commerce looks to 19 C.F.R. § 351.507(a)(4), which states that Commerce will find that a firm is equityworthy "if the Secretary determines that, from the perspective of a reasonable private investor examining the firm at the time the government-provided equity infusion was made, the firm showed an ability to generate a reasonable rate of return within a reasonable period of time."  Further, in "appropriate circumstances," Commerce may "focus its equityworthiness analysis on a project rather than the company as a whole."  19 C.F.R. § 351.507(a)(4).  The regulation further states that the Commerce may examine the following factors, including:  (1) "{o}bjective analyses of the future financial prospects of the recipient firm{,}" (2) "{c}urrent and past indicators of the

recipient firm's financial health{,}" (3) "{r}ates of return on equity" for the three years prior to

the infusion, and (4) "{e}quity investment in the firm by private investors."  *Id.*

### B.  Commerce Reasonably Concluded That Private Investor Prices Were Not Significant And Thus Did Not Rely On Those Prices For Its Benefit Calculation

Section 351.507(a)(2)(iii) of Commerce's regulations states that Commerce will not rely

on private investor prices for the calculation of a benefit through an equity infusion if the private

investor purchases of newly issued shares are not "significant."  Here, as it did in the fourth

administrative review, Commerce determined that the private investor prices for the first, second,

and third debt-to-equity conversions were not significant and not reliable for use in calculating

the benefit.  IDM, P.R. 181 at 52; PDM, P.R. 140 at 16; Equity Infusions Memo, C.R. 260 at 10-

12.  Record evidence supports Commerce's conclusions.

#### 1.  Record Evidence Supports Commerce's Conclusion That Private Investor Prices For The First Three Debt-To-Equity Swaps Were Not Significant And Thus Not Reliable

Commerce found that GOK-controlled entities, specifically the KDB, exercised

significant influence over the first through third debt-to-equity conversions.  IDM, P.R. 181 at 49

(citing Equity Infusions Memo, C.R. 260 at 11-13; GOK IQR), P.R. 52-68, C.R. 32-51, at Exh.

Debt-Restructuring-3 and Exh. Debt Restructuring-6).  That is, although private investors

participated in the first three debt-to-equity conversions, their participation as private creditors

was within the KDB-led creditors' councils.[5]  GOK-controlled financial institutions controlled

the decisions of the creditors' committees or councils, and thus private creditors had no decision-

---

[5]  The Creditor Bank Committee (CBC) and Dongbu Steel's Creditor Financial Institutions' Committee (DSCFIC), *i.e.*, committees of Dongbu Steel's creditors, herein referred to as creditors' committees or councils, led Dongbu Steel's debt restructuring.  Equity Infusions Memo, C.R. 260 at 3-5; IDM at 49.

making control over these committees and had to comply with the terms set by the KDB and other GOK-controlled financial institutions.  Equity Infusions Memo, C.R. 260 at 11-12.

For the first debt-to-equity conversion, at the time of the conversion, the GOK-owned banks, including KDB, owned [████] percent of Dongbu Steel's shares, and [██████████ ████████████████████], with the rest owned or [████████] by private investors.  *See* Equity Infusions Memo, C.R. 260 at 5-6 (citing KG Dongbu IQR, P.R. 68-75, C.R. 100-154 at Exh. Debt Restructuring-9 and Exh. B-10, Attachment 1).  And with respect to the second debt-to-equity conversion, of the shares subject to the conversion [██████████████ ████████████████], and [███████████████████].  Equity Infusions Memo, C.R. 260 at 6-7 (citing KG Dongbu IQR, C.R. 100-154 at 52 and Exh. B-17).  At the time of the third restructuring, [████████████████████████████████ ████].  Equity Infusions Memo, C.R. 260 at 7 (citing KG Dongbu IQR, C.R. 100-154 at 53).

KDB also exercised significant influence over the three debt restructurings.  Equity Infusions Memo, C.R. 260 at 11.  KDB and Dongbu Steel had entered into the [██████ ████████], pursuant to which KDB was able to dictate how Dongbu Steel would manage its assets and repay its creditors.  Equity Infusions Memo, C.R. 260 at 11 (citing Dongbu IQR, C.R. 100-154 at Exh. B-3 at Article 4); *see also id*. at 2 (citing Dongbu IQR, C.R. 100-154 at 22-24, 56 and Exh. B-2 at 2).  As Dongbu Steel went through these three debt restructurings, the KDB also dictated how Dongbu Steel would use its assets and production to generate revenue, and thus how Dongbu Steel repay its creditors.  *Id*. at 2; IDM, P.R. 181 at 48 (citing Equity Infusions Memo, C.R. 260 at 11-13 and GOK IQR, C.R. 32-51 at Exh. Debt Retructuring-3 and Exh. Debt Restructuring-6 at 8).  In combination with KDB and GOK-controlled banks' majority [████████], this required that any private creditors had no alternative but to accept the terms

imposed on them.  Equity Infusions Memo, C.R. 260 at 11 (citing GOK IQR, C.R. 32-51 at Exh.

Debt Restructuring-3 (Minutes of 1st Dongbu Steel's Voluntary Creditors Association) at

Contents of Third Agenda) and Debt Restructuring-6 at 8; Dongbu IQR, C.R. 100-154 at Exh. B-

5); IDM, P.R. 181 at 49-52.  Although private investors participated in these conversions,

because of this government influence, Commerce determined that the participation of Dongbu

Steel's private creditors was not significant.  IDM, P.R. 181 at 47-52; Equity Infusions Memo,

C.R. 260 at 9-11.  Thus, pursuant to 19 C.F.R. § 351.507(a), private investor prices were not

available for the first through third debt-to-equity conversions, and Commerce had to determine

whether Dongbu Steel was equityworthy.  IDM at 52.

KG Dongbu argues that the equity infusions were consistent with the usual investment

practice of private investors because both private and government financial institutions

participated on the same terms and the private investor participation was significant.  Dongbu Br.

at 19-20.  Dongbu also contends that record evidence demonstrates that the private financial

institutions paid the same per share price as the GOK-controlled banks, and that the private

financial institutions purchased a significant percentage of the shares of debt converted to equity.

