NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KG DONGBU STEEL CO., LTD.** | |
| Plaintiff, | **Before: Hon. Jennifer Choe-Groves, Judge** |
| v. | |
| **UNITED STATES,** | **Court No. 23-00055** |
| Defendant, | **NON-CONFIDENTIAL VERSION** |
| and, | **Business Proprietary Information Removed from Pages: 8, 14-15** |
| **NUCOR CORPORATION,** | |
| Defendant-Intervenor. | |

### RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Defendant-Intervenor
Nucor Corporation*

Dated: November 9, 2023

Ct. No. 23-00055                                      NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................... 1

    A.    Administrative Decision Under Review ............................... 1

    B.    Issues Presented and Summary of Argument ....................... 2

III.   STATEMENT OF FACTS .................................................................. 4

    A.    Legal Framework ................................................................. 4

    B.    Dongbu's Debt-to-Equity Swaps ......................................... 7

    C.    Commerce's Preliminary Results ......................................... 8

    D.    Commerce's Final Determination ........................................ 9

IV.   ARGUMENT ................................................................................... 11

    A.    Commerce's Reconsideration of the Benefit Conferred by the First Three Debt-to-Equity Swaps Was Lawful and Supported by Substantial Evidence ........................................................ 11

        1.    Commerce Has the Inherent Authority to Reconsider Its Determinations, With or Without New Evidence ..................... 12

        2.    Commerce's Reconsideration of the First Three Debt-to-Equity Swaps Was Adequately Explained and Supported on both Legal and Factual Grounds ..................... 13

        3.    Commerce's Determination Was Otherwise Lawful and Supported by Substantial Evidence ......................... 15

    B.    Commerce Properly Determined that the KG Consortium's Investment Did Not Extinguish Non-Recurring Subsidies ................................. 21

    C.    Commerce Properly Calculated the Uncreditworthy and Unequityworthy Benchmarks ............................................. 23

**NON-CONFIDENTIAL VERSION**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Elkam Metals Co. v. United States*,
    26 CIT 234, 193 F. Supp. 2d 1314 (2002) .............................................................12

*Hangzhou Spring Washer Co. v. United States*,
    29 CIT 657, 387 F. Supp. 2d 1236 (2005) .............................................................12

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009) .............................................................................12

*Hynix Semiconductor Inc. v. United States*,
    30 CIT 288, 425 F. Supp. 2d 1287 (2006) ...............................................................5

**Statutes**

19 U.S.C. § 1677(5)(B) ....................................................................................................4, 17

19 U.S.C. § 1677(5)(B)(iii) ..................................................................................................17

19 U.S.C. § 1677(5)(D) ..........................................................................................................4

19 U.S.C. § 1677(5)(E)(i) .......................................................................................................4

**Regulations**

19 C.F.R. § 351.505(a)(3)(iii) .......................................................................................23, 25

19 C.F.R. § 351.507(a)(1) ...............................................................................................4, 16

19 C.F.R. § 351.507(a)(2)(i) ...........................................................................................4, 16

19 C.F.R. § 351.507(a)(2)(iii) .........................................................................................5, 16

19 C.F.R. § 351.507(a)(3) .............................................................................................16, 18

19 C.F.R. § 351.507(a)(3)(i) ................................................................................................6

19 C.F.R. § 351.508(a) ..................................................................................................4, 15

19 C.F.R. § 351.524(b)(1) ...................................................................................................6

19 C.F.R. § 351.524(c)(1) ...................................................................................................6

19 C.F.R. § 351.524(d)(1) .............................................................................................6, 25

Ct. No. 23-00055                                    NON-CONFIDENTIAL VERSION

19 C.F.R. § 351.524(d)(3)(ii)..................................................................................25

19 C.F.R. § 351.524(d)(3)(iii).................................................................................25

**Administrative Materials**

*100- to 150-Seat Large Civil Aircraft from Canada*,
     82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) ..............................24

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*,
     77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) ................................5

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
     88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023).....................................1

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
     87 Fed. Reg. 47,973 (Dep't Commerce Aug. 5, 2022)...................................6

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
     87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) ...............................8, 9

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
     86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) ...............................19

*Certain Pasta from Italy*,
     70 Fed. Reg. 17,971 (Dep't Commerce Apr. 8, 2005)...................................7

*Coated Free Sheet Paper from the Republic of Korea*,
     72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ..........................20, 21

*Countervailing Duties*,
     63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)..................4, 16, 19, 23, 24

*Dynamic Random Access Memory Semiconductors from the Republic of Korea*,
     68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) .................................5

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled
     or Unassembled, from Japan*, 73 Fed. Reg. 67,131 (Dep't Commerce Nov. 13,
     2008) .........................................................................................................12

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay
     Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't Commerce
     June 23, 2003) .................................................................................6, 7, 21, 22

*Regulations Improving and Strengthening the Enforcement of Trade Remedies
     Through the Administration of the Antidumping and Countervailing Duty Laws*,
     88 Fed. Reg. 29,850 (Dep't Commerce May 9, 2023) ............................5, 18

NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

On behalf of Defendant-Intervenor Nucor Corporation ("Nucor"), we hereby submit the
following response to the July 21, 2023 motion for judgment on the agency record filed by Plaintiff
KG Dongbu Steel Co. Ltd. ("KG Dongbu") (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon
Steel Co., Ltd. (collectively "Dongbu Steel" or "Dongbu")).[1]  Pl. Mot. For J. on the Agency R.
(July 21, 2023), ECF No. 28 ("KG Dongbu Br.").  For the reasons discussed below, Nucor
respectfully requests that the Court reject KG Dongbu's arguments and sustain the determination
of the U.S. Department of Commerce ("Commerce").

## II.   RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

The administrative determination under review in this appeal is Commerce's Final Results
of the administrative review of the countervailing duty order on *Certain Corrosion-Resistant Steel
Products from the Republic of Korea* for the 2020 POR.  *Certain Corrosion-Resistant Steel
Products from the Republic of Korea*, 88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023) (final
results and partial rescission of countervailing duty admin. rev.; 2020), P.R. 188[2] ("Final Results")
and accompanying Issues and Decision Memorandum, P.R. 181 ("Final Decision Memo").

