**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., <br><br>    Plaintiff, <br><br> v. <br><br>UNITED STATES, <br><br>    Defendant, <br><br>  and <br><br>NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA, <br><br>    Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br>Proprietary Information Removed from Pages 7, 16, and 17 <br><br>Court No. 23-00055 |

**REPLY BRIEF OF PLAINTIFF KG DONGBU STEEL CO., LTD., IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiff KG Dongbu Steel Co., Ltd.*

December 6, 2023

## **TABLE OF CONTENTS**

I.   ARGUMENT ..................................................................................................... 2

    A.   Commerce's Determination That The First Three D/E Swaps Provided A Countervailable Subsidy To Dongbu Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law. ..................................................... 2

        1.   Commerce's Change In Its Established Agency Practice Without A Reasonable Explanation Was Contrary To Law. ........................................... 2

        2.   Commerce's Conclusion That The Private Investor Prices Were Not Significant and Thus Not Reliable Is Unlawful. ........................................... 5

    B.   Commerce's Determination That The Sale Of Dongbu Steel Was Not Arm's Length For Fair Market Value Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law. .......................................................... 10

        1.   The *Final Modification* Provides For A Fact Specific Analysis Of Fair Market Value, And Does Not Make Profit Maximization The Main Focus. ....................................................................................................... 11

        2.   The Sale Of Dongbu Steel Was For Fair Market Value. ........................... 13

        3.   The Other Factors Listed In The *Final Modification* Also Support The Conclusion That Any Non-Recurring Subsidies Received By Dongbu Steel Were Extinguished. ....................................................................... 18

    C.   Commerce Must Calculate The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rate According To The Plain Language Of Its Regulations. ........................................................................................................ 19

II.   CONCLUSION AND RELIEF REQUESTED ................................................. 23

III.   CERTIFICATE OF COMPLIANCE ................................................................ 24

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016)...................................................................................16

*Delverde, SRL v. United States*,
   202 F.3d 1360 (Fed. Cir. 2000)...................................................................................12

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ...................................................................................16

*KG Dongbu Steel v. United States*,
   648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) ................................................. *passim*

**Statutes**

19 U.S.C. § 1677...........................................................................................................20

**Other Authorities**

19 C.F.R. § 351.505 ...........................................................................................19, 20, 22

19 C.F.R. § 351.507 ................................................................................................ 3, 6-10

*100- to 150-Seat Large Civil Aircraft From Canada:  Final Affirmative
   Countervailing Duty Determination*,
   82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) ........................................21

*Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea:
   Final Affirmative Countervailing Duty Determination*,
   77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) ................................9, 10, 20

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final
   Results of Countervailing Duty Administrative Review; 2017*,
   85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020) ........................................10

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative
   Countervailing Duty Determination*,
   72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ........................................6, 9

*Final Affirmative Countervailing Duty Determination*: *Dynamic Random Access
   Memory Semiconductors from the Republic of Korea*,
   68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) ................................. 6-7, 22

*Final Affirmative Countervailing Duty Determination: Small Diameter Circular*
    *Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe*
    *("Seamless Pipe") From Italy,*
    60 Fed. Reg. 31,992 (Dep't Commerce June 19, 1995) ......................................................6, 9

*Notice of Final Modification of Agency Practice Under Section 123 of the*
    *Uruguay Round Agreements Act,*
    68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003) .................................................. *passim*

*Significant*, Merriam Webster Dictionary...........................................................................................6

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| KG DONGBU STEEL CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA, <br><br> Defendant-Intervenors. | **NON-CONFIDENTIAL** <br><br> Proprietary Information Removed from Pages 7, 16, and 17 <br><br><br> Court No. 23-00055 |

**REPLY BRIEF OF PLAINTIFF KG DONGBU STEEL CO., LTD IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

    In accordance with Rule 56.2 and the Court's scheduling order, Plaintiff KG Dongbu

Steel Co., Ltd. ("KG Dongbu" or "Plaintiff") (formerly Dongbu Steel Co., Ltd. and Dongbu

Incheon Steel Co., Ltd, collectively "Dongbu") files this reply brief in opposition to the response

briefs filed by Defendant, the United States ("Def. Br."), and Defendant-Intervenor Nucor

Corporation ("Def.-Int. Br.").  As discussed below, the arguments made by Defendant and

Defendant-Intervenor are unpersuasive and should be rejected.  Instead, this Court should grant

KG Dongbu's Rule 56.2 Motion for Judgment on the Agency Record for the reasons discussed in

Plaintiff's Rule 56.2 brief ("Pl. Br."), and remand the case to the U.S. Department of Commerce

("Commerce") with instructions to correct the errors identified by the Court.

I.     **ARGUMENT**

    A.     **Commerce's Determination That The First Three D/E Swaps Provided A Countervailable Subsidy To Dongbu Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law.**

        1.     **Commerce's Change In Its Established Agency Practice Without A Reasonable Explanation Was Contrary To Law.**

As discussed in KG Dongbu's Rule 56.2 brief, Commerce erred in the *Final Results* by ignoring its established agency practice of not reviewing the countervailability of a program in the absence of new information – and its consistent finding in the first three administrative reviews – that no benefit was provided from Dongbu's first three debt-equity ("D/E") swaps.  Pl. Br. at 13-19.  Instead, Commerce found these three D/E swaps to be countervailable even though no new information existed to support this abrupt change in practice.  PR 181 at 47-52.  KG Dongbu also argued that this Court's decision in *KG Dongbu Steel v. United States*, 648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) ("*KG Dongbu I*"), where this Court concluded that Commerce's change in practice was arbitrary and not in accordance with law, should be followed here.  Pl. Br. at 13-14.  Defendant and Defendant-Intervenor offer various explanations why Commerce was justified in disregarding its established practice, and why this Court should not reach the same conclusion as it did in *KG Dongbu I*.  The Court should reject these arguments and instead follow its decision in *KG Dongbu I*.