*Id*. at 20-24.  But these arguments merely invite the Court to reweigh the evidence, which does

not satisfy KG Dongbu's burden of proving that Commerce's determination is unsupported by

substantial evidence.  As the Federal Circuit explained in *Changzhou Trina Solar Energy Co.,*

*Ltd. v. United States*, 975 F.3d 1318, 1333 (Fed. Cir. 2020), "'{t}hat {a party} can point to

evidence of record which detracts from the evidence which supports the {agency's} decision and

can hypothesize a reasonable basis for a contrary determination is neither surprising nor

persuasive."  *Id.* (quoting *Matsuhita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed.

Cir. 1984)).

Regardless, there is no merit to KG Dongbu's claims.  Although private investors paid the same per share price as the GOK-controlled banks, it is inaccurate to say that the private investors purchased a significant percentage of shares or that the private investors' participation was significant, or on the same terms as the GOK-controlled entities.  As explained above, the totality of the evidence and relevant agreements between Dongbu Steel and KDB indicates that the GOK-controlled entities, specifically KDB, exercised significant influence over the debt-to-equity conversions through their majority [          ] during Dongbu Steel's debt restructuring, and that the GOK-controlled entities consistently held [      ] percent of the relevant shares.  IDM, P.R. 181 at 49; Equity Infusions Memo, C.R. 260 at 11.  Under this arrangement, KDB controlled the largest share of debt, equity, and [          ].  IDM, P.R. 181 at 49; Equity Infusions Memo, C.R. 260 at 11.  Further, as Commerce explained, the private investors held a minority of the [          ] and a minority of Dongbu Steel's shares—private investors were in no position to prevent the terms of the debt-to-equity conversions dictated by the GOK-controlled entities for the first three debt-to-equity conversions.  IDM, P.R. 181 at 48-49; Equity Infusions Memo, C.R. 260 at 11-12.  Thus, the private investors had no decision-making control, and no significant participation in these restructurings because they had no choice but to comply with the GOK-controlled entities' terms.  *Id*.  Consequently, contrary to KG Dongbu's arguments, the private investors' participation in the first, second, and third debt-to-equity conversions was not significant, as well as their purchase of shares.

Nor is there merit to KG Dongbu's position that "{a}ny of the creditors" had the option to "opt out" under the Corporate Restructuring Promotion Act (CRPA), or that Commerce's references to the high percentage of KG Dongbu's secured debt owned by GOK-owned banks is "misleading and disingenuous"  because voting rights are determined on the basis of "total

17

outstanding debt and not just secured debt." Dongbu Br. at 21, 22-23.  As Commerce explained, GOK-owned banks controlled the restructuring.  IDM at 48-50 (citing Equity Infusions Memo, C.R. 260 at 11, which cites GOK IQR, C.R. 32-51 at Exhibit Debt Restructuring-3 and Exhibit Debt-Restructuring-6 at 8).  As explained above, in the first debt restructuring the government-owned banks controlled [      ] percent of the voting rights of the creditor's committee restructuring, in the second debt restructuring KDB's voting rights accounted for [      ] percent of [            ], and in the third debt restructuring the government-owned banks controlled [      ] percent of the voting rights of the creditor's committee.  Equity Infusions Memo, C.R. 260 at 6-8, 11-12 (citing Dongbu IQR, C.R. 100-154 at 53, Exh. B-17); GOK IQR, C.R. 32-51 at Exh. Debt Restructuring-9.  This control by the GOK-controlled creditors would exist even if the private investors opted out.  Further, contrary to KG Dongbu's assertions, Commerce considered all of the debt which determined the voting rights.  *Id.*

KG Dongbu also wrongly asserts that Commerce's precedent, specifically *Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007 (final affirm. countervailing duty determ.), and accompanying IDM at 43 (*CFS Paper from Korea*) does not support the position that the GOK-controlled creditors' majority status on a creditors' committee renders private participation insignificant.  Dongbu Br. at 23-24.  Unlike in this review, in *CFS Paper from Korea*, Commerce did not find evidence of the GOK's influence over the decision-making ability of the Korean respondent's creditors' council at issue.  *CFS Paper from Korea*, 72 Fed. Reg. at 60,639, and accompanying IDM at 43.  Here, however, Commerce found GOK-controlled policy banks, which are considered authorities pursuant to 19 U.S.C. § 1677(5)(B), led Dongbu Steel's creditors' council.  IDM, P.R. 181 at 51; Equity

Infusions Memo, C.R. 260 at 4-12.[6]  Thus, and contrary to KG Dongbu's assertions, the record does not reflect that the GOK-controlled and private banks on the council acted in a "commercially reasonable" manner (*i.e.*, seeking to maximize interest income) on the restructured loans without comparing the terms of the renegotiated loans to those of a similar loan provided by a commercial bank.

### 2.    Commerce Reasonably Re-examined The Countervailability Of The Three Debt-To-Equity Conversions

We also respectfully disagree with KG Dongbu's arguments, which are based on this Court's decision in *KG Dongbu Steel*, Slip Op. 23-98 at 9-11, that Commerce has a "standard practice regarding not reexamining the countervailability of Dongbu Steel's equity infusions" and that Commerce failed to explain its departure from that practice in this review.  Dongbu Br. at 16-19.

In *Ranchers-Cattleman Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999), the Court explained that a practice becomes an "established practice" when "a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." In order to challenge Commerce's determination as an unreasoned departure from past practice, KG Dongbu must show that "Commerce consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." *Pakfood Public Co., Ltd. v. United States*, 453 Fed. App'x 986, 989 (Fed. Cir. 2011) (citing *Consol. Bearings*, *Co. v. United States,* 412 F.3d 1266, 1269 (Fed. Cir. 2005); *see also Huvis Corp. v.*

---

[6]  The Equity Infusions Memo, C.R. 260 at pages 4-11 cites Donbgu IQR, C.R. 100-154 at 28-53, Exh. B-7 at 23, Exh. 10-A Exh. 12-A, Exh. B-10, Exh. B-11, Exh. B-17, Exh. B-22 Exh. B-29, and GOK IQR, C.R. 32-51 at 8, Exh. Debt Restructuring-3, Exh. Debt Restructuring-4, Exh. Debt Restructuring-6, Exh. Debt Restructuring-9.