---

[1]     This appeal addresses a period of review ("POR") acquisition of equity shares in the former
Dongbu Steel Co., Ltd. by a group of investors called the KG Consortium.  Following the share
acquisition, Dongbu Steel Co., Ltd. changed its name to KG Dongbu Steel Co., Ltd.  Hereinafter,
Nucor refers to the pre-acquisition entity as "Dongbu Steel" or "Dongbu," and to the post-
acquisition entity, including Plaintiff, as "KG Dongbu."

[2]     Documents on the public record of the underlying administrative review are identified here
as "P.R.," followed by the number assigned to the relevant document in the administrative record
index filed with the Court on May 16, 2023, ECF No. 21. Documents in the confidential
administrative record are identified by name, followed by "C.R." and the corresponding record
number.

Ct. No. 23-00055                                                     NON-CONFIDENTIAL VERSION

B.      **Issues Presented and Summary of Argument**

1.      **Whether Commerce lawfully revisited and modified its prior determinations regarding the first three debt-to-equity swaps in Dongbu Steel's debt restructuring program.**

Yes, Commerce lawfully revisited and modified its prior determinations regarding the first three debt-to-equity swaps.  Commerce, like other administrative agencies, has the inherent authority to reconsider its prior determinations.  It does not require any specific threshold of new information to do so.  Regardless, in this case, the record included new information regarding the benefit conferred by the debt-to-equity swaps considered in prior reviews, and that new information provided sufficient basis for Commerce's departure from its prior findings.  This aspect of the Final Results was thus supported by the record, adequately explained, otherwise lawful, and should be sustained.

2.      **Whether Commerce's determination that private investor participation in certain debt-to-equity conversions was not "significant" was otherwise lawful and supported by substantial evidence.**

Yes, Commerce's determination that private investor participation in the debt-to-equity swaps was not significant was lawful and supported by substantial evidence.  Contrary to KG Dongbu's arguments, determining whether private investor participation is "significant" within the meaning of Commerce's rules is not a rote, numerical analysis based on redline thresholds of private investor participation.  Rather, the question is whether private investor participation is "significant" in that it can be used to establish whether government creditors purchased equity in a manner that is consistent with actual private investor practice and reflective of actual market prices for the shares at issue.  Here, Commerce properly determined that the Korean government financial institutions controlled the terms of the debt-to-equity swaps in a manner that precluded the non-government financial institutions from influencing the terms of the transaction.  It also

properly determined that they were not seeking to maximize returns on new investment but to salvage what they could of pre-existing loans to Dongbu.   The non-government financial institutions were thus not participating as actual private investors, and their share purchases could not be used to benchmark the purchases of the government financial institutions.

> **3.      Whether Commerce properly determined that non-recurring benefits conferred by the debt-to-equity swaps passed through to KG Dongbu following the KG Consortium's investment in Dongbu Steel.**

Yes, Commerce properly applied its "baseline presumption" that non-recurring benefits continue to benefit a firm during the average useful life period ("AUL").  KG Dongbu failed to carry its burden of rebutting this presumption.  As Defendant establishes in detail, KG Dongbu did not establish that its acquisition of shares in Dongbu Steel was an arm's-length transaction for fair market value.   KG Dongbu also failed to establish that the transaction was a sale of all or substantially all of Dongbu Steel or its assets, after which Dongbu Steel's owners retained no control over the company.  To the contrary, Dongbu Steel's prior owners retained a significant ownership interest in the company and significant influence over the company's management decisions.

> **4.      Whether Commerce properly calculated the uncreditworthy interest rate benchmark and, by extension, the uncreditworthy discount rate for non-recurring subsidy allocation.**

Yes, Commerce properly calculated the uncreditworthy interest rate benchmark in accordance with the formula provided in its rules.  This rule defines the variables in the formula as those that Commerce "normally" will use, but it provides the flexibility to modify those variables when doing so is necessary or appropriate based on record information.  Here, Commerce reasonably modified one of the variables to ensure the accuracy and consistency of the resulting benchmark interest rate.  Commerce's rules further provide that the agency will use this interest

rate as the discount rate for uncreditworthy companies when allocating non-recurring benefits over the AUL period.  That is exactly what Commerce did here, so KG Dongbu's assertion that the agency failed to abide by the clear language of its rules is meritless.

## III.    STATEMENT OF FACTS

### A.    Legal Framework

The statute defines a countervailable subsidy, in relevant part, as "the case in which an authority provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B).  A "financial contribution" includes "the direct transfer of funds, such as . . . equity infusions . . . ."  *Id.* § 1677(5)(D).  An equity infusion confers a benefit "if the investment decision is inconsistent with the usual investment practice of private investors . . . in the country in which the equity infusion is made." *Id.* § 1677(5)(E)(i).

Commerce's regulations treat debt-to-equity conversions as equity infusions for the purpose of the benefit analysis.  19 C.F.R. § 351.508(a).  Like the statute, Commerce's equity infusion rules provide that "a benefit exists to the extent that the investment decision is inconsistent with the usual investment practice of private investors . . . in the country in which the equity infusion is made." *Id.* § 351.507(a)(1).  This inquiry "is divided into two methodological tracks, with the choice of methodology dependent upon whether or not actual private investor prices can serve as a benchmark for the shares purchased by the government." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,372 (Dep't Commerce Nov. 25, 1998) (final rule) ("*CVD Preamble*").

When "actual private investor prices (*i.e.*, market prices)" are available to use as a benchmark, *id.*, Commerce "will consider an equity infusion as being inconsistent with usual investment practice . . . if the price paid by the government for newly issued shares is greater than the price paid by private investors" for the same or similar shares.  19 C.F.R. § 351.507(a)(2)(i).