Defendant argues that Commerce did not depart from any consistent agency practice because it "did not apply a new methodology in this review."  Def. Br. at 20.  This is a non sequitur.  KG Dongbu's argument is that Commerce has consistently found that there was no benefit from the first three D/E swaps, and that absent new information its practice as indicated in its own questionnaire instructions is not to revisit that determination.  Pl. Br. at 15-19.  No new information is on the record regarding the first three D/E swaps and thus there was no basis

to deviate from this established agency practice.  This argument has nothing to do with Commerce applying or not applying a new *methodology* in this review.  It has to do with Commerce deviating from its established agency *practice* without an adequate explanation.

Instead of actually addressing KG Dongbu's argument, and this Court's decision in *KG Dongbu I*, Defendant next seeks to support its reconsideration of the first three D/E swaps by arguing that "Commerce's reasonable, established practice is to apply the regulations at 19 C.F.R. § 351.507 to the specific facts of each case to determine benefit."  Def. Br. at 20.  This is nonsense.  In the first three reviews of this order, Commerce <u>did</u> apply 19 C.F.R. § 351.507 to the specific facts of the first three D/E swaps and determined that there was no benefit.  *See* Pl. Br. at 3-5, 15-17.  Based on these consistent determinations, this Court "conclude{d} that Commerce has a standard practice of not reexamining the countervailability of Plaintiffs' equity infusions absent new information."  *KG Dongbu I*, 648 F. Supp. 3d at 1358.  It is nonsensical for Defendant to espouse some new "established" agency practice that does not actually exist.

Defendant next argues that Commerce did explain "why it reached a different conclusion than it had in the investigation and first three administrative reviews."  Def. Br. at 21 (citing PR 181 at 47-52).  Specifically, Defendant argues that a change in practice was justified "because the record of this review includes a fourth equity infusion which, unlike the earlier three equity infusions, involved private investors independent from the creditors' committee."  *Id.*  But Defendant does not, nor did Commerce, explain how this "new" fact related to the fourth D/E swap is relevant to the earlier and separate first three D/E swaps in 2015, 2016, and 2018.  The record shows there was no change, significant or otherwise, to the facts surrounding the first three D/E swaps, and Commerce considered those facts when making its determination, in three separate reviews, that private investor participation *was* significant.  CR 100-154 (PR 69-75) at

Exhibit B-8 (Attachment 2), Exhibit B-11 (Attachment 2), and Exhibit B-15 (Attachment 2); Pl.

Br. at 16-19.  Therefore, Defendant's reference to private investor participation in the fourth D/E

swap is a red herring.

This Court has already agreed.  In *KG Dongbu I*, this Court rejected Commerce's attempt

to rely on the fourth D/E swap as "new" information that justified its deviation from the prior

determinations that the first three D/E swaps were not countervailable.  Specifically,

> The Court notes that the record evidence cited by Commerce {the fourth D/E
> swap} as justification for its deviation from its past practice does not deal directly
> with the first through third debt-to-equity restructurings and is not a sufficient
> explanation to justify departing from its standard practice…

*KG Dongbu I*, 648 F. Supp. 3d at 1359.  Although Defendant may not agree with this part of the

Court's holding, it cannot simply ignore it and parrot the same arguments that this Court has

already considered and rejected.

Defendant next argues that KG Dongbu "ignores the history of the prior reviews" when it

claims that Commerce's determination in this case was contrary to its established practice.  Def.

Br. at 21.  This is not accurate.  Commerce considered arguments made by Nucor that the first

three D/E swaps were countervailable and rejected those arguments on the grounds that there

was "significant" private investor participation on the same terms as the government creditors.

*See* Pl. Br. at 13-14.  This is the history of the prior reviews, and it was discussed in KG

Dongbu's Rule 56.2 brief.  Pl. Br. at 3-5.

Defendant further argues that in those prior reviews Commerce had "specifically reserved

the right to 're-examine this issue' in future administrative reviews 'if new record evidence

requires such an examination."  Def. Br. at 21 (citing PR 181 at 48).  This is true.  However, such

a re-examination was premised on the existence of "new" record evidence related to the first

three D/E swaps.  There was none.  Defendant's continued reference to the fourth D/E swap

(Def. Br. at 22) was not new information related to the first three D/E swaps, as this Court recognized in the quote included above.  *See KG Dongbu I*, 648 F. Supp. 3d at 1359.

For its part, Defendant-Intervenor argues that Commerce has the inherent authority to reconsider its determination, with or without new evidence.  Def.-Int. Br. at 12.  The problem with this argument is that Commerce did not invoke any inherent authority as the basis for its change in practice.  Instead, Commerce primarily relied upon the fourth D/E swap as the "new" information that justified its change in agency practice.  PR 181 at 48.  Furthermore, Commerce states in its questionnaire instructions that it will not revisit previous determinations regarding the countervailability of programs absent new information.  PR 23 at page III-1.  This is the inherent authority exercised by Commerce.  Defendant-Intervenor's argument is thus unpersuasive and, in any event, is nothing but a *post-hoc* justification.

Defendant-Intervenor finally argues that it was necessary for Commerce to reconsider its treatment of the first three D/E swaps "in light of the participation of an outside private investor for the first time in the fourth debt-to-equity swap."  Def.-Int. Br. at 13.  According to Defendant-Intervenor, this fourth D/E swap should not be viewed in isolation but rather as part of the history of Dongbu's restructuring process.  *Id.*  As discussed, this Court already rejected this argument in *KG Dongbu I*, where it found that the fourth D/E swap "does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice…."  *KG Dongbu I*, 648 F. Supp. 3d at 1359.

### 2. Commerce's Conclusion That The Private Investor Prices Were Not Significant and Thus Not Reliable Is Unlawful.

As discussed in KG Dongbu's Rule 56.2 brief, even if Commerce's change in its prior consistent practice was reasonable (which it was not), the conclusion that private investor participation was not "significant" is unlawful.  Pl. Br. at 19-24.  That new determination is

based primarily on the claim that the GOK creditors exercised "significant influence" over the D/E swaps through the supermajority of voting rights and share ownership they held during each restructuring.  Def. Br. at 14.  However, there is no *per se* rule that a supermajority held by government creditors on the creditors committee renders private investor participation insignificant.  To the contrary, Commerce has previously found private investor participation to be significant in analogous circumstances.  *See, e.g., Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) and accompanying Decision Memorandum at Comment 7 ("*CFS Paper from Korea*"); *Final Affirmative Countervailing Duty Determination: Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe ("Seamless Pipe") From Italy*, 60 Fed. Reg. 31,992, 31,997 (Dep't Commerce June 19, 1995) ("*Seamless Pipe from Italy*").