*United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (explaining that Commerce's deviation from an established practice will not be disturbed if "its methodology is permissible under the statute and . . . it had good reasons for the new methodology").

Contrary to KG Dongbu's assertions that Commerce departed from its "consistent practice," Commerce did not apply a new methodology in this review. Dongbu Br. at 17. Conversely, based on the record facts of this administrative review, Commerce examined an issue consistent with its statutory obligation to determine benefit. 19 U.S.C. § 1675(a)(1)(A). As Commerce explained in its IDM at pages 47-52 and in the Equity Infusions Memo, C.R. 260, Commerce's "established practice" when determining the benefit of equity infusions (or debt-to-equity conversions), is to follow its regulation, 19 C.F.R. § 351.507. And as indicated in *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65, 348, 65,371, 65,373 (Dep't Commerce Nov. 25, 1998) (CVD Preamble), Commerce's regulations were developed as the result of Commerce's experience in analyzing equity infusions since the 1980s. Also, because benefit determinations are made on a fact-specific basis, Commerce's other established practice is to review whether a benefit exists for each segment as the facts in each segment could differ. IDM, P.R. 181 at 47 (citing *Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1354-56 (Fed. Cir. 2007)). Put differently, Commerce's reasonable, established practice is to apply the regulations at 19 C.F.R. § 351.507 to the *specific facts* of each case to determine benefit. *Yama Ribbons & Bows Co. v. United States,* 865 F. Supp. 2d 1294, 1298 (Ct. Int'l Trade 2012) ("Commerce must base its decisions on the record before it in each individual investigation."); *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018).

During the investigation and the first through third administrative reviews, Commerce determined that both private banks and GOK-controlled banks were involved in the equity

infusions and paid the same price and that private creditors accounted for a significant

percentage of the shares of debt that were converted to equity.  IDM at 47-48 (citing *CORE AR4*

*Preliminary Results*, 86 Fed. Reg. at 37,740, and accompanying PDM at 16).  In accordance with

these prior findings, Commerce determined that there was no benefit and did not perform an

analysis of Dongbu Steel's equityworthiness.  *Id*. at 48.  In this review and in the fourth

administrative review, however, Commerce explained why it reached a different conclusion than

it had in the investigation and first three administrative reviews.  IDM at 47-52.  Specifically,

because the record of this review includes a fourth equity infusion which, unlike the earlier three

equity infusions, involved private investors independent from the creditors' committee,

Commerce examined the role of the KDB-controlled creditors' committees in its benefit analysis

with respect to the debt-to-equity conversions.  Because GOK-controlled entities, in particular

the KDB, exercised significant influence over the first three debt-to-equity conversions,

Commerce determined that the private investor prices were not significant under 19 C.F.R.

§ 351.507(a)(2)(iii), and therefore, do not constitute "private investor prices" under 19 C.F.R. §

351.507(a)(2)(i).  IDM, P.R. 181 at 47-49, 52; Equity Infusions Memo, C.R. 260 at 2-10; *CORE*

*AR4 Final Results*, 87 Fed. Reg. at 2,759, and accompanying IDM at cmt. 7.

      Further, KG Dongbu's claim that Commerce had an "established agency practice"

ignores the history of the prior reviews and Commerce's obligation to make record-based

determinations.  Dongbu Br. at 16-17.  As Commerce noted in its decision in the fourth

administrative review, although Commerce had declined to make an equityworthiness finding in

prior reviews and had previously found that the equity infusions provided no benefit to Dongbu

Steel, it had specifically reserved the right to "re-examine this issue" in future administrative

reviews "if new record evidence requires such an examination."  IDM, P.R. 181 at 48 (citing

*CORE AR4 Preliminary Results*, 86 Fed. Reg. at 37,740, and accompanying PDM at 16, which, in turn, cited *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 29, 237 (Dep't of Commerce June 1, 2021) (final results and partial rescission of countervailing duty administrative review), and accompanying IDM at cmt. 7); *CORE AR4 Final Results*, 87 Fed. Reg. at 2,759, and accompanying IDM at cmt. 7.  The participation of private investors *independent* from the creditors' committee in the fourth equity infusion during the 2019 period of review prompted Commerce to re-examine the issue.  IDM at 47-48. Specifically, record information about the fourth debt-to-equity conversion (*i.e.*, the inclusion of private investors) prompted examination of the significance of investor prices in the equity benefit analysis.  IDM at 48-49; Equity Infusions Memo, C.R. 260 at 12-13.  This reasonably led Commerce to reconsider the KDB's role in the prior debt-to-equity conversions.

In reconsidering the KDB's control in the debt restructurings and in light of the private investor participation independent of that control in the fourth equity conversion, as discussed above, Commerce's equity benefit analysis led to a different conclusion than in previous reviews (*i.e.,* finding, now, that the private investors' participation was not significant) with respect to the first three debt-to-equity conversions.  Commerce is not barred from making new determinations or reconsidering its position on the issues in light of new record information so long as Commerce provides a reasonable explanation for doing so, as Commerce did here.  *Yama Ribbons*, 865 F. Supp. 2d at 1298 ("Commerce must base its decisions on the record before it in each individual investigation."); *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (2005) ("{E}ach administrative review is a separate segment of proceedings with its own unique facts."); *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1320 (Ct. Int'l Trade 2002) (recognizing Commerce's inherent authority to reconsider prior positions).

KG Dongbu's assertion that Commerce should not have re-examined the countervailability of the three debt-to-equity conversions because there was no new information on the record that would justify a reexamination is meritless. Dongbu Br. at 19-22. Commerce explained that, although it ordinarily does not re-examine findings of financial contribution and specificity absent new evidence, Commerce must reexamine "benefit" in each successive administrative review because the purpose of these reviews is to determine the amount of any net countervailable subsidy. IDM at 47-48. Here, and in the fourth administrative review, as Commerce explained in the IDM, private investors independent from the creditors' committee were involved in the fourth equity conversion. IDM, P.R. 181 at 47. This inclusion of private investors independent from the creditors' committee is a factual change from prior reviews that led Commerce to reconsider the role the KDB played in its control in the debt restructurings, as discussed above. *Id.* Although KG Dongbu may disagree about the import of independent private investor participation, Dongbu Br. at 16, KG Dongbu's subjective disagreement is not dispositive. *Uttam Galva Steels Ltd. v. United States*, No. 21-2119, 2022 WL 1419596, at *4 (Fed. Cir. May 5, 2022) (agreeing with the trial court that appellant failed to demonstrate that Commerce's determination was unsupported by substantial evidence because it could not demonstrate that the cited evidence "could lead Commerce to reach one and only one reasonable outcome on this administrative record").