Commerce has recently explained that the issue under this standard is "whether an outside private investor would make an equity investment into that firm under its usual investment practice, not whether a private investor who has already invested would continue to invest." *Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 88 Fed. Reg. 29,850, 29,867 (Dep't Commerce May 9, 2023) ("Proposed Rule").  Pursuant to this "long-standing practice," Commerce "makes a distinction . . . between 'inside' shareholders and private 'outside' investors." *Id.*

Commerce will not rely on such private investor prices if it "concludes that private investor purchases of newly issued shares are not significant."  19 C.F.R. § 351.507(a)(2)(iii).  Private investor share purchases are not significant when they are insufficient for use as a benchmark to establish whether "the other creditors' decision to swap their debt for equity was consistent with the private investor standard . . . ."  Issues and Decision Memorandum accompanying *Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) (final affirm. countervailing duty deter.) at 90 ("*DRAMS from Korea IDM*") (sustained in *Hynix Semiconductor Inc. v. United States*, 30 CIT 288, 315, 425 F. Supp. 2d 1287, 1311-12 (2006)).  Commerce has based this "significance" determination both on the relatively small absolute volume of private investor purchases, *see, e.g.*, *id.*, and on the inability of private investors to independently influence the terms on which government investors purchase shares (*i.e.*, where information other than mere purchase volumes confirms that government investors influenced the terms of non-government investor participation).  *See, e.g.*, Issues and Decision Memorandum accompanying *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) (final affirm. countervailing duty deter.) at 100 ("*Refrigerator-Freezers from Korea IDM*").  When "actual

private investor prices" (*i.e.*, market prices) are unavailable or insignificant, Commerce proceeds to the second "methodological track" and considers whether the equity infusion recipient was equityworthy.  19 C.F.R. § 351.507(a)(3)(i).[3]

Equity infusions and debt-to-equity swaps are normally treated as "non-recurring" subsidies under Commerce's rules.  19 C.F.R. § 351.524(c)(1).  Commerce "will normally allocate a non-recurring benefit to a firm over the number of years corresponding to the AUL of renewable physical assets," in this case 15 years, using a formula set forth in the regulations.  *Id.* § 351.524(b)(1), (d)(1); *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 47,973 (Dep't Commerce Aug. 5, 2022) (prelim. results and partial recission of the countervailing duty admin. rev., 2020), P.R. 145 ("Preliminary Results") and accompanying Preliminary Decision Memorandum, P.R. 140 at 6 ("Prelim. Decision Memo").

When a recipient of non-recurring subsidies has been acquired by another firm during the AUL period, Commerce applies a "baseline presumption" that "non-recurring subsidies can benefit the recipient over a period of time . . . normally corresponding to the average useful life of the recipient's assets."  *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003) (modification of agency practice regarding privatizations) ("*Final Modification*").  This baseline presumption may be rebutted by a showing that "during the allocation period, a {change-in-ownership} occurred in which {a firm} sold its ownership of all or substantially all of a company

---

[3]    Here, Commerce determined that actual private investor prices were unavailable and proceeded to determine that Dongbu Steel was not equityworthy at the time of the respective debt-to-equity conversions.  Final Decision Memo at 46-51.  KG Dongbu challenges only Commerce's determination regarding the availability of actual private investor prices and not Commerce's determination that Dongbu Steel was otherwise not equityworthy at the time of the debt-to-equity swaps.  KG Dongbu Br. at 14-36.

or its assets, retaining no control of the company or its assets, and that the sale was an arm's length transaction for fair market value." *Id.  See also Certain Pasta from Italy*, 70 Fed. Reg. 17,971, 17,972 n.2 (Dep't Commerce Apr. 8, 2005) (prelim. results of countervailing duty admin. rev.) (explaining that the same methodology applies to both government privatizations and other changes in ownership).

### B.   Dongbu's Debt-to-Equity Swaps

In this appeal, KG Dongbu challenges Commerce's determination that a benefit was conferred by a series of debt-to-equity swaps by creditor committees controlled by Korean government financial institutions over the course of a five-year debt restructuring program.  KG Dongbu Br. at 13-36.  Dongbu Steel's debt restructuring program began in 2014 and ended in 2019 with an equity investment by a group of outside investors called the "KG Consortium."  *See generally* Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Initial Questionnaire Response* (Nov. 29, 2021), C.R. 100-154, P.R. 69-75 at 20-42 ("Dongbu IQR").  The first of these debt-to-equity swaps totaled 53 billion Korean won ("KRW") and occurred in January 2015. *Id.* at 30-31.  The second debt-to-equity swap totaled KRW 200 billion and occurred in May 2016. *Id.* at 33-34.  The third debt-to-equity swap totaled KRW 200 billion and occurred in April 2018. *Id.* at 35-36.  The fourth and final debt-to-equity swap totaled KRW 605 billion and occurred in June 2019 as one of the KG Consortium's conditions for its proposed acquisition of shares in Dongbu Steel.  *Id.* at 41-42.[4]  Following the fourth debt-to-equity swap and further

---

[4]      Each of these debt-to-equity swaps was accompanied by revisions to the maturities and interest rates on Dongbu Steel's remaining outstanding debt.  Dongbu Steel does not challenge Commerce's determination that it was not creditworthy and that these revisions to loan terms conferred a benefit.

revisions to the terms of Dongbu Steel's other outstanding debts, the KG Consortium completed an acquisition of majority share ownership in September 2019. *Id.*; Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: Dongbu's Affiliated Companies Response* (Oct. 27, 2021), C.R. 6, P.R. 42 at 1 n.1 ("KG Dongbu Affiliation Response").  KG Dongbu does not challenge Commerce's determination regarding the fourth debt-to-equity swap.  KG Dongbu Br. at 13-36.

These debt-to-equity swaps were approved by committees of financial institutions that included both Korean government financial institutions and non-government financial institutions, but they were controlled by the Korean government financial institutions, which held a veto-proof majority of [                    ] of the creditor committees' voting rights throughout the process. *See* Dongbu IQR at 52-56.