Based on its ordinary meaning, the determination of whether private investor participation was "significant" has nothing to do with alleged ("Government of Korea") GOK influence over the private creditors.  "Significant" is defined as "of a noticeably or measurably large amount."  *Significant*, Merriam Webster Dictionary available at https://www.merriam-webster.com/dictionary/ significant (last visited Nov. 29, 2023) (attached hereto as **Attachment 1** pursuant to USCIT R. 81).  Therefore, even *assuming arguendo* that the GOK creditors had influence over the private creditors, that does not mean that the private investor participation cannot be considered "significant" for purposes of 19 C.F.R. § 351.507(a)(2)(ii).  Defendant-Intervenor argues that whether private investor prices are "significant" is not a "rote numerical analysis."  Def.-Int. Br. at 16.  But Defendant-Intervenor cites no authority to support its assertion that "significant" should not be interpreted based on its ordinary meaning.  The

authority it does cite – *Final Affirmative Countervailing Duty Determination*: *Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003), and accompanying Decision Memorandum ("*DRAMs from Korea IDM*") at 90 – actually supports the interpretation of "significant" in terms of the amount of private investor participation.

> In the pages cited by Defendant-Intervenor, Commerce states as follows:

> Pursuant to 19 CFR 351.507(a)(2)(iii), if a private investor's purchases of newly issued shares are not significant, the Department will not use the market price paid by the private investor for comparison purposes. Although we cannot reveal the actual portion of the equity purchase accounted for by Citibank because it is proprietary, we find, consistent with *Pipe from Italy*, that Citibank's purchase was insignificant. (We note that Infineon is incorrect in asserting that Citibank accounted for 2.4 percent of the debt swap.) Moreover, we find that Citibank's participation in the October restructuring, in value terms, is small relative to the total value of debt converted to equity by GOK owned, controlled, or directed banks.

*DRAMs from Korea IDM* at 90.  As this language shows, Commerce found that Citibank's share purchases were not significant because they were small in percentage and value terms.  They did not reject them because of any alleged government influence.  In this case, private investor participation in the first three D/E swaps *was* significant under any reasonable definition of "significant."  Private creditors accounted for [        ] percent, [        ] percent, and [        ] percent of the first three D/E swaps, respectively.  CR 100-154 (PR 69-75) at Exhibit B-8, Exhibit B-11, and Exhibit B-15.  Record evidence also demonstrates that the private creditors paid the same per share prices as the GOK-controlled policy banks.  CR 100-154 (PR 69-78) at 43-47.

Defendant and Defendant-Intervenor focus their arguments on alleged GOK control of the actions of the private creditors based on the fact that GOK-owned banks including the Korea Development Bank ("KDB") held majority voting rights.  *See* Def. Br. at 15; Def.-Int. Br. at 17.

7

Specifically, Defendant argues that certain documents on the record such as the Special Agreement for Corporate Bond Refinancing Issues ("Special Agreement") demonstrate that the KDB was allowed to "dictate how Dongbu Steel would manage its assets and repay its creditors." Def. Br. at 15. However, Dongbu Steel entered into the Special Agreement in December 2013, well before the structured workout of its debt and the formation of the creditors' committee. CR 100-154 (PR 69-75) at 23, Exhibit B-3. The KDB was Dongbu Steel's largest creditor and the rights and obligations afforded to the KDB in that capacity carried over to its position on Dongbu's Voluntary Creditors Association. CR 100-154 (PR 69-75) at 61, Exhibit B-2, Exhibit B-5. There is no evidence that the powers granted to the KDB as the largest creditor allowed it to bend the private creditors to its will.

Furthermore, the private creditors had the option to sell their credits to the other creditors if they wished to opt-out of the voluntary restructuring or corporate workout program. CR 9-12, 32-51 (PR 52-68) at Exhibit Debt Restructuring-15 (Article 20). Defendant responds that "{t}his control by the GOK-controlled creditors would exist even if the private investors opted out." Def. Br. at 18. But that misses the point. The fact that the private investors could opt-out demonstrates that they could still act in their own commercial interests and did not have to do whatever the GOK creditors dictated. This is important, especially since there is no record evidence of actual intervention or attempts by the GOK to dictate the decisions made by the private creditors. *See* PR 181 at 47-50. If the private creditors were being forced to do something that was not in their own interests, they could simply opt-out of the deal entirely. The fact that they did not supports the argument that their participation was consistent with the usual investment practice of private investors. *See* 19 C.F.R. § 351.507(a)(1).

Defendant's attempts to distinguish *CFS Paper from Korea* are unavailing.  Defendant

argues that "{u}nlike in this review, in *CFS Paper from Korea*, Commerce did not find evidence

of the GOK's influence over the decision-making ability of the Korean respondent's creditors'

council at issue."  Def. Br. at 18; Def.-Int. Br at 20-21.  But this is an unsupported assertion.

Commerce's *Final Results* point to no actual evidence of undue influence by the GOK creditors

on the creditors committee other than the fact they collectively constituted a supermajority.  PR

181 at 47-50.  This is thus not a distinguishing factor from the *CFS Paper from Korea* case. That

case stands for the proposition that even if government financial institutions on the creditors

committee account for more than 75 percent of the voting rights (a supermajority), the

participation of private creditors in the D/E swaps on the same terms can still serve as benchmark

for finding no benefit.  *CFS Paper from Korea* at Comment 7; *see also Seamless Pipe from Italy*,

60 Fed. Reg. at 31,997.  A supermajority of government entities on the creditors committee,

without more, is thus not dispositive of whether private investor participation was significant

under 19 C.F.R. § 351.507(a)(2)(iii).