As explained in detail in the Equity Infusions Memorandum, C.R. 260, Commerce's comprehensive review of the totality of the evidence, including the underlying agreements and the ownership of Dongbu Steel, indicates that GOK-controlled entities, in particular the KDB, exercised significant influence over the first three conversions. Thus, as Commerce explained, Commerce reasonably concluded that the participation of KG Dongbu's private creditors in the

first, second, and third equity infusions was not significant.  Accordingly, we respectfully request

that the Court sustain Commerce's determination.

### III.   Commerce's Determination That The Benefits From Dongbu Steel's Debt-To-Equity Swaps Passed Through To KG Dongbu Is Supported By Substantial Evidence And In Accordance With Law

This Court should also sustain Commerce's determination that the benefits from Dongbu

Steel's debt-to-equity swaps were not extinguished when the company was acquired by KG

Dongbu.  IDM, P.R. 181 at 61.  KG Dongbu challenges Commerce's "pass through"

determination because, it claims, the acquisition involved an arm's length purchase for fair

market value and, therefore, the sale extinguished any benefits.  Dongbu Br. at 25.  Put

differently, KG Dongbu claims that it rebutted Commerce's baseline presumption that non-

recurring subsidies continue to benefit the new company regardless of the change in ownership.

But the record does not support this claim.  Commerce conducted a thorough analysis of the

relevant record facts, including KG Dongbu's change-in-ownership appendix response.  Having

done so, Commerce could not conclude that the sale was arm's length for fair market value.

IDM, P.R. 181 at 57-61.  Because KG Dongbu failed to rebut Commerce's baseline presumption,

Commerce applied it.  *Id*. at 61.

#### A.   Legal Framework

Pursuant to 19 U.S.C. § 1677(5)(F) and the *Notice of Final Modification of Agency*

*Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127

(Dep't Commerce June 23, 2003) (*Notice of Final Modification*), Commerce presumes that a

non-recurring subsidy will benefit a recipient over the average useful life of the relevant assets,

and Commerce allocates the subsidy over that period of time.  A respondent may rebut this

presumption if it proves that a change in ownership occurred in which the former owner sold all

or substantially all of a company or its assets, and that the sale was at arm's-length and for fair market value, in which case, the pre-sale subsidy has been extinguished and does not "pass through" to the new owner.  *Id.*

      Where a government sells its ownership in a company, a respondent may rebut the baseline "pass through" presumption by demonstrating that during the allocation period, a privatization occurred in which the government sold its ownership of all or substantially all of a company or its assets, retaining no control of the company or its assets, and that the sale was an arm's length transaction for fair market value.  *Notice of Final Modification*, 68 Fed. Reg. at 37,127.  The *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act* (SAA) provides that Commerce has the discretion to determine whether, and to what extent, privatization of a government-owned firm extinguishes prior subsidies.  IDM, P.R. 181 at 57 (citing to the *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act* (SAA), H.R. Doc. 103-316, vol. 1 (1994) at 258).  The SAA also acknowledges that "{t}he issue of the privatization of a state-owned firm can be extremely complex and multifaceted."  *Id*.  Moreover, section 1677(5)(F) of the statute was added "to clarify that the sale of a firm at arm's length does not automatically, and in all cases, extinguish any prior subsidies conferred."  *Id*. (citing to the SAA at 258); 19 U.S.C. § 1677(5)(F) (providing that even if the sale resulting in a change in ownership was arm's length, Commerce is not required to find prior subsidies no longer countervailable).

      In analyzing whether the transaction was for fair market value, the *Notice of Final Modification* specifies that "the basic question is whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under the prevailing market conditions were paid, and paid through monetary or equivalent compensation."  *Notice of*

*Final Modification,* 68 Fed. Reg. at 37,127; IDM at 57-58.  To make this determination, Commerce normally will examine whether the government, in its capacity as seller, acted in a manner consistent with the normal sales practices of private, commercial sellers in that country. *Id.*, 68 Fed. Reg. at 37,127.  A primary consideration in this analysis is "whether the government failed to maximize its return on what it sold, indicating that the purchaser paid less for the company or assets than it otherwise would have had the government acted in a manner consistent with the normal sales practices of private, commercial sellers in that country." *Id.*

Commerce considers profit maximization, *i.e.*, a basic principle of corporate finance and management that the primary function of a commercial enterprise is to maximize the financial return on investment, an appropriate consideration in the fair market value analysis.  IDM at 58; 68 Fed. Reg. at 37,132.  In *Delverde v. United States*, the United States Court of Appeals for the Federal Circuit agreed, acknowledging that the concerns of a private, commercial seller are distinct from those of the government: "{u}nlike a private seller who seeks the highest market price for its assets, the government may have other goals, such as unemployment, national defense, and political concerns, which may affect the terms of a privatization transaction." *Delverde, SrL v. United States*, 202 F.3d 1360, 1369 (Fed. Cir. 2000).

### B.  Commerce's Fair Market Value Analysis Is Supported By Substantial Evidence And Is In Accordance With Law

Here, the record for this review shows that the government retained 27.10 percent of its Dongbu Steel ownership upon the acquisition at issue.  IDM, P.R. 181 at 57.  As Commerce explained in the *Final Results*, "even if a transaction is made at arm's length, if the sale was not for fair market value, the prior subsidies may still pass through." *Id.*; Dongbu Br. at 26 n.6. Thus, based on these facts, Commerce's "pass through" analysis centered on fair market value.

26

In the *Final Results*, Commerce determined that the seller, in this case, the KDB-led

creditor's council, did not maximize profit when selling Dongbu Steel, as in a normal private-to-

private transaction. Therefore, the sale was not for fair market value. IDM, P.R. 181 at 58-61.