### C.   <u>Commerce's Preliminary Results</u>

Commerce issued the Preliminary Results of the administrative review on July 29, 2022 and published them in the Federal Register on August 5, 2022.  Preliminary Results; Prelim. Decision Memo.  Referencing its decision in the immediately preceding 2019 administrative review, Commerce explained that it "previously determined that KG Dongbu Steel was not equityworthy at the time of {the first three} debt-to-equity conversions." Prelim. Decision Memo at 16.  In the 2019 review, Commerce determined that "{Government of Korea} ("GOK")-controlled entities, in particular the KDB, exercised significant influence over the debt restructurings which included the debt-to-equity conversions." Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't Commerce Jan. 19, 2022) (final results and partial rescission of countervailing

duty admin. rev.; 2019) at 47.  This influence was so significant that "the private creditors had no decision-making control over the creditors' committees and had no choice but to comply with the terms set by the KDB and other GOK-owned banks." *Id.*  As a result, "the share prices established through {the creditor committees} do not constitute 'private investor prices,' within the meaning of {the regulation}," *id.* at 50, and "the participation of KG Dongbu's private creditors in the first, second, and third equity infusions was not significant." *Id.* at 47.  Because private investor participation was not significant, and because private investor prices in fact did not exist at all, Commerce could not use the non-government financial institutions to benchmark the financial contributions of the GOK-owned and controlled financial institutions.

### D. Commerce's Final Determination

KG Dongbu filed a case brief on December 16, 2022.  Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea, Case No. C-580-879: KG Dongbu Steel's Case Brief* (Dec. 16, 2022), C.R. 298, P.R. 171.  In relevant part, KG Dongbu argued that Commerce unlawfully revisited its prior determinations regarding the first, second, and third debt-to-equity swaps, asserting that there was no new evidence on the record to justify doing so.  *Id.* at 4-12.  KG Dongbu argued further that the GOK did not control the terms of the transaction because the non-government banks participated voluntarily and that private investor participation was "significant" based on the shares of the equity purchased by the non-government financial institutions on the creditor committees, so that Commerce erred in proceeding to an analysis of equityworthiness.  *Id.* at 12-21.  KG Dongbu also argued that, even if Commerce continued to determine that Dongbu was not equityworthy, its response to the Change-in-Ownership Appendix was sufficient to rebut the baseline presumption that non-recurring subsidies pass through to the acquiring firm.  *Id.* at 21-35.  Finally, KG Dongbu

argued that Commerce erred in its calculation of the uncreditworthy benchmark interest rate and, by extension, the discount rate for allocating non-recurring subsidy benefits over the AUL period. *Id.* at 35-40.

Nucor filed its brief in rebuttal to KG Dongbu on December 29, 2022.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Rebuttal Brief Regarding KG Dongbu* (Dec. 29, 2022), C.R. 301, P.R. 174.  Nucor pointed out that Commerce, like other agencies, has the inherent authority to reconsider its prior determinations, notwithstanding any purported new evidence threshold articulated in Commerce's questionnaire, and that Commerce's Preliminary Results were thoroughly explained and supported by the record.  *Id.* at 2-8.  Nucor also demonstrated that, contrary to KG Dongbu's assertions, the record included critical new record evidence to support Commerce's departure from its previous findings.  *Id.*  Nucor explained that Commerce correctly and consistently applied the regulation in finding that actual private investor prices were unavailable and insignificant.  *Id.* at 8-15.  Nucor emphasized that, notwithstanding its response to the Change-in-Ownership Appendix, KG Dongbu failed to rebut the baseline presumption as a substantive matter because the acquisition (i) was not an arms-length transaction, (ii) was facilitated by substantial additional subsidies from the government-owned banks, and (iii) was not a sale of all or substantially all of Dongbu's assets in which the sellers retained no control over the company.  *Id.* at 15-20.  Finally, Nucor argued that Commerce properly calculated the uncreditworthy interest rate and discount rates for non-recurring subsidies in accordance with its rules and prior determinations.  *Id.* at 21.

Commerce issued the Final Results on February 1, 2023 and published them in the Federal Register on February 7, 2023.  *See* Final Results.  Commerce continued to countervail the debt-to-equity swaps as it did in the Preliminary Results.  Final Decision Memo at 44-61.  Commerce

explained that, contrary to Dongbu's argument regarding the agency's practice, "it is necessary for Commerce to reexamine benefit in each successive administrative review." *Id.* at 47. Commerce also explained that new evidence in the form of outside private investor participation further justified its decision to revisit prior determinations. *Id.* at 48. It thus reiterated its previous findings that the KDB and other government policy banks controlled the terms of the creditors committees and prevented the non-government financial institutions from influencing the transactions or otherwise acting as actual private investors. *Id.* at 48-52. With respect to purported extinguishment of non-recurring subsidies, Commerce noted that, despite the KG Consortium's share acquisition, Dongbu's Korean government owners "retained 27.10 percent ownership . . . after the M&A." *Id.* at 57. In addition, Commerce explained that the share acquisition was not for fair market value and was made for policy purposes other than maximizing the value of the sale. *Id.* at 58-61. Finally, Commerce determined that its calculation of the uncreditworthy interest rate benchmark and discount rates were necessary for consistency and accuracy in light of the information available on the record. *Id.* at 61-63.

This appeal followed.

## IV.   ARGUMENT

### A.   Commerce's Reconsideration of the Benefit Conferred by the First Three Debt-to-Equity Swaps Was Lawful and Supported by Substantial Evidence

KG Dongbu argues that Commerce's determination that the first three debt-to-equity swaps in the debt restructuring process conferred a benefit was unlawful in light of the agency's previous determinations to the contrary. KG Dongbu Br. at 15-19. According to KG Dongbu, "Commerce had a consistent practice . . . in which it determined that the significant participation of private investors in the first three D/E swaps rendered them not countervailable." *Id.* at 17. KG Dongbu also asserts that Commerce acted inconsistently with "a more general practice as reflected in its

questionnaire instructions of not re-examining prior countervailability determinations" in the absence of new information.  *Id.*  Neither argument is persuasive.