Defendant-Intervenor's attempt to equate this case with *Refrigerators-Freezers from*

*Korea* is similarly unavailing.  Defendant-Intervenor claims that "as in *Refrigerator-Freezers*

*from Korea*," the non-government banks' participation in Dongbu's creditors committee "'was

not significant enough to prevent the government-controlled supermajority from imposing the

terms of the… debt-to-equity conversions.'"  Def.-Int. Br. at 18 (citing *Bottom Mount*

*Combination Refrigerator-Freezers From the Republic of Korea: Final Affirmative*

*Countervailing Duty Determination*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012)

("*Refrigerator-Freezers from Korea*") and accompanying Decision Memorandum at 104).  But

what Defendant-Intervenor fails to mention is that Commerce distinguished *Refrigerator-*

*Freezers from Korea* from Dongbu's case in the 2017 review.  In finding no benefit from

Dongbu's D/E swaps, Commerce held:

> The facts on the record of this review differ from the facts in *Refrigerators from Korea*.  In *Refrigerators from Korea*, less than half of the private creditors voted in favor of the debt-to-equity conversion, while in this case, all private investors agreed with the debt-to-equity swap rates and participated in the two separate debt-to-equity swaps.  Furthermore, the private investors accounted for a significant percentage of the shares and much higher than the private investors' shares in *Refrigerators from Korea*.

*Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results of*

*Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 15,112 (Dep't Commerce Mar.

17, 2020), and accompanying Decision Memorandum at Comment 11.

Finally, Defendant-Intervenor quotes *Refrigerator-Freezers from Korea* to support its

argument that the prices paid by the private creditors in the D/E swaps do not represent actual

market prices that can be used as a benchmark.  Def.-Int. Br. at 19.  However, the quote used by

Defendant-Intervenor is inapposite because that discussion was part of the equityworthiness

analysis that was done in that case <u>after</u> Commerce determined there was no significant private

investor participation such that the purchase by private creditors could serve as benchmarks.  *See*

*Refrigerator-Freezers from Korea* at 106 (discussing requirements for an equityworthiness

determination under 19 C.F.R. § 351.507(a)(4)).  Here, the issue is whether the private investor

participation was "significant" under 19 C.F.R. § 351.507(a)(2)(iii) such that an

equityworthiness analysis under § 351.507(a)(4) is unnecessary.

>
> **B.    Commerce's Determination That The Sale of Dongbu Steel Was Not Arm's Length For Fair Market Value Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law.**

In its Rule 56.2 brief, KG Dongbu argued that the record demonstrates that Dongbu Steel

sold substantially all of the company in an arm's-length transaction for fair market value such

that any alleged subsidies from the first three D/E swaps that occurred prior to the sale were

extinguished.  Pl. Br. at 24-31.  Defendant responds that Commerce's analysis in the *Final Results* was lawful because "Commerce determined that the seller, in this case, the KDB-led creditor's council, did not maximize profit when selling Dongbu Steel, as in a normal private-to-private transaction" (Def. Br. at 27) and thus the sale was not for fair market value.[1]  However, Defendant's attempt to frame the fair market value analysis as one focused only upon "profit maximization," and what would occur in a "normal" private-to-private transaction, is not supported by the authority it relies upon.  Instead, the *Final Modification* clarifies that the extinguishment analysis of which fair market value is a part is a fact specific analysis.

> 1. **The *Final Modification* Provides For A Fact Specific Analysis Of Fair Market Value, And Does Not Make Profit Maximization The Main Focus.**

Defendant cites to the *Final Modification*, which states, in part that "the basic question is whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth <u>under the prevailing market conditions</u> were paid, and paid through monetary or equivalent compensation."  Def. Br. at 25 (emphasis added).  Defendant also references part of the *Final Modification* that states that profit maximization can be an appropriate factor to consider in the fair market value analysis.  *Id.*  Based on this authority, Defendant concludes that the *Final Results* are lawful because the creditor's council allegedly "did not maximize profit when selling Dongbu Steel, as in a normal private-to-private transaction."  *Id.* at 27.  Defendant's attempt to narrowly frame the fair market value analysis is not supported by the *Final Modification*.

---

[1] Defendant does not dispute that the transaction was arm's-length and so KG Dongbu does not separately address it here.  However, the sale of Dongbu's assets was between Dongbu's Creditors Council and a private unrelated consortium known as the KG Consortium.  CR 100-154 (PR 69-75) at 37-38; Exhibit B-35 at 3-4; Exhibit B-19.

The language quoted by Defendant makes plain that the assessment of what a company or its assets are worth must be made within the context of the "prevailing market conditions." This fact specific analysis is further supported by other parts of the *Final Modification*, which provides that: "{o}ur fair-market-value analysis must be sufficiently flexible to address the diverse factual scenarios that may be encountered in the future." *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,131 (Dep't Commerce June 23, 2003). Defendant's attempt to frame the analysis as one that is narrowly focused on "profit maximization" in the context of a "normal" private-to-private sale alone is thus inaccurate. The fair market value analysis must be made based on the facts and circumstances that exist for the company or the assets being sold and within those prevailing market conditions.

The circumstances in which the sale of a company or its assets may occur can vary greatly. If the analysis focused solely upon "profit maximization" and some "normal" private-to-private transaction then it would not be sufficiently flexible to deal with the "diverse factual scenarios that may be encountered {by Commerce} in the future." *Final Modification*, 68 Fed. Reg. at 37,131. The rebuttable presumption that is required by the *Delverde* decision would be rendered a nullity if such a narrow analysis was applied as it would only permit the presumption to be rebutted in circumstances where the seller is only pursuing profit maximization in some "normal" private-to-private sale. *See Delverde, SRL v. United States*, 202 F.3d 1360, 1364 (Fed. Cir. 2000) ("Rather, the Tariff Act requires that Commerce make such a {pass through} determination by examining the particular facts or circumstances of the sale and determining whether Delverde directly or indirectly received both a financial contribution and benefit from a government."). The Court should reject the narrow analysis applied by Commerce and

12

Defendant, and instead evaluate the facts and circumstances of this particular sale of Dongbu Steel to determine if it was for fair market value.