Thus, and contrary to KG Dongbu's assertions, Commerce's fair market value analysis is

supported by the record and otherwise in accordance with law. Dongbu Br. at 26; IDM at 57-59.

To reach its determination, Commerce considered the purpose of the acquisition; the information

on and conditions to which the seller agreed; and price per share paid. IDM at 58-59; Dongbu

Br. at 26-27.

First, at the time of the acquisition, Dongbu Steel was effectively under the control of its

creditors and its ███████████████████ ]. Equity Infusions Memo, C.R. 260 at 12 and 15.[7]

The record shows that the KDB-led creditors' council had concerns other than seeking the

highest market price for Dongbu Steel's assets, as they would have in a normal private,

commercial transaction. IDM at 58; *see also Delverde*, 202 F.3d at 1369. In fact, the entire

purpose of the sale was to graduate Dongbu Steel from the debt restructuring program. IDM,

P.R. 181 at 58 (citing Equity Infusions Memorandum, C.R. 260 at 12-13); Dongbu IQR, P.R.

100 at 36-38, Exh. B-10 and B-33; Dongbu SQR 1, P.R. 102, C.R. 200 at 7; GOK IQR, P.R. 52-

68, C.R. 32-51 at 16. KG Dongbu summarized the acquisition's origins and purpose:

> Because of the upcoming maturity date and termination date of the extension
> period for repayment of the restructured loans of December 31, 2018, the KDB, as
> the principal creditor bank in the {creditors' council}, appointed
> {Pricewaterhouse Cooper} to evaluate … whether Dongbu Steel **could meet the
> workout graduation requirement by the maturity date**. According to
> {Pricewaterhouse Cooper's 2018 Feasibility Report}, Dongbu Steel could not
> meet the workout graduation requirement, but the going-concern value of the
> company (KRW [███████████████████████████

---

[7]    The Equity Infusions Memorandum on these pages cites Dongbu IQR, P.R. 69-75;
C.R. 100-154 at 28, 31, 33, 35, 38, Exh. 10-A, Exh. B-7, Exh. B-10, Exh. B-16, Exh. B-30, and
KG Dongbu First Supplemental Questionnaire Response (Donbgu SQR, 1), Jan. 29, 2022, P.R.
102, C.R. 200 at 9.

████████████████████████ n]).  Thus, a ██████████
████████████████ ] recovery ratio
for liquidation.  … Based upon the Feasibility Report, the {creditors' council}
held the 6th {Meeting} … and approved the following:

1)  Confirmation of credit amount and voting rights thereon based on
    credit amount as of November 30, 2018.
2)  Extension of loan maturity until December 31, 2020, with no other
    changes to the terms of the loans.
3)  Amendment of the Agreement for Compliance of Business
    Normalization Plan ("Amended Workout Agreement") …

Under Article 3 of the Amended Workout Agreement approved at the 6th
{Meeting}, the {creditors' council} and Dongbu Steel **agreed to proceed with
the business normalization process through a merger and acquisition**.

Dongbu IQR, C.R. 100 at 36-37 (emphasis added).  Thus, the creditors' council's concern was to

graduate Dongbu Steel from the debt restructuring program and the focus of the acquisition was

credit recovery in light of the fact that "Dongbu Steel could not meet the workout graduation

requirement by the maturity date."  *Id.*; IDM, P.R. 181 at 57-58.  It is under these circumstances

that the acquisition took place, highlighting the distinction between profit maximization in

accordance with normal sales practices of private, commercial sellers (*i.e.*, seeking the highest

market price for assets) and creditor recovery (*i.e.*, to cease further loss and recover investment).

IDM at 58-59; Equity Infusions Memo, C.R. 260 at 15.

Second, the seller, the KDB-led creditors' council, agreed to certain conditions for the

KG Dongbu (KG Consortium) to acquire Dongbu Steel.  IDM, P.R. 181 at 58.  One of the

conditions required the creditors' council to extend existing loans and reduce interest rates.  *Id.*

Further, the creditors' council agreed to another round of debt-to-equity swaps, at a price of

KRW 25,000 per share.  *Id.*  Notably, the price per share paid by the creditors' council was

higher than the price per share paid by the KG Consortium for the acquisition at 5,000 KRW per

share.  *Id.*  Although Pricewaterhouse Cooper evaluated the acquisition, it did so in contrast to

three other scenarios, and focused mainly on how much money Dongbu Steel's creditors could

28

recover—not how the creditors could maximize profit.  *Id.*  Therefore, Commerce reasonably determined that the KDB-creditors' council did not maximize its return when selling Dongbu Steel.  *Id.* at 58-59.

KG Dongbu claims that "there is absolutely no basis to conclude" certain conditions agreed to by the seller (*i.e.*, an agreement to extend existing loans and reduce interest rates) led to KG Dongbu paying less than fair value.  Dongbu Br. at 27.  To clarify, Commerce concluded that the acquisition was not carried out to maximize profit in selling Dongbu Steel, as in a normal, private-to-private transaction, and, therefore, that it was not for fair market value based on the standard set forth in the *Notice of Final Modification*.  68 Fed. Reg. at 37,127.  IDM, P.R. 181 at 58.  Commerce did not base its conclusion solely on these certain conditions, or any other single fact alone.  Instead, Commerce considered the relevant record evidence and relied on the weight of the record, *see* IDM at 58-61, to determine that the sale was not carried out to maximize profit as in a normal, private-to-private transaction.[8]

For example, KG Dongbu acquired Dongbu Steel in an open bidding process as the highest bidder.  IDM at 60.  However, as KG Dongbu acknowledges in its brief, *only* KG Dongbu (KG Consortium) submitted a final bid.  Dongbu Br. at 8.  As a general rule, Commerce carefully scrutinizes any sale where the face value of a financial, or other instrument given as payment, differs from market value.  *Id.*  Here, the price per share paid by the creditors' council was higher, *i.e.*, KRW 25,000, than the price per share paid by KG Dongbu, *i.e.*, KRW 5,000.  Equity Infusions Memo, C.R. 260 at 13; IDM, P.R. 181 at 58.  KG Dongbu's claim that this price per share difference is irrelevant to the fair market value inquiry is not logical and ignores