> **1.     Commerce Has the Inherent Authority to Reconsider Its Determinations, With or Without New Evidence**

It is indisputable that agencies, including Commerce, may reconsider prior methodologies and determinations.  Commerce may "{n}ot only . . . {choose} which methodology to employ, {it} can also change it," as long as it "clearly set{s} forth the ground so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 667, 387 F. Supp. 2d 1236, 1246 (2005) (internal quotations omitted).  "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology." *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009).

Notwithstanding any threshold of new factual evidence, an agency's prior determinations are not inviolable decrees that bind it to the same outcome in perpetuity.  To the contrary, both the courts and Commerce have recognized the inherent authority that agencies possess to reconsider previous determinations.  *See, e.g.*, *Elkam Metals Co. v. United States*, 26 CIT 234, 238, 193 F. Supp. 2d 1314, 1320 (2002); Issues and Decision Memorandum accompanying *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan*, 73 Fed. Reg. 67,131 (Dep't Commerce Nov. 13, 2008) (final results of reconsideration of sunset rev.) at 4-5.  Commerce was thus entitled to revisit its previous determinations and to reach a different outcome, provided that its examination was permissible under the statute and that there were good reasons for the different approach.

      **2.**     **Commerce's Reconsideration of the First Three Debt-to-Equity Swaps Was Adequately Explained and Supported on both Legal and Factual Grounds**

Commerce's explanations for reconsidering the first three debt-to-equity swaps are supported by both fact and law.  Factually, Commerce explained that it was necessary to reconsider its treatment of the first three debt-to-equity swaps in light of the participation of an outside private investor for the first time in the fourth debt-to-equity swap.  Final Decision Memo at 48.  KG Dongbu attempts to characterize this fact as irrelevant, KG Dongbu Br. at 18, but Commerce disagreed, and it is Commerce's role, not KG Dongbu's, to weigh the significance of important pieces of evidence in the context of the record as a whole.  Nor should the Court attempt to do so in Commerce's place.

Commerce was eminently justified in reconsidering the entire course of the restructuring in light of new evidence about its final stage because its various stages were not isolated, individual transactions that each occurred in its own vacuum.  Each one was part of a broader, years-long program of debt relief and restructuring, led by the same core group of government-controlled financial institutions, with the same objective of preventing Dongbu's liquidation.  *See generally* Memorandum from Dennis McClure, Int'l Trade Analyst, AD/CVD Operations, Off. VIII, Enf't and Compliance to The File, re: *Certain Corrosion Resistant Steel Products from the Republic of Korea: 2020 Countervailing Duty Administrative Review: Equity Infusion Analysis Memorandum* (July 29, 2022), C.R. 260, P.R. 138 ("Equity Infusion Analysis Memo"); Final Decision Memo at 47-52.  The Korean government's initial steps to rescue Dongbu Steel began in 2013, with the extension of multiple rounds of significant bridge loans and bond refinancing support from the government-owned policy bank, the KDB.  *See* Dongbu IQR at 21-25.  The KDB not only extended significant direct financial support, it also actively sought buyers for Dongbu Steel's non-

**BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED**

viable assets. *Id.* at 24.  Ultimately, these efforts failed, as no private buyer was willing to proceed with an acquisition.  *Id.* at 25.

   With its failure to sell Dongbu Steel's assets, the KDB's efforts to rescue the company continued under the debt restructuring program at issue here, which consisted of multiple rounds of loan restructurings, along with a total of more than KRW [         ] in government-led debt-to-equity swaps, over a period of more than five years.  *See id.* at 43-51.  Over the course of this restructuring period, and notwithstanding significant and ongoing support from government-owned or controlled financial institutions, (i) Dongbu's liquidation value and its value as a going-concern [                ], *id.* at 29, 32, 35, 37, 41 (discussing *id.* at Exhibit B-7, Exhibit B-9, Exhibit B-14, Exhibit B-16, Exhibit B-29), (ii) it was nearly forced to de-list from the Korean Stock Exchange on multiple occasions due to poor financial performance, *id.* at 33-35, 41, and (iii) it [

           ].  *Id.* at Exhibit B-29; Equity Infusion Analysis Memo at 12 (noting that "Dongbu Steel repeatedly failed to meet its required performance goals set in the restructuring agreements . . . .").

   Each failed attempt by the Korean government to restore Dongbu to a competitive position by reducing the company's debts despite its deteriorating value and its failure to meet performance metrics provides vital context that sheds light on the reality of prior stages of the restructuring.  This is true of the fourth debt-to-equity swap, and it is true of all prior rounds of the restructuring.

   The conduct of the outside investor in the fourth debt-to-equity swap put in stark relief the non-market orientation of the creditor committees' prior decisions.  Even after several rounds of debt restructuring, the KG Consortium refused to invest in Dongbu Steel unless an additional KRW 605 billion in liabilities was removed from Dongbu's balance sheets through debt-to-equity

conversions, and unless maturities and interest rates on Dongbu's remaining debts were extended and reduced.  Dongbu IQR at 39-40.  The KG Consortium told the creditor committee that KG Dongbu's "[



                                                                                                    ]." *Id.* at Exhibit B-26 (emphasis added).

Even after years of government-led debt restructuring, in other words, the only potential private investor conditioned its investment on more than [



                                                                        ].  If an actual private investor would not invest in Dongbu Steel even after three rounds of significant debt reductions, it would not be reasonable to conclude that actual private investors would have invested in Dongbu Steel before those debt reductions occurred.  Far from having "nothing to do" with the previous debt-to-equity swaps, the KG Consortium's actions bear directly on the decisions of the non-government banks on the creditor committees throughout the restructuring process.

### 3.   Commerce's Determination Was Otherwise Lawful and Supported by Substantial Evidence

KG Dongbu further asserts that Commerce's determination regarding the first through third debt-to-equity swaps was otherwise unsupported by substantial evidence.  KG Dongbu Br. at 19-24.  KG Dongbu's arguments on this point mischaracterize both Commerce's determination and the applicable law and should be rejected.  Based on Commerce's rules and practice for equity infusions, the record overwhelmingly supports the Final Results.