### 2. The Sale of Dongbu Steel Was For Fair Market Value.

In this case, the "factual scenario" at issue is the sale of a distressed company that was in a restructuring process with its creditors. Profit maximization was out of the question under these prevailing market conditions. That does not mean, however, that any subsidy received by Dongbu Steel automatically passed through to KG Dongbu. If the record shows that under the particular facts and circumstances that existed "the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under the prevailing market conditions were paid . . ." (*Final Modification*, 68 Fed. Reg. at 37,127) (emphasis added) then the sale *was* for fair market value.

As demonstrated in KG Dongbu's Rule 56.2 brief, the sale of Dongbu Steel was for fair market value and the basis for Commerce's determination that the sale was not for fair market value is not supported by substantial evidence. Pl. Br. at 26-31. Defendant supports its argument that the sale was not for fair market value by claiming that the sale of Dongbu Steel was under the control of the creditors council and that the "purpose of the sale was to graduate Dongbu Steel from the debt restructuring program." Def. Br. at 27. Defendant relies on these facts to draw an artificial distinction between "profit maximization in accordance with normal sales practices of private, commercial sellers (*i.e.,* seeking the highest market price for assets) and creditor recovery (*i.e.,* to cease further loss and recover investment)." Def. Br. at 28. This is a false distinction, and is incompatible with the requirement to examine the transaction based on the facts and circumstances that existed.

As discussed, the question is whether "the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under the prevailing market

<u>conditions</u> were paid….”  *Final Modification*, 68 Fed. Reg. at 37,127 (emphasis added).  This question is not a narrow one that only focuses on profit maximization in a perfect scenario, but instead must be viewed under the prevailing market conditions which, in this case, involved the sale of a distressed company.  The fact that the sale was of a distressed company by creditors who were seeking to graduate Dongbu Steel from a debt restructuring program is not evidence that the sale was not for fair market value.  Rather, these facts are just part of the prevailing market conditions for the sale and must be taken into account in assessing whether the sale was for fair market value.  The issue is thus whether the sale of Dongbu Steel, as a distressed company by its creditors was for fair market value.

Defendant does not actually point to any evidence that supports the conclusion that, under these circumstances, the sale price was for less than what Dongbu Steel as a distressed company involved in a restructuring program, was actually worth.  It is no answer to just say that because this case does not involve a “normal” private-to-private sale where the seller was going to maximize profit it is not for fair market value.  The creditors *were* trying to maximize their recovery by trying to get the highest price possible for Dongbu Steel.  The KG Consortium offered the highest bid in an open bidding process, CR 100-154 (PR 69-75) (PR 74-78) at 38-39, Exhibit B-19, Exhibit B-23, Exhibit B-26, and PricewaterhouseCoopers (“PWC”) independently analyzed whether the creditors committee should accept the KG Consortium’s bid, CR 100-154 (PR 69-75) at 40-41, Exhibit B-29; *see also* Pl. Br. at 27-31.  Moreover, the creditors were the sellers of Dongbu Steel and thus a focus on their recovery as creditors <u>is</u> a focus on maximizing the sellers’ return.

Defendant admits that the KG Consortium “bought Dongbu Steel in an open bidding process as the highest bidder.”  Def. Br. at 29.  Nonetheless, in an effort to show this sale was not

for fair market value, Defendant and Defendant-Intervenor claim the loan modifications and fourth D/E swap that occurred concurrently with the sale are market distorting measures without which the KG Consortium allegedly would not have gone through with the transaction. Def. Br. at 28-29; Def.-Int Br. at 28. However, rather than evidence of a failure to maximize value, these types of concurrent subsidies are normal and are expected to *raise* the transaction price.[2]

In its *Final Modification*, Commerce addressed the treatment of so-called "concurrent subsidies" that are provided as incentives to close the sale. Specifically, Commerce explained that it "would expect that potential investors would be willing to increase the value of their offer prices to reflect the additional value" that "concurrent subsidies are expected to contribute to the overall value of the company." *Final Modification*, 68 Fed. Reg. at 37,137. Commerce recognized that concurrent subsidies "*increase* the value and, therefore, in a normally functioning market, *increase* the price the purchaser pays." *Id.* (emphasis added). Accordingly, Commerce explained that "there would be no reason to believe that a concurrent subsidy would lead to a purchaser paying less than fair market value." *Id.* Following the logic of the *Final Modification*, the loan extensions, interest rate reduction and the fourth D/E swap that Commerce raised in the *Final Results* do not evidence failure by the creditors committee to maximize Dongbu's value in the acquisition. Instead, these concurrent subsidies would be expected to have *increased* the sale price.

Here, there is no basis to conclude that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair market value for Dongbu. The Preliminary Bidding

---

[2] Commerce separately countervailed the fourth D/E swap and loans, and thus it would be perverse if these concurrent subsidies were also relied upon as the basis for finding that the sale of Dongbu Steel was <u>not</u> for fair market value. After all, if these concurrent subsidies are being separately countervailed then they would not even be relevant to an extinguishment analysis as there could be no pass through of a prior subsidy.

NON-CONFIDENTIAL

Guide requested that the bidder provide a purchase price for the acquisition of new shares and include any request, such as debt adjustment, that should be part of the transaction. CR 100-154 (PR 69-75) at 36, Exhibit B-20. In its preliminary bid, the KG Consortium submitted a definitive purchase price of KRW [               ] and noted that its price was conditioned on "a certain level of debt restructuring." CR 100-154 (PR 69-75) 38, Exhibit B-23. Then, in its final bid, the KG Consortium submitted an increased price of KRW [               ] as well as a proposed D/E swap, interest rate adjustment and maturity adjustment. CR 100-154 (PR 69-75) at 39-40, Exhibit B-26. Nothing about the loan modifications and fourth D/E swap suggests that the creditors committee was accepting less value for Dongbu than it would otherwise receive in the absence of these incentives. To the contrary, the increase in the final bid price from KRW [               ] to KRW [               ] shows these incentives *increased* the price that the KG Consortium paid for Dongbu.