---

[8]   These pages of the IDM cite: Dongbu IQR, P.R. 69-75, C.R. 100-154 at 36-37, 39, Exh. B-16, Exh. B-35; GOK IQR, P.R. 52-68, C.R. 32-51, at 16; Equity Infusions Memo, C.R. 260, at 13.

the standard articulated in the *Notice of Final Modification* when the key question is whether the full value of the company under prevailing market conditions was paid.  IDM at 57; *Notice of Final Modification*, 68 Fed. Reg. at 37,127, 37,133.  Regardless, one of the conditions for KG Dongbu to acquire Dongbu Steel was that the KDB-led creditors' council agree to extend existing loans and reduce the interest rates.  IDM at 58; Dongbu IQR, P.R. 69-75, C.R. 100-154 at 39; Equity Infusions Memo, C.R. 260 at 8.  Further, the creditors' council agreed to another round of debt-to-equity conversions.  *Id*.  Nothing on the record indicates that the incentives agreed to by the seller would be part of a normal, private-to-private transaction for fair market value.  IDM at 61.  Nor does KG Dongbu's final bid increase after the creditors' council agreed to KG Dongbu's conditions demonstrate that the seller maximized profit or that fair market value was tendered. Dongbu Br. at 28-29.  After all, KG Dongbu increased its bid only after the creditors' council increased the sales value (by agreeing to the debt-to-equity swap, extension of loans and reduction of interest rates).  Equity Infusions Memo, C.R. 260 at 8.

KG Dongbu also claims that Pricewaterhouse Cooper's evaluation, *i.e.*, Termination Report, proves that the acquisition was the "most valuable scenario available to the Creditors' Council."  Dongbu Br. at 30 (emphasis added); *id.* at 29 (arguing the creditor recovery focus suggests return maximization).  That the acquisition was the most valuable scenario for or available to Dongbu Steel's creditors does not detract from Commerce's determination.  IDM at 58; *Delverde*, 202 F.3d at 1369 (stating that unlike a private seller's endeavor to seek the highest market price, the government may have other concerns which may affect the terms of a transaction (emphasis added)).  Again, the fair market value inquiry asks whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth what was paid under prevailing market conditions was paid.  *Notice of Final Modification*, 68

Fed. Reg. at 37,127.  In making this determination, Commerce normally examines whether the government, in its capacity as seller, acted in a manner consistent with the normal sales practices of private, commercial sellers and a primary consideration is whether the "government failed to maximize its return on what it sold." *Id*.  That the acquisition was the most valuable to the company's creditors, focused on investment recovery, fails to demonstrate that the creditors maximized return on the sale of the company (*i.e.*, that they acted in a manner consistent with the normal sales practices of private, commercial sellers and maximized profit).

Having committed substantial capital to the company, Dongbu Steel's creditors were interested in graduating the company from the restructuring program and recovering their investments.  IDM at 58-60 (citing Dongbu IQR, C.R. 100 at 36-37); Equity Infusions Memo, C.R. 260 at 15.  In its brief, KG Dongbu acknowledges the possibility of a "better deal" and the report's creditor recovery focus.  Dongbu Br. at 30 ("{T}he PricewaterhouseCoopers report demonstrated ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████]" (internal marks omitted) (citing GOK IQR at 10).  Indeed, the report's focus is not whether the acquisition represents the best deal to maximize profit, but the risk to creditor recovery in four scenarios, including acceptance of the sole, final bid from KG Dongbu and total liquidation.  *Id*.; IDM at 58; Equity Infusions Memo, C.R. 260 at 8; Dongbu IQR, C.R. 100 at 38-42 and Exhibit B-29, C.R. 140 (Pricewaterhouse Cooper's report on termination of joint management) (Termination Report).  According to KG Dongbu, the report "is an analysis of the new investment as a part of Dongbu Steel's business normalization plan which analyzes the best way for creditors to maximize their recovery ratio."  Dongbu IQR, C.R. 100 at 40 n.13; IDM,

P.R. 181 at 58 and Equity Infusions Memo, C.R. 260 at 7.  Commerce reasonably found that

Pricewaterhouse Cooper's evaluation of the acquisition focused mainly on how much money the

creditors could recover from the acquisition, rather than how they could maximize profit.  IDM

at 58, 60 (citing Dongbu IQR, C.R. 100 at 39-40).  Contrary to KG Dongbu's assertions,

Commerce never claimed to rely solely any one factor, such as the report's creditor recovery

focus to support its conclusion that the sale was not carried out to maximize profit.  IDM at 58;

Dongbu Br. at 29-30, 30 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168

(1962)).

### C.  Commerce's Analysis Of The Non-Exhaustive Factors Is Supported By Substantial Evidence And In Accordance With Law

KG Dongbu also challenges Commerce's determination based on the agency's analysis

of the factors listed in the *Notice of Final Modification*.  Dongbu Br. at 32-36 (citing *Notice of*

*Final Modification*, 68 Fed. Reg. at 37,127).  But the four factors, as outlined in the *Notice of*

*Final Modification*, are non-exhaustive factors which Commerce *may* consider when assessing

whether a transaction was for fair market value. IDM at 59-61; *Notice of Final Modification*, 68

Fed. Reg. at 37,127 (emphasis added) (discussing that Commerce may consider whether:  (1) an

objective analysis was performed to determine appropriate sales price; (2) artificial barriers to

entry were imposed on potential purchasers; (3) the highest bid was accepted; and (4) committed

investment barred entry or distorted value bidders were willing to pay).  As Commerce explained

in the *Final Results*, "{w}hile these factors may be used to assess whether a transaction was for

fair value, they are not required by Commerce as part of its analysis" and, because the list is non-

exhaustive, "Commerce may consider other facts on the record that are relevant to Commerce's

determination."  IDM at 59.  In any event, Commerce's analyzed all of the relevant factors and

based its determination on the weight of the record.

In the *Notice of Final Modification*, Commerce acknowledged that it generally does not consider "any one factor in itself to be dispositive, but will consider all the relevant facts and circumstances of a privatization to determine whether the sales price was a fair market value." IDM at 59 (citing *Notice of Final Modification*, 68 Fed. Reg. at 37,131 (explaining that Commerce's fair market value analysis must be "sufficiently flexible to address the diverse factual scenarios"). Thus, contrary to KG Dongbu's challenge, Commerce's fair market value framework is not restricted to formulaic analysis of the four non-exhaustive factors set forth in the *Notice of Final Modification*. Instead, Commerce analyzes *all* the relevant facts and circumstances surrounding a particular privatization which is precisely Commerce did here. IDM at 59 (citing to the four factors set forth in *Notice of Final Modification*, 68 Fed. Reg. at 37,127).