Commerce considers debt-to-equity swaps under its rules for equity infusions.  *See* 19 C.F.R. § 351.508(a) ("In situations where the entity assuming or forgiving the debt receives

shares in a firm in return for eliminating or reducing the firm's debt obligation, the Secretary will

determine the existence of a benefit under {the rules for equity infusions}.").  Those rules provide

that "a benefit exists to the extent that the investment decision is inconsistent with the usual

investment practice of private investors . . . in the country in which the equity infusion is made."

*Id.* § 351.507(a)(1).  These must be "actual private investor{s}" whose share purchases reflect "a

market price for newly issued equity."  *Id.* § 351.507(a)(3); *CVD Preamble*, 63 Fed. Reg. at 65,372

(emphasis added).  When "private investor prices {are} available," Commerce considers whether

"the price paid by the government for newly issued shares is greater than the price paid by private

investors for the same (or similar form of) newly issued shares."  19 C.F.R. § 351.507(a)(2)(i).

Even if private investors purchased some portion of the equity at issue, however,

Commerce "will not use private investor prices" to determine whether a benefit was conferred if

it "concludes that private investor purchases of newly issued shares are not significant."  *Id.*

§ 351.507(a)(2)(iii).  If "significant" private investor prices are not available, Commerce considers

whether the equity infusion recipient was equityworthy, as it did here.  *Id.* § 351.507(a)(3).

KG Dongbu suggests that Commerce's determination of whether actual private investor

prices are "significant" is a rote numerical analysis based on nothing more than whether the volume

purchased exceeds a certain threshold.  KG Dongbu Br. at 20.  This is incorrect.  Applying the

equity infusions rule to similar debt restructuring programs, Commerce has explained that the

question is not simply whether private investor equity purchases surpass some red-line threshold,

but whether the private investor participation was significant inasmuch as it "demonstrates that the

other creditors' decision to swap their debt for equity was consistent with the private investor

standard . . . ."  *DRAMS from Korea* IDM at 90.

While a low enough volume of shares purchased may be sufficient to find that private investor prices are insignificant, higher volume equity purchases by private investors may also be insignificant based on other evidence regarding the circumstances of the transaction. Commerce, for example, has found that the equity purchases of private investors participating in government-led debt restructurings like Dongbu Steel's are not "significant" when the participating government banks exercise veto-proof control over the creditor committees' decisions. In *Refrigerator-Freezers from Korea*, for example, Commerce determined that private investor participation in a similar debt-to-equity conversion was not significant because, as here, the Korean government banks controlled a veto-proof supermajority of the creditor committee's voting rights. *Refrigerator-Freezers from Korea* IDM at 100. Because of this supermajority, "{t}he GOK controlled the decisions of the Creditors' Council, and was therefore able to impose its decisions on the private creditors." *Id.* Given the non-government banks' inability to influence the actions of the government banks, Commerce determined that "private investor participation is not significant." *Id.*

Contrary to KG Dongbu's assertion, then, the question is not whether the government banks forced or otherwise coerced the non-government banks into participating. KG Dongbu Br. at 21-22. On this point, KG Dongbu conflates two distinct elements of the countervailing duty statute, the "financial contribution" element and the "benefit" element. *See* 19 U.S.C. § 1677(5)(B). The statute provides that a private entity provides a "financial contribution" where the government "entrusts or directs" it to do so. *Id.* § 1677(5)(B)(iii). If the government banks on the creditor committees had coerced the non-government banks into participating, then Commerce would have treated their share purchases as "financial contributions" and would have included them in the benefit analysis. It did not. Final Decision Memo at 51 ("{T}he question of whether

these private creditors are entrusted or directed to provide benefits to Dongbu Steel is not at issue here.").

Rather, Commerce treated only the government banks' equity conversions as financial contributions.  For the purpose of the <u>benefit</u> determination, the question before Commerce was not what the actions of the government banks said about the decisions of the non-government banks.  It was whether the prices paid by the non-government banks represented market prices paid by actual outside private investors so that they could be used to determine whether the government banks were acting in the same manner as "actual private investor{s}."  19 C.F.R. § 351.507(a)(3); Proposed Rule, 88 Fed. Reg. at 29,867-69.  In this case, they were not.

As in *Refrigerator-Freezers from Korea*, the non-government banks' "representation and participation in the Creditors' Council" for Dongbu's debt restructuring "was not significant enough to prevent the government-controlled supermajority from imposing the terms of the . . . debt-to-equity conversions."  *Refrigerator-Freezers from Korea* IDM at 104; Final Decision Memo at 48-49 ("GOK-controlled financial institution creditors controlled the decisions of the creditors' committees.  Thus, the private creditors had no decision-making control over the creditors' committees and had no choice but to comply with the terms set by the KDB and other GOK-owned banks.").  The non-government banks thus participated on the government-controlled banks' terms, and not vice versa.

That they may have done so "of their own accord," KG Dongbu Br. at 24, suggests only that they expected to lose less by participating than they would have by taking market-based losses on the pre-existing loans that Dongbu was unable to repay without the Korean government's

support.[5]  Again, in an equity infusion analysis, Commerce must "determine whether, at the time
of the infusion, there was a market price for newly issued equity."  *CVD Preamble*, 63 Fed. Reg.
at 65,372 (emphasis added).   The prices paid by purportedly private investors attempting to
minimize their own losses in the context of a government-controlled debt restructuring program
do not represent "market prices" that can be used to benchmark the prices paid by the government
investors that control the transaction.  To the contrary,

> the pool of "investors" that participated in the debt-to-equity conversions was
> composed of existing . . . creditors attempting to mitigate their losses . . . they are
> not outside private investors considering whether or not to purchase shares, based
> on the projected rates of return. . . . Therefore, they were not evaluating the
> reasonableness of the rate of return on any equity they were considering investing
> in the company.  Rather, they were considering how best to limit their losses and
> maximize the recovery rate on their funds that were already at considerable risk, a
> risk that was not anticipated at the time the loans were made.