Unable to counter the fact that the fourth D/E swap and final loan modifications actually had the impact of *raising* the sale price, Defendant-Intervenor resorts to a weak and non-substantive argument about the parties' respective burdens of proof. Def.-Int. Br. at 22. However, KG Dongbu never argued that the burden of proof required Commerce "to affirmatively demonstrate that the sale was not for fair market value." *Id.* Instead, KG Dongbu argued that it had rebutted the baseline presumption by pointing to evidence that the sale of Dongbu Steel was in an arm's length transaction for fair market value. *See* Pl. Br. at 32-36. Under the standard of review, Commerce needs to address this record information and explain why it does not rebut the baseline presumption. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720

(Fed. Cir. 1997) ("{T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.''). This is not shifting the burden of proof.

Lastly, Defendant-Intervenor claims that the criteria for extinguishment are not met because the creditors committee did not sell "all or substantially all" of Dongbu Steel and that the KDB retained significant influence over Dongbu.[3] Def.-Int. Br. at 22-23. Commerce, however, never disputed that the creditors committee sold substantially all of Dongbu's shares to the KG Consortium or otherwise maintained any control, and thus this is another *post-hoc* argument that should not be considered. *See* PR 181 at 57-61. Even if considered, the record shows that the creditors committee sold substantially all of Dongbu's shares and the KG Consortium assumed control of the company. In connection with the sale of Dongbu, new shares were issued to the KG Consortium and the members of the creditors' committee (who swapped debt for equity); the new shares accounted for 96.15 percent of Dongbu's total shares.[4] CR 100-154 (PR 69-75) at 41-42, 48, Exhibit B-30, Exhibit B-31. Only 3.85 percent of the pre-acquisition shares thus remained. As a result of the transaction, private companies held [    ] percent of Dongbu's shares. CR 260 (PR 138) at 13 (noting that the GOK-related entities own merely [    ] percent after the transaction, the majority of which were new shares). The transaction resulted in the dissolution of the creditors committee and almost all of Dongbu's board members and managing directors being replaced. CR 100-154 (PR 69-75) (PR 74-78) at 42, 64, Exhibit B-30 (Agenda Item No. 4); CR 6 (PR 42) at 5, Exhibit 3. Whether the former

---

[3] The *Final Modification* requires that in the change of ownership, "the government sold its ownership of all or substantially all of a company or its assets, retaining no control." *Final Modification* at 37,127.

[4] Dongbu issued 72,000,000 new shares to the KG Consortium and 24,200,000 news shares to creditors in the fourth D/E swap after converting their debt to equity. At the end of 2019, Dongbu had 100,055,019 total shares outstanding. (24,200,000+72,000,000)/100,055,019=96.15 percent. CR 100-154 (PR 69-75) at Exhibit 12-A n.20.

members of the creditors committee, including some government entities such as the KDB, continued to hold a minority of shares after the sale does not alter the fact that substantially all of Dongbu's shares were sold and the creditors committee retained no control after the transaction was complete.

> **3.**    **The Other Factors Listed In The *Final Modification* Also Support The Conclusion That Any Non-Recurring Subsidies Received By Dongbu Steel Were Extinguished.**

In its Rule 56.2 brief, KG Dongbu argued that the four-factors in the *Final Modification* regarding the extinguishment of non-recurring subsidies demonstrate that any subsidies were extinguished by the sale of Dongbu Steel.  *See* Pl. Br. at 32-36.  Defendant downplays the importance of these factors as "non-exhaustive factors which Commerce *may* consider when assessing whether a transaction is for fair market value."  Def. Br. at 32.  While it may be true that this list is not exhaustive, these factors are highly relevant to the extinguishment analysis since Commerce specifically itemized them in the *Final Modification*.  68 Fed. Reg. at 37,127.  As discussed in KG Dongbu's Rule 56.2 brief, an analysis of these four factors supports the conclusion that any non-recurring subsidies received by Dongbu were extinguished by the sale to the KG Consortium.

With respect to the first factor – whether an objective analysis was performed to determine the sales price – Defendant argues that "Commerce could not agree with KG Dongbu that price acceptance was based on an objective analysis by Pricewaterhouse Cooper."  Def. Br. at 33.  The reason being that the Pricewaterhouse Cooper report was focused on creditor recovery and not profit maximization.  *See id.* at 33-34.  As discussed, the fair market value and extinguishment analysis is not limited to factual situations involving the sale of a profitable and healthy company where profit maximization is possible.  Instead, the *Final Modification* explains that it is a flexible and fact based analysis to deal with the "diverse" factual scenarios that could

occur with the sale of a company or its assets.  Based on the facts and circumstances of this case, that involved the sale of a distressed company that was in a restructuring process with its creditors, the Pricewaterhouse Coopers report was an objective analysis that was designed to maximize creditor recovery.

Defendant also seeks to undermine the third factor related to acceptance of the highest bid by pointing out that the creditors committee paid a higher per-share price for new shares (KRW 25,000) than the KG Consortium did (KRW 5,000 per-share).  *See* Def. Br. at 29-30. However, this fact actually undercuts its argument.  The KG Consortium conditioned its bid on the fourth D/E swap, and the higher prices paid by the creditors in the swap thus represent measures that the creditors committee took to *increase* the market value of Dongbu and secure the successful sale of the company.  *See* discussion *supra* at Section I(B)(2).[5]

Finally, Defendant does not seek to address the second and fourth factors, which relate to whether there were any artificial barriers to entry or whether the seller reduced the price in exchange for any committed investments by the buyer.  As discussed in KG Dongbu's Rule 56.2 brief, both of these factors further support the conclusion that any non-recurring subsidies received by Dongbu Steel were extinguished.  *See* Pl. Br. at 32-36.  These factors remain unrebutted.

### C. Commerce Must Calculate The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rate According To The Plain Language Of Its Regulations.