First, based on the record, Commerce could not agree with KG Dongbu that price acceptance was based on an objective analysis by Pricewaterhouse Cooper. IDM at 59; Dongbu Br. at 32. Pricewaterhouse Cooper had been retained by the creditors' council to evaluate the feasibility of the debt restructuring workout program in prior years and one such feasibility evaluation prompted the acquisition. Equity Infusions Memo, C.R. 260 at 16-17. As explained above, Commerce found that the Pricewaterhouse Cooper report focused on how much money creditors could recover on their past loans and investments as a result of the acquisition, compared to three other scenarios. IDM at 59-60 (citing Dongbu IQR, P.R. 69-75; C.R. 100-154 at 36-37, 39-40).

Commerce correctly considered the Pricewaterhouse Cooper 2018 Feasibility Report to support its finding that no objective analysis was performed. Dongbu Br. at 33; IDM at 59-60. In its initial questionnaire response, KG Dongbu explained that the creditors' council initiated

33

the acquisition because of fears that Dongbu Steel "could not meet the workout graduation requirements."  Dongbu IQR, P.R. 69-75, C.R. 100-154  at 36-37, Exhibit B-35; IDM at 59-60 (citing Dongbu IQR, P.R. 69-75, C.R. 100-154  at 36-37).  This assessment derived from Pricewaterhouse Cooper's 2018 Feasibility Report and prompted the creditors' council's approval to proceed the business normalization plan through an acquisition.  IDM at 59-60 (citing Dongbu IQR, P.R. 69-75, C.R. 100-154 at 36-37); *see also* KG Dongbu IQR, P.R. 69-75, C.R. 100-154 at Exh. B-35.  In this context, Pricewaterhouse Cooper conducted its analysis of the acquisition, considering the risk of creditor recovery in four scenarios including total liquidation.  Accordingly, Commerce concluded that Pricewaterhouse Cooper's evaluation of the acquisition was mainly focused on how much money the creditors could recover from the acquisition, not on how profit from the sale could be maximized.  IDM at 59-60.  Therefore, the record did not support an objective analysis was performed.  As outlined in the *Notice of Final Modification*, "the absence of an objective analysis {is} highly probative in determining that the transaction was not a fair market value."  68 Fed. Reg. at 37,131 n.13.

Next, although KG Dongbu bought Dongbu Steel through an open bidding process as the highest bidder, Commerce determined the sale was not for fair market value given the conditions of the sale, price per share paid, *etc*.  As explained above, Commerce will scrutinize any sale where the face or exchange value of a financial, or other instrument given as payment, differs from its market value.  IDM at 60 (citing *Notice of Final Modification*, 68 Fed. Reg. at 37,132).  The creditors' council paid KRW 25,000 per share, yet KG Dongbu paid only KRW 5,000 per share as the highest bid.  Given that the fair market value analysis centers on whether the company's value, under prevailing market conditions, was paid, the price per share difference along with the conditions upon which the creditors' council agreed are significant.

34

Upon thorough consideration of the applicable standard in light of the record facts, including the non-exhaustive factors set forth in the *Notice of Final Modification*, Commerce reasonably concluded that the creditors' council did not act in a manner consistent with the normal sales practices of private, commercial sellers in Korea.  Therefore, Commerce determined that that the acquisition was not for fair market value because it was not carried out to maximize profit.  IDM at 59-60.  Accordingly, KG Dongbu failed to rebut the baseline pass-through presumption with record information and, as such, Commerce lawfully applied it here. That KG Dongbu can draw different conclusions from the record evidence to support its preferred outcome fails to establish that Commerce's determination is unsupported by substantial evidence.  *Consolo v. Fed'l Maritime Comm'n*, 383 U.S. at 620 (holding that the ability to reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence); *Changzhou Trina Solar Energy*, 975 F.3d at 1333 ("That {a party} can point to evidence of record which detracts from the evidence which supports the {agency's} decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive") (cleaned up).

IV.     **Commerce's Calculation Of The Uncreditworthy Benchmark And Unequityworthy Discount Rate Is Supported By Substantial Evidence And In Accordance With Law**

Commerce correctly calculated the uncreditworthy benchmark rate and the unequityworthy discount rate consistent with its regulations and based upon the available record evidence.  KG Dongbu claims that Commerce incorrectly applied the formulas to calculate the uncreditworthy benchmark and unequityworthy discount rates, asserting that the Court should follow its remand opinion in *KG Dongbu Steel*, Slip Op. 23-98.  Dongbu Br. at 36.  Again, the decision in *KG Dongbu Steel* is not yet final.  Accordingly, while acknowledging this Court's prior ruling, we respectfully submit that Commerce's calculation of the uncreditworthy

benchmark and unequityworthy discount rate is supported by substantial evidence, is in accordance with law, and should be sustained.

### A.  Legal Framework

In accordance with 19 C.F.R. § 351.507(c), the benefit conferred by an equity infusion "shall be allocated over the same period as a non-recurring subsidy."

Commerce's regulations at  19 C.F.R. § 351.505(a)(1) provide that in the case of a government-provided loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount a firm would pay on a comparable commercial loan that the firm could actually obtain on the market.  Commerce normally relies on effective interest rates.  *Id*.  When Commerce finds that a company has received a government-provided long-term loan, and that company is uncreditworthy, however, Commerce looks to 19 C.F.R. § 351.505(a)(3)(iii), which provides the uncreditworthy benchmark formula, to calculate the benefit.

ib = ████████████████ 1/n − 1,

where:

n = the term of the loan;

ib = the benchmark interest rate for uncreditworthy companies;

if = the long-term interest rate that would be paid by a creditworthy company;

pn = the probability of default by an uncreditworthy company within n years; and

qn = the probability of default by a creditworthy company within n years.