*Refrigerator-Freezers from Korea* IDM at 106.

Here, Commerce likewise determined that the non-government banks on Dongbu's
creditor committees were not acting as "actual private investors."  To the contrary, "they were part
of the existing group of creditors" that was not "evaluat{ing} the reasonableness of the rate of
return on any equity they were considering investing in the company . . . . Rather, they were
considering how best to limit their losses and maximize the debt recovery."  Preliminary Decision
Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of
Korea*, 86 Fed. Reg. 37,740 (Dep't Commerce July 16, 2021) (prelim. results of the countervailing

---

[5]      While this appeal does not address the "entrustment or direction" standard for non-
government financial contributions, that standard is instructive here because it establishes that
government influence over the actions of non-government parties is not limited to coercion.
Rather, such influence also "encompass{es} government actions that provide inducements . . . to
a private party to provide a benefit to another party."  *CVD Preamble*, 63 Fed. Reg. at 63,350.  The
mere fact that the non-government banks were not forced to participate does not establish that they
were participating as market actors free from government influence.

duty admin. rev., 2019) at 16 (unchanged in final deter.).  *See also* Prelim. Decision Memo at 12 (issuing determination consistent with 2019 review); Equity Infusion Analysis Memo at 15 (explaining that the non-government banks "had already committed substantial debt financing" and "were merely interested in how to recover the debt financing already invested in the company.").

KG Dongbu misses the mark by suggesting that Commerce's determination was that the volume of private share purchases was too low to be significant.  KG Dongbu Br. at 25-26.  It was not.  Commerce's determination was that the non-government investors were not acting as "actual private investors" within the meaning of the rule, and that their participation was otherwise not significant because the government investors held veto-proof control over the creditor committees and therefore dictated the terms of the transactions.

Dongbu does not challenge the accuracy of the key facts on which these findings rested.  It does not argue that Commerce was wrong in determining that the government-controlled banks held a veto-proof supermajority on the creditor committees, such that the non-government banks had no means of influencing the terms of the transactions.  It does not argue that Commerce was wrong in finding that the non-government banks were pre-existing creditors that were attempting to minimize losses on existing debt, and not outside investors seeking to maximize returns on newly issued shares.  These two factual determinations alone are sufficient to support Commerce's determination.

KG Dongbu's reliance on Commerce's determination in *Coated Free Sheet Paper from Korea* is likewise unavailing.  *Id.* at 24 (citing Issues and Decision Memorandum accompanying *Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) (notice of final affirm. countervailing duty deter.) at 43 ("*Coated Free Sheet Paper from*

*Korea* IDM")).  In that proceeding, Commerce considered the supermajority position of "creditors with GOK ownership levels of at least 25 percent" during a single phase of a multi-phase debt restructuring.  *Coated Free Sheet Paper from Korea* IDM at 43.  In two of the three phases of the restructuring, those banks held less than a supermajority of the voting rights.  *Id.*  Here, in contrast, creditors that were majority owned and controlled by the GOK held a supermajority of the creditor committees' voting rights in each phase of Dongbu Steel's restructuring.  Equity Infusion Analysis Memo at 6-7.  Unlike in *Coated Free Sheet Paper from Korea*, therefore, the creditor committees in this case were controlled by GOK policy banks like the KDB.  *Coated Free Sheet Paper from Korea* is inapplicable given these markedly different facts.

### B.   Commerce Properly Determined that the KG Consortium's Investment Did Not Extinguish Non-Recurring Subsidies

KG Dongbu challenges Commerce's decision to apply to the baseline "pass-through" presumption, primarily on evidentiary grounds, arguing that "there is absolutely no basis to conclude that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair market value for Dongbu."  KG Dongbu Br. at 27.  KG Dongbu adds that Commerce's consideration of the remaining factors in the pass-through analysis was unsupported by substantial evidence and "contrary to the framework and reasoning behind the *Final Modification* test." *Id.* at 32.  These arguments are unpersuasive.

As summarized above, Commerce applies a baseline presumption that non-recurring subsidies continue to benefit a firm over the AUL period.  *Final Modification*, 68 Fed. Reg. at 37,127.  This presumption may be rebutted by showing that a change in ownership occurred in which the previous owner of a firm "sold its ownership of all or substantially all of a company or its assets, retaining no control of the company or its assets, and that the sale was an arm's-length transaction for fair market value." *Id.*  A respondent wishing to challenge the baseline presumption

must therefore establish that (i) there was a sale, (ii) the sale was of all or substantially all of the company or its assets, (iii) the previous owners retained no control over the company, (iv) the sale was an arm's-length transaction, and (v) the sale was for fair market value.

As a preliminary matter, KG Dongbu's arguments incorrectly frame the issue in light of the burden of proof. For example, in arguing that "there is absolutely no basis to conclude that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair market value," KG Dongbu suggest that it was Commerce's duty to affirmatively demonstrate that the sale was not for fair market value. KG Dongbu Br. at 27. The burden of proof, however, is on the respondent challenging the baseline presumption, not on Commerce. *Final Modification*, 68 Fed. Reg. at 37,128. Commerce's determination here was that KG Dongbu failed to present evidence sufficient to carry that burden. This determination was correct. As Defendant demonstrates, Commerce thoroughly explained why the evidence presented by KG Dongbu was insufficient to rebut the baseline presumption based on numerous red flags apparent in the transaction. Def. Resp. to Pl.'s Mot. for J. upon the Agency R. (Oct. 19, 2023), ECF No. 32 at 26-35.