In its Rule 56.2 brief, KG Dongbu argued that Commerce's use of a 3-year term in the calculation of the uncreditworthy benchmark rate and the unequityworthy discount rate was

---

[5] Additionally, Commerce separately countervailed the additional KRW 20,000 per share that the creditors committee paid as a separate subsidy.  This difference thus should not impact the fair market value analysis.  *See also* fn.2 *supra*.

contrary to the plain language of 19 C.F.R. § 351.505(a)(3)(iii), which provides that Commerce must use as variable $n$ the actual 6 and 15 year terms of Dongbu's loans and average useful life ("AUL") allocation.  Pl. Br. at 36-42.  Defendant argues that Commerce correctly used a three-year KRW-denominated AA-rate corporate bond rate "because it was the only long-term interest rate available on the record consistent with the legal standard."  Def. Br. at 38.  Defendant also argues that Dongbu's "loans from private creditors… cannot be construed to be 'comparable commercial loans,'" and "cannot be used as a commercial benchmark under 19 U.S.C. § 1677(5)(E)(ii) and 19 C.F.R. § 351.505(a)(2)" due to alleged "government influence and the fact that they were part of a government program."  Def. Br. at 37-38.

However, KG Dongbu does not argue that Commerce used the incorrect interest rate for "the long-term interest rate that would be paid by a creditworthy company" as variable $i_f$ or that its loans from private banks are "comparable commercial loans."  Def. Br. at 36-37.  KG Dongbu argues that, because the "term of the loan" for KG Dongbu's "government provided long-term loan" is 6 years and the AUL period for the equity infusions is 15 years, 19 C.F.R. § 351.505(a)(3)(iii) requires Commerce to calculate the benchmark interest rate using 6 year and 15 year terms as the term of the loan for variable $n$ and use the probabilities of default by creditworthy and uncreditworthy companies within 6 and 15 years for variables $p_n$ and $q_n$.  Def. Br. at 36.

Defendant argues that "Commerce can rely only on information that is on the record, and it was KG Dongbu's burden to populate the record with relevant information."  Def. Br. at 38.  But the information necessary to calculate the uncreditworthy benchmark rate and unequityworthy discount rate pursuant to 19 C.F.R. § 351.505(a)(3)(iii) is on the record, contrary to Defendant's argument.  Commerce has on the record the 6-year term of KG Dongbu's loans

and the 15-year AUL period for variable $n$, the long-term interest rate that would be paid by a creditworthy company (*i.e.*, the 3-year AA-rated KRW interest rate published by the Bank of Korea) for variable $i_f$, and the probability of default by creditworthy and uncreditworthy companies within 6 and 15 years for variables $p_n$ and $q_n$.  CR 100-54 at 16, 41-42; CR 262-63 at Attachment II (Exhibit 33).  As the Court recently held, Commerce must consider the record evidence that Dongbu's long-term loans and allocation period have terms of 6 and 15 years.  *KG Dongbu I*, 648 F. Supp. 3d at 1361.

Additionally, Commerce was the one that put the comparable three-year interest rate on the record.  CR 262-63 at Attachment III.  Commerce routinely uses the yield on three-year corporate bonds as the proxy long-term interest rate on comparable creditworthy loans for variable $i_f$ regardless of the length of the actual loan.  PR 140 at 11.  There was thus no missing information from the record that KG Dongbu failed to provide.

Defendant-Intervenor cites *LCA from Canada* to support that Commerce modifies variable $n$ "when confronted with limitations in the record."  Def.-Int. Br. at 24-25 (citing *100- to 150-Seat Large Civil Aircraft From Canada:  Final Affirmative Countervailing Duty Determination*, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017) and accompanying Decision Memorandum at 55 ("*LCA from Canada*")).  But the "limitation in the record" in *LCA from Canada* was that Commerce only had probabilities of default for up-to-five-year terms, not that the comparable interest rate on that record did not match the term of the respondent's loan.  Here, there is no dispute that Commerce has on this record the default rates for 6- and 15-year time periods it needs to calculate the uncreditworthy and unequityworthy benchmarks.  CR 262-63 at Attachment II.  Additionally, *LCA from Canada* supports that Commerce uses default rate data that is most specific to the respondent's actual loan terms and AUL when calculating

uncreditworthy and unequityworthy benchmarks.  *LCA from Canada IDM* at 55 ("{W}hen the *term of the loan or benefit allocation period* exceeds the term of the default data, Commerce's practice is to use the *final year* of the available data{.}") (emphasis added); *see also Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) and accompanying Decision Memorandum at Comment 18 (finding that Commerce should use a three-year default rate because the loans at issue "have a three year term").

  Defendant-Intervenor's argument that Commerce reasonably modified the variables "for the sake of accuracy and consistency," Def.-Int. Br. at 24, does not justify the *Final Results* because Commerce's decision conflicts with the plain language of its regulation. 19 C.F.R. § 351.505(a)(3)(iii) expressly ties the "the term of the loan" for variable *n* to the "government provided long term loan," here KG Dongbu's restructured loans, because it states if "a firm that received *a government-provided long-term loan* was uncreditworthy," then Commerce "will calculate the interest rate to be used in making the comparison… where: n = the term of *the loan*."  19 C.F.R. § 351.505(a)(3)(iii) (emphasis added).  Commerce's disregard of the actual 6- and 15-year data points on the record in favor of a 3-year term unrelated to the term of the loan is contrary to 19 C.F.R. § 351.505(a)(3)(iii).