Further, 19 C.F.R. §§ 351.524(d)(1) and (d)(3)(ii) provide that, in the case of a firm considered to be uncreditworthy, Commerce will use as a discount rate the interest rate described in 19 C.F.R. § 351.505(a)(3)(iii).

36

**B.   Commerce Correctly Calculated The Unequityworthy Discount Rate Used For Allocating The Benefits From Long-Term Loans, Bonds, And Equity Infusions**

In the preliminary results, unchanged in the final results, Commerce found that KG Dongbu was uncreditworthy, and thus, used the uncreditworthy benchmark formula in 19 C.F.R. § 351.505(a)(3)(iii).  IDM, P.R. 181 at 61.  Commerce used a three-year KRW-denominated AA-rate corporate bond rate as the long-term interest rate paid by a creditworthy company because it was the only one available on the record.  *Id.*

Ignoring the plain language of Commerce's regulations, KG Dongbu contends that Commerce incorrectly used three-year default rates instead of six-year rates.  Dongbu Br. at 37-38, 40.  Dongbu maintains that the default rates should be tied to the term of the loan.  *Id.*  And Dongbu further argues that Commerce incorrectly calculated the discount rates based on a three-year period because it incorrectly calculated the uncreditworthy benchmark interest rate, as discussed above.  Dongbu Br. at 40-41.  For the reasons explained below, there is no merit to these claims.

As explained in the preliminary results, Commerce found that though there were some private commercial banks involved in the debt restructuring of KG Dongbu, the restructuring of the company's debt was not overseen by private banks.  PDM, P.R. 141 at 14-16.  Instead, KG Dongbu's debt restructuring was controlled by the CBC, which, in turn, was controlled by GOK policy banks, such as, the KDB.  *Id.*  Thus, Commerce found that the record did not warrant any change from prior reviews, and concluded that the loans from private creditors on the CBC cannot be construed to be "comparable commercial loans," and, therefore, cannot be used as a commercial benchmark under 19 U.S.C. § 1677(5)(E)(ii) and 19 C.F.R. § 351.505(a)(2).  Commerce based its conclusion on the fact that the CBC is controlled by GOK-controlled policy and special purpose banks.  PDM, P.R. 141 at 14-16.  Further, the renegotiated loans raised by

KG Dongbu, *see* Dongbu Br. at 36-37, were provided by member banks of Dongbu Steel's

Creditor Financial Institutions' Committee, which took over the administration of Dongbu

Steel's restructuring from the CBC, which in turn was controlled by GOK policy banks.  Dongbu

IQR, C.R. 100 at 28 and Exhibit B-44, C.R. 151.  Consequently, these loans do not constitute

"comparable commercial loans" suitable for the purposes of the benchmark calculation under 19

C.F.R. 351.505(a)(2), due to the substantial government influence and the fact that they were

part of a government program.  *Nucor v. United States*, 494 F. Supp. 3d 1377, 1381 (Ct Int'l

Trade 2021) ("The court concludes that Commerce determined properly that Dongbu's loans

could not be used for calculating a benchmark interest rate because the loans provided under the

government program were non-commercial.  The Court notes that the relevant statute and

regulations do not require Commerce to use every loan received by a company as benchmark.").

As a result, Commerce used a three-year KRW-denominated AA-rate corporate bond rate

published by the Bank of Korea as the long-term interest rate paid by a creditworthy company

because it was the only long-term interest rate available on the record consistent with the legal

standard.  No other long-term interest rates were provided on the record by the parties.  IDM,

P.R. 181 at 62; 19 C.F.R. § 351.505(a)(3)(iii).

Commerce can rely only on information that is on the record, and it was KG Dongbu's

burden to populate the record with relevant information.  *Yama Ribbons & Bows*, 865 F. Supp.

2d at 1298 ("Commerce must base its decisions on the record before it in each individual

investigation."); *Mannesmannrohren–Werke AG v. United States,* 120 F. Supp. 2d 1075, 1097

(Ct. Int'l Trade 2000) (explaining that it is not Commerce's burden to develop the record).  Thus,

the calculation Commerce used is the correct calculation for a three-year unequityworthy

discount rate, based on the formula specified by 19 C.F.R. 351.505(a)(3)(iii), and information

available on the record.  Although we acknowledge that the Court remanded this issue for further explanation regarding the loan term in *KG Dongbu*, Slip Op. No. 23-98 at 16, we respectfully submit that, for the reasons, explained above, Commerce's determination is supported by substantial evidence and in accordance with law.

Further, 19 C.F.R. 351.507(c) requires that the benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy.  Because Commerce found that KG Dongbu was uncreditworthy, Commerce used a discount rate for uncreditworthy companies consistent with 19 C.F.R. § 351.524(d)(1) and (d)(3)(ii).  IDM at 62.  Commerce used as a discount rate the interest rate described in 19 C.F.R. § 351.505(a)(3)(iii), which is an exception for an uncreditworthy company and, as discussed above, was a three-year creditworthy interest rate.  *Id.*

Here, Commerce found that the use of an uncreditworthy benchmark rate, calculated using three-year KRW-denominated AA-rate corporate bonds published by the Bank of Korea is appropriate based on the record, as is use of the same discount rate for the allocation of the benefit conferred by the equity infusions.  Despite KG Dongbu's contentions, Commerce has correctly applied the formula in 351.505(a)(3)(iii) and adhered to the regulations to the best of its ability given the information available on the record.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's *Final Results*, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

<u>/s/Claudia Burke</u>
By:   CLAUDIA BURKE
Deputy Director

<u>/s/ Elizabeth Speck</u>

OF COUNSEL:          ELIZABETH SPECK
                            Senior Trial Counsel
Leslie M. Lewis           United States Department of Justice
Attorney                  Civil Division
U.S. Department of Commerce   Commercial Litigation Branch
Office of the Chief Counsel for    P.O. Box 480
Trade Enforcement & Compliance  Ben Franklin Station
Washington, D.C. 20230       Washington, D.C. 20044
                            Tel: (202) 307-0369
                            Fax: (202) 514-7965

October 19, 2023           *Attorneys for Defendant*

*PUBLIC VERSION*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 11,868 words, including text, footnotes, and

headings.

<u>/s/ Elizabeth Anne Speck</u>