It is telling that KG Dongbu's arguments elide the threshold showing that must be made and instead leap directly to a discussion of Commerce's "fair market value" determination. KG Dongbu Br. at 26-36. The reason for this omission is clear. There was no "sale of all or substantially all" of Dongbu or its assets, as a result of which the prior owners "retain{ed} no control of the company or its assets." *Final Modification*, 68 Fed. Reg. at 37,127. The first fact that Commerce highlighted in its determination was that the creditors committee retained 27.10 percent ownership of KG Dongbu after the KG Consortium's investment. Final Decision Memo at 57. As a result, they also retained "significant influence over {KG Dongbu's} major management decisions, such as appointment of directors, etc." KG Dongbu Affiliation Response

at Exhibit 5, p. 69.  KG Dongbu's previous owners thus did not sell "all or substantially all" of the company, nor did they "retain no control" over the company after the sale.

This fact alone supports Commerce's determination.  As Defendant thoroughly explains, however, Commerce also provided a detailed explanation that KG Dongbu failed to establish that the sale was for fair market value.  Nucor agrees with and supports this explanation and does not repeat the same arguments here.  The Court should therefore sustain Commerce's determination that KG Dongbu failed to rebut the baseline presumption and that the benefit of non-recurring subsidies passed through to KG Dongbu as a result.

## C.   Commerce Properly Calculated the Uncreditworthy and Unequityworthy Benchmarks

KG Dongbu also argues that Commerce unlawfully calculated the benchmark interest rate for uncreditworthy companies and, by extension, the discount rate for the allocation of non-recurring benefits over the AUL period.  KG Dongbu Br. at 36-42.  Dongbu's arguments are unpersuasive.  Given the information available to Commerce in this review, its calculation of the uncreditworthy benchmark was reasonable.

Commerce's rules provide that, for uncreditworthy companies, the agency "normally will calculate {the benchmark} interest rate" according to the following formula:

$$i_b = [(1 - q_n)(1 + i_f)^n / (1 - p_n)]^{1/n} - 1,$$

where:
n = the term of the loan;
$i_b$ = the benchmark interest rate for uncreditworthy companies;
$i_f$ = the long-term interest rate that would be paid by a creditworthy company;
$p_n$ = the probability of default by an uncreditworthy company within n years; and
$q_n$ = the probability of default by a creditworthy company within n years.

19 C.F.R. § 351.505(a)(3)(iii).  While the rules require Commerce to calculate uncreditworthy benchmarks according to this formula, the *CVD Preamble* explains that the addition of the word

"normally" was intended to provide the agency with flexibility to modify certain variables in the formula, when doing is necessary or appropriate in light of the information available.  *See CVD Preamble*, 63 Fed. Reg. at 65,365.  Commerce, for example, has modified the value of "n" in the "probability of default" variable when confronted with limitations in the record.  *See, e.g.*, Issues and Decision Memorandum accompanying *100- to 150-Seat Large Civil Aircraft from Canada*, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) (final affirm. countervailing duty deter.) at 55 n.243 (explaining that "we are not able to use a longer period due to limitations imposed by the available record evidence").

Commerce faced similar constraints regarding its benchmark calculation here. Specifically, it "used a {three}-year AA-rated {Korean Won} interest rate as the long-term interest rate paid by a creditworthy company" because that was "the only long-term interest rate on the record . . . ."  Final Decision Memo at 62.  Commerce explained that it could not modify the variable for "the term of the loan" without creditworthy interest rates for loans of similar duration because it would result in "an inconsistent mixing of . . . variables" that "does not . . . result in a more accurate uncreditworthy discount rate."  *Id.* at 62-63.  Given Commerce's flexibility under the rule to modify the variables that it "normally" uses in the uncreditworthy benchmark formula, its decision to do so here for the sake of accuracy and consistency among the variables was reasonable in light of the information on the record.

Because Commerce's calculation of the uncreditworthy benchmark interest rate was lawful and supported by the record, its calculation of the discount rate for allocation over the AUL period was also lawful and supported by the record.  Commerce's rules provide that the benefit from non-recurring subsidies, including equity infusions, should be allocated over the AUL period according to the following formula:

Ct. No. 23-00055                                                NON-CONFIDENTIAL VERSION

$$A_k = \frac{y/n + [y - (y/n)(k-1)]d}{1+d}$$

Where:
$A_k$ = the amount of the benefit allocated to year k,
y = the face value of the subsidy,
n = the AUL (see paragraph (d)(2) of this section),
d = the discount rate (see paragraph (d)(3) of this section), and
k = the year of allocation, where the year of receipt = 1 and $1 \leq k \leq n$.

19 C.F.R. § 351.524(d)(1). Regarding the discount rate for uncreditworthy companies, Commerce's rules are explicit. They provide that "{i}n the case of a firm considered by the Secretary to be uncreditworthy . . . the Secretary will use as a discount rate the interest rate described in {19 C.F.R.} § 351.505(a)(3)(iii)," which provides the formula for calculating uncreditworthy interest rate benchmarks. *Id.* § 351.524(d)(3)(ii). In other words, the uncreditworthy interest rate Commerce calculates pursuant to the formula in 19 C.F.R. § 351.505(a)(3)(iii) must be used as the discount rate for allocating non-recurring subsidies under 19 C.F.R. § 351.524(d)(3)(iii).

KG Dongbu nevertheless suggests that Commerce "fail{ed} to follow the plain language of its own regulations" because "the 'n' variable (the number of years) in the formula for calculating the unequityworthy discount rates should match the fifteen-year allocation period . . . ." KG Dongbu Br. at 42. But that is not what Commerce's rule says. Rather, it says that the agency "will use as a discount rate the interest rate described in" the rule for uncreditworthy interest rate benchmarks. 19 C.F.R. § 351.524(d)(3)(ii). That is exactly what Commerce did. Because

NON-CONFIDENTIAL VERSION

Commerce properly calculated the uncreditworthy interest rate benchmark, its discount rate was

by extension lawful and supported by the record.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Defendant-Intervenor*
*Nucor Corporation*

</div>

Dated: November 9, 2023

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(l), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Response to Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,673 words.

<u>*/s/ Alan H. Price*</u>
(Signature of Attorney)

<u>Alan H. Price</u>
(Name of Attorney)

<u>Nucor Corporation</u>
(Representative Of)

<u>November 9, 2023</u>
(Date)