## II.    CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, KG Dongbu respectfully requests that this Court reject the

arguments made by Defendant and Defendant-Intervenor and (i) hold that Commerce's *Final*

*Results* are unsupported by substantial evidence and otherwise not in accordance with law; (ii)

remand the case to Commerce with instructions to correct the errors identified by the Court; and

(iii) for such other and further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4116

*Counsel to Plaintiffs KG Dongbu Steel Co.,*
*Ltd.*

23

**III.     <u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 6,998 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills

**Attachment 1**

 

significant

STAY MORE & SAVE MORE
Stay 4 nights and receive 20% off
BOOK NOW

| Definition | Synonyms | Example Sentences | Word History | Phrases Containing | Ent |

# significant *adjective*

sig·nif·i·cant    sig-ˈni-fi-kənt 🔊

*Synonyms of* significant ›

**1**   : having meaning

  *especially* : SUGGESTIVE

    a *significant* glance

**2** **a** : having or likely to have influence or effect : IMPORTANT

    a *significant* piece of legislation

  *also* : of a noticeably or measurably large amount

    a *significant* number of layoffs

    producing *significant* profits

 **b** : probably caused by something other than mere chance

    statistically *significant* correlation between vitamin deficiency and disease

✕

Stay 4 nights and



 For adults with active psoriatic arthritis

PRESCRIBING INFO | ME
IMPORTANT SAFETY IN
What is the most import
information I should kno
TREMFYA®? TREMFYA®



## Definition    Synonyms    Example Sentences    Word History    Phrases Containing    Ent

eloquent

meaning

pregnant

revelatory

expressive

meaningful

revealing

suggestive

See all Synonyms & Antonyms in Thesaurus ›

Historians of ancient gender have seen this as crucially *significant*. Women in antiquity were by definition so disempowered that the authority of a new female ruler could only be captured by representing her in the guise of a man. Or so the argument goes.

— Mary Beard, *New York Review of Books*, 12 Feb. 2009

While Congress will take a *significant* role in designing new regulation and is not likely to rubber-stamp the administration's proposals, momentum is strong for the creation of comprehensive financial reform.

— Marc I. Seltzer et al., *Commonweal*, 19 June 2009

A new study on women and the media from the University of Missouri-Columbia shows that overweight women and women with eating disorders are not the only ones negatively affected by unrealistic advertisements (as previous studies have indicated). After viewing images of models, women of all sizes reported a *significant* decrease in satisfaction with their weight, hair, physical shape and sexual attractiveness.

— *Ms.*, Summer 2007



**Definition**     Synonyms     Example Sentences     Word History     Phrases Containing     Ent

— Amy Stewart, *Wilson Quarterly*, Winter 2004

See More ⌄

## Recent Examples on the Web

The show ran for 13 episodes on NBC in 1973-75 and made a *significant* impression.

— Carmel Dagan, *Variety*, 26 Nov. 2023

Jesse Core, founder of Core Brewing and Distilling said his operation is gearing up to post *significant* growth in 2023 and will be making a run at the state's top production spot.

— John Magsam, *arkansasonline.com*, 26 Nov. 2023

Noise-canceling is capped at good rather than great, but their class-leading sound makes up for it, especially at this *significant* price drop.

— Matt Jancer, *WIRED*, 25 Nov. 2023

See More ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'significant.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.



**Definition**    Synonyms    Example Sentences    Word History    Phrases Containing    Ent

Stay 4 nights and
receive 20% off

BOOK NOW

## Etymology

Latin *significant-, significans*, present participle of *significare* to signify

## First Known Use

1579, in the meaning defined at sense 1

## Time Traveler

**The first known use of *significant* was in 1579**

See more words from the same year

significant digit                    significant other



## Definition      Synonyms      Example Sentences      Word History      Phrases Containing      Ent

significancy

**significant**

significant digit

See More Nearby Entries >

**Style**   MLA

"Significant." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/significant. Accessed 29 Nov. 2023.

⧉ Copy Citation



**Facebook**



**Twitter**

# significant adjective

sig·nif·i·cant          sig-ˈnif-i-kənt 🔊

**1**    : having much importance



**Definition**   Synonyms   Example Sentences   Word History   Phrases Containing   Ent

a statistically *significant* relationship between vitamin deficiency and disease

**3**   : having meaning and especially a hidden or special meaning

gave us a *significant* wink

**adverb**

## Etymology

from Latin *significant-, significans,* present participle of *significare* "to signify, indicate," from *signum* "mark, sign, image" — related to SIGN



Stay 4 nights and
receive 20% off

BOOK NOW

# significant adjective

sig·nif·i·cant    sig-ˈnif-i-kənt 🔊

: probably caused by something other than mere chance

a statistically *significant* correlation between diet and disease

**adverb**

Case 1:23-cv-00055-JCG      Document 37     Filed 12/06/23    Page 36 of 39



**Definition**     Synonyms     Example Sentences     Word History     Phrases Containing     Ent

Nglish: Translation of *significant* for Spanish Speakers

Britannica English: Translation of *significant* for Arabic Speakers

Last Updated: 29 Nov 2023 - Updated example sentences

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**





**Definition**      Synonyms      Example Sentences      Word History      Phrases Containing      Ent



Can you solve 4 words at once?

| Play |



**WORD OF THE DAY**

# detritus 🔊

<u>See Definitions and Examples</u> »

**Get Word of the Day daily email!**

Your email address      SUBSCRIBE

## Games & Quizzes



## Quordle

Can you solve 4 words at once?

Play

## Blossom Word Game

You can make only 12 words. Pick the best ones!

Play

## Missing Letter

A crossword with a twist

Play

## Spelling Bee Quiz

Can you outdo past winners of the National Spelli...

Take the quiz



**Definition**    Synonyms    Example Sentences    Word History    Phrases Containing    Ent

OTHER MERRIAM-WEBSTER DICTIONARIES

MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY

SCRABBLE® WORD FINDER

MERRIAM-WEBSTER DICTIONARY API

NGLISH - SPANISH-ENGLISH TRANSLATION

BRITANNICA ENGLISH - ARABIC TRANSLATION

Browse the Dictionary:    A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W
X  Y  Z  0-9  BIO  GEO

Home  |  Help  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |  Contact Us  |
Join MWU  |  Videos  |  Word of the Year  |  Kid's Dictionary  |  Law Dictionary  |
Medical Dictionary  |  Privacy Policy  |  Terms of Use

Browse the Thesaurus  |  Browse the Medical Dictionary  |  Browse the Legal Dictionary  |
Browse the Kid's Dictionary

© 2023 Merriam-Webster, Incorporated

Do not sell or share my personal information