**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

KG DONGBU STEEL CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA,

Defendant-Intervenors.

**NON-CONFIDENTIAL VERSION**

Proprietary Information removed from Pages 17-19, 22, and 25

No. 23-cv-00055-JCG

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Brady W. Mills
R. Will Planert
Mary S. Hodgins
Edward J. Thomas III
Nicholas C. Duffey

TAFT STETTINIUS & HOLLISTER LLP
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
Email: bmills@taftlaw.com
Telephone: 202.216.4116

*Counsel to Plaintiff*

September 30, 2026

## TABLE OF CONTENTS


Table of Authorities ........ ii

Introduction ........ 1

Summary of Argument ........ 3

Questions Presented ........ 9

Statement of Facts ........ 9

Standard of Review ........ 13

Argument ........ 13

I. Commerce's Determination That The Sale of Dongbu Steel Was Not Arm's Length For Fair Market Value Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law ........ 13

A. Commerce's Fair Market Value Analysis Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law ........ 16

B. Commerce's Analysis of its Four-Factor Test And Conclusion That The Sales of Dongbu Steel Was Not Arm's Length for Fair Market Value Is Unsupported by Substantial Evidence and is Otherwise Not in Accordance with Law ........ 21

C. *KG Dongbu III* Does Not Address The Specific Arguments That Plaintiff Raises In This Case And Is Therefore Not Dispositive As To Whether The *Final Results* In This Case Are Supported By Substantial Evidence Or Contrary To Law. ........ 26

II. Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rates ........ 30

A. Uncreditworthy Benchmark Rate ........ 31

B. Unequityworthy Discount Rates ........ 35

C. The Court Has Previously Found That Commerce Should Use the Actual Terms of the Financial Instrument or Equity Infusion at Issue. ........ 37

Conclusion And Relief Requested ........ 37

Certificate Of Compliance ........ 39

Certificate of Service ........ 40

Proposed Order ........ 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156, 83 S. Ct. 239 (1962)....................20

*Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*,
415 F. Supp. 3d 1216 (Ct. Int'l Trade 2019)....................33, 35, 36

*GPX Intern. Tire Corp. v. United States*,
893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013)....................15

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*,
181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016)....................33

*KG Dongbu Steel Co. v. Nucor Corp.*,
181 F.4th 1335 (Fed. Cir. 2026).................... *passim*

*KG Dongbu Steel Co. v. United States*,
648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023)....................3, 9, 31, 37

*KG Dongbu Steel Co. v. United States*,
695 F. Supp. 3d 1338 (Ct. Int'l Trade 2024)....................3, 9, 31, 37

*Risen Energy Co. Ltd. v. United States*,
122 F.4th 1348 (Fed. Cir. 2024)....................21

*SKF USA, Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)....................1

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504, 114 S. Ct. 2381 (1994)....................34

**Statutes**

19 U.S.C. § 1516a....................13

19 U.S.C. § 1677....................14

**Other Authorities**

19 C.F.R. § 351.505.................... *passim*

19 C.F.R. § 351.507....................35-37

19 C.F.R. § 351.524....................35-36

*Certain Cut-to-Length Carbon Steel Plate from Mexico Preliminary Results of Countervailing Duty Administrative Review*,
68 Fed. Reg. 52,895 (Dep't Commerce Sept. 8, 2003)..........31

*Certain Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*,
70 Fed. Reg. 17,971, (Dep't Commerce Apr. 8, 2005)..........14

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*,
72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007)..........31

*Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)..........34, 36

*Drill Pipe From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011*,
78 Fed. Reg. 47,275 (Dep't Commerce Aug. 5, 2013)..........31

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*,
68 Fed. Reg. 37,125 (Dep't Commerce June 23, 2003) .......... *passim*

## INTRODUCTION

This appeal challenges the U.S. Department of Commerce's ("Commerce" or "the Department") final results of the administrative review of the countervailing duty ("countervailing duty" or "CVD") order on certain corrosion-resistant steel products ("CORE" or "subject merchandise") from the Republic of Korea for entries during the January 1, 2020 to December 31, 2020 period of review ("period of review" or "POR"). *See Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2020*, 88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023) ("*Final Results*"), PR 188; *see also* Mem. from James Maeder, Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant Sec'y for Enforcement and Compliance, "Issues and Decision Mem. for the Final Results" (Dep't Commerce Feb. 1, 2023) (ACCESS Barcode: 4336940) ("Final Decision Mem."), PR 181.[1]

Plaintiff KG Dongbu Steel Co., Ltd. ("KG Dongbu" or "Plaintiff") (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd, collectively "Dongbu") filed its initial brief and moved for judgment on the agency record in this matter on July 21, 2023. *See* Pl.'s Mot. For J. on the Agency R., *KG Dongbu Steel Co. v. United States*, No. 23-cv-00055-JCG (July 21, 2023), ECF No. 28. KG Dongbu's appeal covers three distinct issues. The first issue is whether Commerce's abrupt change in agency practice with respect to its treatment of certain debt-equity swaps ("D/E swaps") provided to Dongbu in 2015, 2016, and 2018 was arbitrary because Commerce did not provide a reasonable explanation for departing from its consistent agency practice under *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). The second issue is whether, if such

---

[1] Administrative record documents are cited pursuant to their assigned numbering in the confidential record ("CR") and public record ("PR") indices respectively.

change in practice was reasonable, Commerce's finding that the non-recurring subsidies received by Dongbu from these three D/E swaps passed-through to KG Dongbu was supported by substantial evidence and otherwise in accordance with law. The third issue is whether Commerce's calculation of the uncreditworthy benchmark for purposes of measuring the benefit from certain loans and bonds that were restructured as part of the corporate workout process, and its calculation of the uncreditworthy discount rate for purposes of measuring the benefits from the D/E swaps, were supported by substantial evidence and otherwise in accordance with law.

The initial briefing for this appeal was completed in late 2023 and the Court held oral argument on February 27, 2024. *See* Appearance Sheet, *KG Dongbu Steel Co. Ltd. v. United States*, No. 23-cv-00055 (Ct. Int'l Trade Feb. 27, 2024), ECF No. 44. On April 18, 2024, the Court ordered this matter to be stayed pending disposition of *KG Dongbu Steel Co. v. Nucor Corp.*, 181 F.4th 1335 (Fed. Cir. 2026) *("KG Dongbu III")* before the U.S. Court of Appeals for the Federal Circuit. Order, *KG Dongbu Steel Co. v. United States*, No. 23-cv-00055-JCG (Ct. Int'l Trade Apr. 18, 2024), ECF No. 47. That Federal Circuit appeal was of a decision by this Court related to the prior 2019 administrative review of the countervailing duty order on CORE from Korea. On July 16, 2026, the Federal Circuit issued its decision. *KG Dongbu III*, 181 F.4th 1335. On August 28, 2026, the Court ordered that KG Dongbu should brief "any different or remaining issues" in this matter following the Federal Circuit's decision in *KG Dongbu III*. Order, *KG Dongbu Steel Co. v. United States*, No. 23-cv-00055-JCG (Ct. Int'l Trade Aug. 28, 2026), ECF No. 76.

Pursuant to Rule 56.2 of the U.S. Court of International Trade and the Court's August 28, 2026 order, KG Dongbu hereby provides this supplemental brief regarding the issues in this matter that are different and outstanding after *KG Dongbu III*, and renews its motion for judgment on the agency record. KG Dongbu does not contest the fact that the Federal Circuit's decision in *KG*

*Dongbu III* is binding as to the first issue regarding Commerce's change in agency practice, and thus KG Dongbu does not address that issue herein. However, the second issue regarding whether the non-recurring subsidies from the first three D/E swaps passed-through to KG Dongbu is still a live issue and the *KG Dongbu III* decision does not control. Additionally, the third issue regarding the uncreditworthy benchmark and uncreditworthy discount rate was not appealed and thus was not addressed at all in *KG Dongbu III*. That issue is thus live and this Court should follow its prior decisions in *KG Dongbu Steel Co. v. United States*, 648 F. Supp. 3d 1353, 1360-61 (Ct. Int'l Trade 2023) ("KG *Dongbu I*") and *KG Dongbu Steel Co. v. United States*, 695 F. Supp. 3d 1338, 1353-56 (Ct. Int'l Trade 2024) ("*KG Dongbu II*") and remand for Commerce to revise the uncreditworthy benchmark and discount rates.[2]

**SUMMARY OF ARGUMENT**

The first issue concerns certain D/E swaps received by Dongbu in connection with a corporate workout program. As explained in KG Dongbu's motion for judgment on the agency record and its brief in support, in 2015, 2016 and 2018, Dongbu engaged in three D/E swaps wherein its creditors (the "creditors committee") exchanged debt for equity in the company as part of Dongbu's corporate workout program. *See* Br. in Supp. of Mot. For J. on the Agency R. at 3-5, *KG Dongbu Steel Co. v. United States*, No. 23-cv-00055-JCG (Ct. Int'l Trade July 21, 2023), ECF No. 28-2. In the *Final Results*, Commerce determined that the three D/E swaps were countervailable equity infusions from the creditors committee. *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative*

[2] Given the passage of time, and for the convenience of the Court, KG Dongbu has included all remaining live arguments in this supplemental brief rather than simply referring to the previously filed Rule 56.2 briefs. The substance is essentially the same with the addition of a discussion of the impact of the Federal Circuit's decision in *KG Dongbu III* on this appeal.

*Review; 2020*, 87 Fed. Reg. 47,973 (Dep't Commerce Aug. 5, 2022), PR 145 ("*Preliminary Results*"); Mem. from Scot Fullerton, Associate Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations to Lisa W. Wang, Assistant Sec'y for Enforcement and Compliance, "Decision Memorandum for the Preliminary Results" at 15-16 (Dep't Commerce July 29, 2022) (ACCESS Barcode: 4269706), PR 140 ("Preliminary Decision Mem.") unchanged in *Final Results*, *see* Final Decision Mem. at 52, 62-63. Commerce determined that each equity infusion was a "non-recurring" subsidy, meaning that the infusion would not periodically recur like an annual grant or tax deduction would, and therefore, pursuant to its practice with regard to non-recurring subsidies, Commerce allocated the benefit from each equity infusion to every year within its fifteen-year average useful life (or "AUL") by dividing the total amount of the equity infusion by fifteen years and adjusting each year's allocated benefit amount for the time value of money using a discount rate.

In 2019, *i.e.* within the fifteen-year AUL period for each of the three D/E swaps, the KG Consortium acquired Dongbu through an open bidding process. The KG Consortium included as a condition of its bid for acquisition a request that the creditors committee conduct a fourth D/E swap contemporaneously with the acquisition and that the committee extend the length and adjust the interest rates on Dongbu's outstanding long-term loans and bonds. When a merger and acquisition occurs such as the one between the KG Consortium and Dongbu, Commerce presumes that the benefits from pre-existing non-recurring subsidies—in this case, the outstanding benefit amounts from each of three D/E swaps—continue to benefit the resulting combined company (KG Dongbu) for the years within the AUL period that occur after the acquisition. This presumption of "pass-through" can be rebutted if it can be shown that the KG Consortium acquired Dongbu in an arm's length transaction for fair market value. If this presumption is rebutted then the subsidies

from the three D/E swaps in 2015, 2016, and 2018 are "extinguished" by the acquisition in 2019, *i.e.*, do not pass-through to KG Dongbu. *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003) ("*Final Modification*"). The logic behind extinguishment is that the value of the company at the time of the acquisition, inclusive of pre-existing subsidies, would be fully reflected in the price offered and paid by an acquirer in an acquisition at arm's length for fair market value. *See id.* at 37,126-27 and 37,137.

In the *Final Results*, Commerce determined that the acquisition of Dongbu by the KG Consortium was not for fair market value and thus the non-recurring subsidies from the first three D/E swaps passed through to KG Dongbu. Commerce's determination is unsupported by substantial evidence and is otherwise not in accordance with law because it misapplies its own policies with respect to analyzing the subsidy pass-through issue. Final Decision Mem. at 57-61. For example, Commerce supports its determination that the sale was not for fair market value based on the fact that the creditors committee agreed to provide the newly formed entity certain subsidies concurrently with the acquisition, namely that the creditors committee agree to interest rate reductions, loan extensions, and the additional fourth D/E swap. *Id.* To Commerce, these "concurrent subsidies" evidence that the acquisition price was *not* fair market value because, purportedly, the creditors committee thereby did not maximize the sale price. This interpretation of these concurrent subsidies, however, reflects a fundamental misunderstanding of the impact that they have on the price that an acquirer would pay for a target company.

In the *Final Modification*, which changed Commerce's practice for dealing with the pass-through of non-recurring subsidies following the implementation of an adverse World Trade Organization decision under Section 123 of the Uruguay Round Agreements Act, Commerce

explained that concurrent subsidies, such as the fourth D/E swap here, logically "*increase* the price the purchaser pays" for a target entity and therefore do not evidence a failure to transact at fair market value. *Final Modification*, 68 Fed. Reg. at 37,137 (emphasis added). This logic is borne out by the facts in this case, which show that the final sales price increased after the creditors agreed to the interest rate reductions and the fourth D/E swap. Commerce's determination that the concurrent subsidies in this case suggest that the sale of Dongbu was not at fair market value is illogical and contrary to the *Final Modification*.

Another example that highlights Commerce's faulty analysis is its discussion of the impact of so-called "committed investments" as support for its conclusion that the sale was not for fair market value. As discussed in the *Final Modification*, Commerce considers whether the *seller*, *i.e.*, the government, requires the buyer to undertake certain "committed investments" in connection with an acquisition and whether these committed investments were communicated to all potential buyers so they could be taken into account by the market when those potential buyers assess the value of the target company. *See Final Modification*, 68 Fed. Reg. at 37,133. As support for its conclusion that the sale was not for fair market value in this case, Commerce points to the fact that the KG Consortium, the *buyer*, requested that the seller provide the interest rate reductions and the fourth D/E swap as a part of its bid, and that therefore these supposed "committed investments" were not fully transparent to all potential bidders. Commerce has it exactly backwards. The committed investment factor from the *Final Modification* focuses on commitments that the government seller imposes on the potential buyers, not *vice versa*. The interest rate reductions and fourth D/E swap were commitments that the *buyer* (the KG Consortium) requested of the seller as a condition of its bid price. This misapplication of its own standard exemplifies the logical flaws in Commerce's fair market value analysis.

The Federal Circuit's decision in *KG Dongbu III* does not control the pass-through issue in this appeal. The primary basis for the Federal Circuit's affirmance of Commerce's pass-through decision in *KG Dongbu III* was that KG Dongbu did not provide a "change in ownership appendix" as a prerequisite to challenge the baseline presumption of pass-through in that case. *KG Dongbu III*, 181 F.4th at 1346-47. A "change in ownership appendix" ("CIO Appendix") is a series of questions that Commerce asks respondents to answer if the respondent intends to challenge the "baseline presumption" that non-recurring subsidies "pass-through" from a target company to the surviving entity after an acquisition. Unlike in *KG Dongbu III*, here KG Dongbu provided the requisite CIO Appendix in its initial questionnaire response and therefore properly challenged the baseline presumption that any benefits from the first three D/E swaps passed through to KG Dongbu. *See* Letter from Morris, Manning & Martin LLP to Sec'y Commerce, "Dongbu's Initial Questionnaire Response" at Exhibit B-35 (Nov. 29, 2021), CR 100-54, PR 69-75 ("KG Dongbu's Initial Questionnaire Response"). This is a critical factual distinction that, alone, makes the Federal Circuit's decision on the pass-through issue in *KG Dongbu III* distinguishable.

The Federal Circuit also found that KG Dongbu's arguments regarding pass-through offered merely a "contrary gloss" on the record evidence and accordingly sustained Commerce's final results in the 2019 administrative review because the record, without the CIO Appendix, did "not discredit" the evidence that supported Commerce's baseline presumption in that case. *KG Dongbu III*, 181 F.4th at 1347. The evidence that the Federal Circuit briefly mentions, however, (*i.e.*, that the third party evaluation of the acquisition focused on creditor recovery, that the acquisition included a fourth D/E swap in 2019, and that the price per share paid by the creditors committee in the fourth D/E swap was higher than the price per share paid by the KG Consortium in its acquisition) is defective and does not support Commerce's pass-through determination. By

way of example, Commerce's reliance on the fourth D/E swap as support for the sale not being for fair market value is flatly inconsistent with Commerce's own discussion of the impact of such "concurrent subsidies" and that they would normally be expected to *increase* the value that a purchaser would pay for a target entity. *Final Modification*, 68 Fed. Reg. at 37,137. Given the perfunctory discussion of the evidence relied upon by Commerce, the Federal Circuit did not address this key inconsistency with the *Final Modification*. *KG Dongbu III*, 181 F.4th at 1347.

Nor did the Federal Circuit address how it could be the case that the creditors committee paying a higher per share price than the KG Consortium in the fourth D/E swap evidences that the KG Consortium failed to pay fair market value for Dongbu. Like the fourth D/E swap itself, the higher prices paid by the creditors committee in the swap represent measures the creditors committee took, as concurrent subsidies, to *increase* the market value of Dongbu to secure the successful sale of the company. Furthermore, Commerce separately countervailed the additional amount paid per share by the creditors committee in the fourth D/E swap and thus this is not relevant to the pass-through analysis that is focused on whether the sale of Dongbu extinguished any alleged subsidies received in connection with the first three D/E swaps. The Federal Circuit in *KG Dongbu III* does not grapple with these issues or arguments.

The second issue in this appeal was not addressed at all by the Federal Circuit. This issue involves the uncreditworthy benchmark rate used by Commerce to calculate benefits from certain long-term loans and bonds received by Dongbu as part of its corporate workout, as well as the uncreditworthy discount rate used to calculate the benefits from the D/E swaps. In the *Final Results*, Commerce incorrectly calculated the uncreditworthy benchmark rate used to measure the benefit for Dongbu's outstanding loans and bonds by using three-year default rates instead of default rates based on the loans' terms as required by Commerce's regulations. Commerce made

a similar mistake by also using a three-year term to calculate the uncreditworthy discount rates used when allocating the non-recurring benefit it found for the D/E swaps, where the proper basis of the discount rates is the AUL period (here fifteen years). Commerce's claims that the three-year period is "consistent" with the creditworthy benchmark interest rate and therefore should be used in its calculations in place of the loan term or the AUL period contradicts the express requirements of its own regulations, and is not in supported by substantial evidence and is otherwise not in accordance with law. This Court already addressed this identical issue and ruled in KG Dongbu's favor and it was not appealed to the Federal Circuit. *See KG Dongbu I*, 648 F. Supp. 3d at 1360-61; *KG Dongbu II*, 695 F. Supp. 3d at 1353-56. It should do the same here.

## QUESTIONS PRESENTED

Whether Commerce's determination that the benefits from Dongbu's first three D/E swaps passed through to KG Dongbu Steel, despite the evidence showing that the KG Consortium purchased Dongbu in an arm's length transaction for fair market value, is unsupported by substantial evidence and is otherwise not in accordance with law?

Whether Commerce's calculation of the uncreditworthy benchmark for purposes of measuring the benefit from Dongbu's restructured financing, and Commerce's calculation of the uncreditworthy discount rate for purposes of measuring the benefits from the D/E swaps, is unsupported by substantial evidence and is otherwise not in accordance with law?

## STATEMENT OF FACTS

On September 7, 2021, Commerce initiated the instant administrative review of the CVD order on CORE from Korea covering calendar year 2020. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034 (Dep't Commerce Sept. 7, 2021). On November 29, 2021, KG Dongbu responded to Commerce's initial questionnaire response. Commerce's questionnaire included a question about any change in ownership during

the fifteen-year AUL period and whether the company wished to challenge Commerce's baseline presumption that *non-recurring* subsidies continue to benefit the recipient during the fifteen-year allocation period. KG Dongbu's Initial Questionnaire Response at 16. In its response, KG Dongbu submitted a CIO Appendix to challenge the baseline presumption that non-recurring subsidies were not extinguished by a change-in-ownership during the AUL period. *Id.* at Exhibit B-35. KG Dongbu also responded with details of the restructuring of its long-term loans and bonds as well as the three debt-to-equity swaps in 2015, 2016, and 2018 respectively. *Id.* at Exhibit B-1 to Exhibit B-6. The three D/E swaps were approved by both government-controlled and private commercial banks as part of Dongbu's creditors committee within the corporate workout program. KG Dongbu's Initial Questionnaire Response at 44-46.

KG Dongbu also reported that the creditors committee had agreed in December 2018 to proceed with the business normalization process for Dongbu through a merger and acquisition ("M&A"). KG Dongbu's Initial Questionnaire Response at 37. KG Dongbu provided a detailed explanation of this process, from the initial decision to proceed with an M&A transaction through to final approval of the transaction at its general shareholders meeting, which resulted in the change in ownership of Dongbu during the AUL period. *Id.* at 37 to 49 and Exhibit B-16 to Exhibit B-36.

Early in 2019, the creditors committee selected financial advisors for the M&A transaction, and they decided to use an open bidding process as the means for executing the M&A. *Id.* at 38 and Exhibit B-19 to Exhibit B-21. A public notice announcing the bidding process stated that the purpose of the M&A transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights. *Id.* Potential investors that submitted a confidentiality agreement received private and confidential information of Dongbu to assist them in determining whether to participate in the bidding process. *Id.* Among the potential

investors that received the bidding materials, three submitted preliminary bids, including the KG Consortium. *Id.* These bids were reviewed by the financial advisors and all qualified for the final bidding process, but only the KG Consortium submitted a final bid. *Id.* at 38-39. Following counteroffers and negotiations between the financial advisors and the KG Consortium, the final investment amount bid by the KG Consortium was accepted. *Id.* at 41. In separate agreements, the creditors committee agreed to a fourth D/E swap and a fourth restructuring of Dongbu's outstanding long-term loans and bonds. *Id.* at 41-42. Finally, the creditors committee, Dongbu's board of directors, and its general shareholders each approved the entire package. *Id.*

On August 5, 2022, Commerce published the *Preliminary Results* with a subsidy rate for KG Dongbu of 9.51 percent. *Preliminary Results*, 87 Fed. Reg. at 47,974. As part of the overall subsidy rate, Commerce calculated a 5.17 percent subsidy based on the 2019 restructuring of Dongbu's outstanding long-term loans and bonds by its creditors committee under its corporate workout program. Prelim Decision Mem. at 17. Commerce also determined that KG Dongbu had received a non-recurring subsidy from each of the first three D/E swaps and allocated the benefits from the swaps over the fifteen-year AUL period for each equity infusion. *Id.* at 16-17.

In the *Preliminary Results*, Commerce also found that Dongbu was uncreditworthy. Preliminary Decision Mem. at 12. Commerce stated that in accordance with 19 C.F.R. § 351.505(a)(3)(iii) it calculated an uncreditworthy benchmark, including historical default rates to determine the risk premium. *Id.* at 11. This uncreditworthy benchmark was then used to calculate the benefit from Dongbu's restructured long-term loans and bonds. *Id.* at 15-16; Mem. from Dennis McClure, International Trade Compliance Analyst, to Robert Palmer, Program Manager, Office VIII, AD/CVD Operations, "Preliminary Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd. (collectively, Dongbu)" at 3 (July 29, 2022)

CR 262-63, PR 141 ("Preliminary Calculation Mem."). When applying the formula for calculating an uncreditworthy benchmark, Commerce used as the creditworthy benchmark variable in the formula provided in 19 C.F.R. § 351.505(a)(3)(iii) the three-year corporate bond rate from the Bank of Korea. Preliminary Calculation Mem. at 3. However, in completing the calculation of its uncreditworthy benchmark, Commerce based the variables for the default rates required by the formula on the three-year term of the creditworthy benchmark instead of the actual six-year terms of the restructured loans. *Id.* at Attachment IV, tab "UCW BM."

Commerce also found KG Dongbu to be unequityworthy. *Id.* at 5-6. When calculating the unequityworthy discount rates for the equity infusions, Commerce applied the same incorrect formula and methodology as it applied for calculating the uncreditworthy benchmark. Commerce again based the variables for the default rates on the three-year term of the creditworthy benchmark instead of the fifteen-year AUL allocation period used for measuring the benefits from the government-provided equity infusions as mandated by its regulations. *Id.* at Attachment IV, tab "UCW BM."

On December 16, 2022, KG Dongbu filed its case brief addressing errors in the *Preliminary Results*. Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "KG Dongbu Steel's Case Brief" (Dec. 16, 2022), CR 298, PR 171. Among other things, KG Dongbu argued in its case brief that (1) Commerce improperly found that any benefits from the first three D/E swaps passed through to KG Dongbu despite its change in ownership, *id.* at 17-21; and (2) Commerce calculated the uncreditworthy and unequityworthy benchmarks for KG Dongbu's loans, bonds, and equity infusions contrary to the plain language of its regulations that require the default rates to correspond to the length of the countervailable loan (or allocation period for a non-recurring subsidy). *Id.* at 35-40. Thus, Commerce improperly calculated the uncreditworthy benchmark for

purposes of measuring the benefits from Dongbu's restructured long-term loans and bonds. Similarly, Commerce improperly calculated the uncreditworthy discount rate for purposes of measuring the benefits from the D/E swaps.

On February 7, 2023, Commerce published the *Final Results* with a subsidy rate of 9.47 percent for KG Dongbu. *Final Results*, 88 Fed. Reg. at 7,946. Commerce rejected KG Dongbu's arguments concerning the errors identified in its case brief, and so the *Final Results* with respect to these issues were unchanged from the *Preliminary Results*. Final Decision Mem. at 52-63. This appeal followed.

## STANDARD OF REVIEW

In reviewing a determination by Commerce pursuant to subparagraph (2)(A)(i)(I) of section 516a(a), the Court "shall hold unlawful any determination, finding or conclusion found… to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## ARGUMENT

### I. Commerce's Determination That The Sale of Dongbu Steel Was Not Arm's Length For Fair Market Value Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law

Commerce's treatment of first three D/E swaps as countervailable subsidies that passed through to KG Dongbu is unsupported by substantial evidence and is otherwise not in accordance with law. As discussed below, the record shows that any benefits associated with the first three D/E swaps did not pass through from Dongbu to KG Dongbu. Rather, any alleged benefits were extinguished by the arm's-length purchase of Dongbu by the KG Consortium at fair market value.

Commerce presumes that a non-recurring subsidy, such as the D/E swaps in this case, will benefit a recipient over the AUL of the relevant assets and Commerce thus allocates the subsidy

over that period of time ("allocation period").[3] 19 U.S.C. § 1677(5)(F); *Final Modification*, 68 Fed. Reg. at 37,127. A respondent may rebut the presumption by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was at arm's length and for fair market value.[4] *Final Modification*, 68 Fed. Reg. at 37,127. In such situations, the subsidy is reflected in the fair market price of the arm's-length transaction and the pre-sale subsidy is "extinguished," or does not "pass through" to the new owner. In the *Final Modification*, Commerce listed four non-exhaustive factors that it would analyze when determining whether the transaction price in an acquisition was arm's-length and for fair market value. These factors are: (1) whether an objective analysis was performed in determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay. *Final Modification*, 68 Fed. Reg. at 37,127.

The basic question that Commerce seeks to answer with these factors is "whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth under the prevailing market conditions was paid." *Final Modification*, 68 Fed. Reg. at 37,127. "A primary consideration in this regard" is whether the government "failed to maximize its return on what it sold" which would therefore indicate that "the purchaser paid less for the

[3] Here, the AUL period for the equity infusions is fifteen years. KG Dongbu's Initial Questionnaire Response at 16.

[4] While the *Final Modification* explicitly addresses privatization of government-owned companies, Commerce later determined to apply this methodology to private-to-private sales. *See, e.g.*, *Certain Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 Fed. Reg. 17,971, 17,972 n.2 (Dep't Commerce Apr. 8, 2005) ("*Pasta from Italy*").

company or assets than it otherwise would have had the government acted in a manner consistent with the normal sales practices of private commercial sellers." *Id.* As this court has recognized "it is very important that Commerce be exacting in its determination that FMV {fair market value} was not paid, which would otherwise extinguish the subsidy previously provided." *GPX Intern. Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1327 (Ct. Int'l Trade 2013).

In the underlying review, KG Dongbu argued that any non-recurring subsidies associated with the first three D/E swaps that occurred prior to the KG Consortium's purchase of Dongbu's assets were "extinguished" by the purchase of those assets in an arm's-length transaction for fair market value. KG Dongbu's Case Brief at 21-35. In the *Final Results*, Commerce determined that "the record does not support a finding that the M&A transaction price was arm's-length and at fair market value" and thus found that alleged subsidies from the first three D/E swaps were not extinguished by the KG Consortium's purchase of Dongbu's assets. Final Decision Mem. at 61. In reaching this conclusion, Commerce engaged in a bifurcated analysis whereby it first addressed whether the sale of Dongbu was made in an arm's-length transaction for fair market value without regard to its own four-factor test. Commerce then proceeded to separately address the four-factor test as outlined in the *Final Modification* as this was the analytical framework used by KG Dongbu to support its extinguishment argument before the agency. *See id*. at 57-61. Although these analyses overlap, KG Dongbu addresses them separately below to track the analysis used by Commerce in the *Final Results*. As discussed below, Commerce's analysis and conclusions are not supported by substantial evidence and are not in accordance with law.

### A. Commerce's Fair Market Value Analysis Is Not Supported By Substantial Evidence And Is Otherwise Not In Accordance With Law

In the *Final Results*, Commerce found that the record did not support the conclusion that the sale of Dongbu's assets to the KG Consortium was at fair market value.[5] Final Decision Mem. at 58. To support this conclusion, Commerce relied on its findings that (1) the creditors committee agreed to certain concurrent subsidies—namely to extend existing loans, reduce interest rates, and conduct the fourth D/E swap, (2) PricewaterhouseCoopers's evaluation of the acquisition focused on creditor recovery, and (3) the creditors committee paid a higher price per share in the fourth D/E swap than the KG Consortium paid in the acquisition. *Id.* Commerce determined that the transaction price was not for fair market value allegedly because the creditors committee "did not maximize its return when selling Dongbu Steel," but "rather, the sale was made for the purpose of graduating Dongbu Steel from the debt restructuring program." *Id.* This analysis and conclusions are unsupported by substantial evidence and are otherwise not in accordance with law.

As to the first factor relied upon by Commerce, there is absolutely no basis to conclude that the restructured loans and fourth D/E swap led to the KG Consortium paying less than fair market value for Dongbu. The Preliminary Bidding Guide issued to potential bidders, in its "Estimated Transaction Amount" section, requested that the bidder provide a purchase price for the acquisition of new shares as well as include any request, such as debt adjustment, that should be part of the transaction. KG Dongbu's Initial Questionnaire Response at Exhibit B-20.

[5] Commerce does not dispute or provide analysis of the fact that the transaction was arm's-length and so KG Dongbu does not separately address it here. Suffice to say, however, the sale of Dongbu's assets was between Dongbu's creditors committee and a private unrelated consortium known as the KG Consortium. KG Dongbu's Initial Questionnaire Response at 37-38; Exhibit B-35 at 3; Exhibit B-19. The record thus amply supports the conclusion that the sale was arm's-length. KG Dongbu reserves it right to respond as needed to any arm's length issues that may arise, but has not done so in this brief based the framing of determination by Commerce in its *Final Results*.

Consistently, in its preliminary bid, the KG Consortium submitted a definitive purchase price of KRW **[ ]** and noted that its price was conditioned on "a certain level of debt restructuring." *Id.* at Exhibit B-23. Then, in its final bid, the KG Consortium submitted an increased price of KRW **[ ]** as well as a proposed D/E swap, interest rate adjustment and maturity adjustment as conditions for its bid. *Id.* at 39-40. The KG Consortium conditioned its bid on the D/E swap where it stated that, **[**

**]**. *Id.* at Exhibit B-26. The KG Consortium stated that **[**

**]** *Id.* Accordingly, the KG Consortium's final bid contemplated (1) its assessment of the current condition of Dongbu that was reflective of the amounts of the first three D/E swaps that publicly occurred well ahead of the announcement of the open bidding process, and (2) its request for an additional D/E swap, interest rate reduction, and the maturity extension upon which its bidding price was expressly conditioned.

Nothing about the loan modifications and fourth D/E swap suggests that the creditors committee was accepting less value for Dongbu than it would otherwise receive in the absence of these incentives. To the contrary, the loan modifications and fourth D/E swap that occurred concurrently with the sale actually would be expected to, and actually did, result in an *increase* in the sale price of Dongbu. In the *Final Modification*, Commerce specifically addressed the treatment of so-called "concurrent subsidies" that are provided as incentives to close the sale. Commerce explained that it "would expect that potential investors would be willing to increase

the value of their offer prices to reflect the additional value" that "concurrent subsidies are expected to contribute to the overall value of the company." *Final Modification*, 68 Fed. Reg. at 37,137. Commerce also recognized that concurrent subsidies "*increase* the value and, therefore, in a normally functioning market, *increase* the price the purchaser pays." *Id*. (emphasis added).

Following the logic of the *Final Modification*, the loan extensions, interest rate reduction and the fourth D/E swap that Commerce relied upon in the *Final Results* do not evidence a failure by the creditors committee to maximize the creditors committee's return. Instead, these so-called concurrent subsidies would be expected to *increase* the sale price and the record shows that they did increase the sale price. Specifically, the increase in the KG Consortium's final bid price from KRW **[ ]** to KRW **[ ]** evidences that these incentives, which the KG Consortium finalized in its final bid, increased the price that the KG Consortium was willing to pay for Dongbu. KG Dongbu's Initial Questionnaire Response at 38-40. The final price paid for the Dongbu assets thus increased by **[ ]** percent as a result of the loan modifications and fourth D/E swap. Commerce's determination that these concurrent subsidies support the conclusion that the creditors committee failed to maximize its return is thus illogical and contradictory to its own rationale in the *Final Modification*. *See Final Modification*, 68 Fed. Reg. at 37,137 ("There would be *no reason* to believe that a concurrent subsidy would lead to a purchaser paying less than fair market value.") (emphasis added).

The second factor relied upon by Commerce to support its decision is also unavailing. Specifically, Commerce claims that the creditors committee did not maximize its return on the sale because PricewaterhouseCoopers' "evaluation of the acquisition was mainly focused on how much money the creditors can recover from this acquisition." Final Decision Mem. at 58. However, the fact that PricewaterhouseCoopers "focused on how much money the creditors {could} recover

from this acquisition" suggests that the transaction price and the creditors' return on the sale *was maximized*. *Id.* at 58. After all, the creditors were the sellers of Dongbu's assets and thus a focus on their recovery as creditors is a focus on maximizing the sellers' return. This focus on creditor recovery thus actually supports the conclusion that the creditors committee as the seller was seeking to maximize its return on the sale of Dongbu's assets.

In this regard, PricewaterhouseCoopers evaluated four scenarios regarding the KG Consortium's bid: Scenario 1 assumed that Dongbu continued with no changes to its prior pre-acquisition structure. KG Dongbu's Initial Questionnaire Response at 40-41. Scenario 2 assumed that Dongbu would merge with its affiliate Dongbu Incheon. *Id.* at 41. Scenario 3 assumed the conditions of the KG Consortium's proposals, **[ ]**. *Id.* at 41 and Exhibit B-29. Scenario 4 assumed total liquidation of Dongbu. *Id.* at 41 and Exhibit B-35 p. 5, n.2. PricewaterhouseCoopers concluded that Scenario 1 (status quo) had a value of **[ ]**, Scenario 2 (merger with Dongbu Incheon) had a value of **[ ]**, Scenario 3 (acquisition by the KG Consortium) had a value of **[ ]**, and Scenario 4 (liquidation) had a value of **[ ]**. *Id.* at Exhibit B-35 p. 6. Through these valuations, the PricewaterhouseCoopers report demonstrated **[ ]** (GOK APO). Letter from Yoon and Yang LLC to Sec'y Commerce "Response to the Initial Questionnaire" at 9 (Nov. 29, 2021), CR 9-12, PR 52-68 ("GOK's Initial Questionnaire Response").

Thus, the PricewaterhouseCoopers report evidences that the KG Consortium's investment and acquisition of Dongbu was the most valuable scenario available to the creditors committee. KG Dongbu's Initial Questionnaire Response at Exhibit B-35 p. 12. The report also demonstrates that, had the creditors committee declined to accept the KG Consortium's bid, the creditors committee would *not* be maximizing value because the alternative scenarios available, specifically maintaining Dongbu's pre-acquisition structure with no changes or its liquidation, were valued lower than the sale to KG Consortium. Therefore, in the *Final Results*, Commerce's conclusion lacks substantial evidence and fails to articulate any rational connection between the facts found—that the PricewaterhouseCoopers report focused on how much money the creditors can recover—and the choice made—that the creditors committee did not maximize its return when selling Dongbu. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 244 (1962).

Commerce's reliance on the fact that the creditors committee paid a higher price per share in the fourth swap than the KG Consortium paid also does not support the conclusion that the sale was not for fair market value. The *Final Results* note that the creditors paid KRW 25,000 per share in the fourth swap whereas the KG Consortium paid KRW 5,000 per share for its acquisition shares. Final Decision Mem. at 58. But, the higher prices paid by the creditors in the D/E swap represent measures that the creditors committee took, as concurrent subsidies, to *increase* the market value of Dongbu and secure the successful sale of the company. *See Final Modification*, 68 Fed. Reg. at 37,137. Furthermore, Commerce separately countervailed the additional KRW 20,000 per share paid by the creditors in the fourth D/E swap, *see* Preliminary Decision Mem. at 16-17, and thus it is not relevant to the extinguishment analysis that is focused on whether the sale

of Dongbu extinguished any alleged subsidies received in connection with the first three D/E swaps.

Lastly, Commerce also notes in the *Final Results* that the creditors committee's concern that Dongbu could not meet the requirements to graduate from the workout program somehow suggested that the sale price was not for fair market value. Final Decision Mem. at 59-60. But there is nothing incompatible with the creditors committee wanting Dongbu to graduate from the workout program and also wanting to obtain fair market value for its sale. The reality is that this case involves the sale of a distressed company's assets and its creditors trying to maximize the return on what they were owed from Dongbu.

Commerce then concludes, based on each of these facts, that it is "unlikely" that the creditor committee "acted in a manner consistent with the normal sales practices of private, commercial sellers in Korea." Final Decision Mem. at 59. Thus, despite all the evidence that Commerce claims supports its determination, it nonetheless merely *speculates* that the creditor committee did not act pursuant to the normal sales practices of private commercial sellers. Such speculation does not provide substantial evidence here. *See Risen Energy Co. Ltd. v. United States*, 122 F.4th 1348, 1356 (Fed. Cir. 2024) ("Speculation and guesswork are not substitutes for substantial evidence.").

Accordingly, Commerce's conclusion that the sale of Dongbu to the KG Consortium was not for fair value is unsupported by substantial evidence and is not in accordance with law.

### B. Commerce's Analysis of its Four-Factor Test And Conclusion That The Sales of Dongbu Steel Was Not Arm's Length for Fair Market Value Is Unsupported by Substantial Evidence and is Otherwise Not in Accordance with Law

After conducting a stand-alone analysis of whether the sale of Dongbu's assets was for fair market value, Commerce separately addressed its four-factor test regarding the extinguishment of

non-recurring subsidies since KG Dongbu had framed its extinguishment argument using this framework. These factors are: (1) whether an objective analysis was performed in determining the appropriate sale price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay. *Final Modification*, 68 Fed. Reg. at 37,127. Commerce's analysis and conclusions based on these factors is unsupported by substantial evidence and is contrary to the framework and reasoning behind the *Final Modification* test.

First, regarding the objective analysis factor, Commerce disagreed with KG Dongbu that the price acceptance was based on an objective analysis by the creditors committee. Final Decision Mem. at 59. Commerce's conclusion is unsupported by substantial evidence. As explained above, PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the **[ ]** acquisition price in Scenario 3, and compared the proposal with alternative scenarios that assumed the creditors committee either made no changes to Dongbu's pre-acquisition structure or liquidated Dongbu. KG Dongbu's Initial Questionnaire Response at Exhibit B-29. Based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the creditors committee of the available alternative scenarios and **[ ]**. *Id.* at 40-41; GOK's Initial Questionnaire Response at 9. This was thus an objective analysis.

Commerce also cites the PricewaterhouseCoopers 2018 Feasibility Report to support that no objective analysis was performed regarding the acquisition sale price. Final Decision Mem. at 59-60. But the 2018 Feasibility Report, KG Dongbu's Initial Questionnaire Response at Exhibit

B-16, is distinct from PricewaterhouseCoopers' 2019 evaluation of whether the creditors committee should accept the KG Consortium's bid proposal. KG Dongbu's Initial Questionnaire Response at Exhibit B-29. The 2018 Feasibility Report was not prepared for the purpose of evaluating Dongbu's value for purposes of sale. *Compare* KG Dongbu's Initial Questionnaire Response at Exhibit B-35 p. 10, *with* Exhibit B-35 p. 15. The value of the acquisition transaction was determined through an opening bidding process in which the bidders were provided with Dongbu's business, financial and legal information, KG Dongbu's Initial Questionnaire Response at Exhibit B-35 p. 10-11, and the highest bid price (the KG Consortium's bid), along with the debt restructuring conditions on which it was based and possible alternative scenarios, were independently evaluated by PricewaterhouseCoopers to determine if the bid should be accepted KG Dongbu's Initial Questionnaire Response at Exhibit B-29. Therefore, the concern about whether Dongbu could not meet the requirements to graduate from the workout program that resulted from the Feasibility Report does not evidence that the acquisition price was not objectively analyzed. Commerce's determination that an objective analysis was not performed to determine whether the sale price was appropriate is thus unsupported by substantial evidence.

<u>Second</u>, Commerce does not challenge the fact that there were no artificial barriers to entry and thus this factor is not in dispute. In fact, Commerce admits in the *Final Results* that "the KG Consortium acquired Dongbu Steel *through an open bidding process* as the highest bidder." Final Decision Mem. at 60 (emphasis added). Additionally, this conclusion is supported by the fact that, on January 7, 2019, the financial advisors published in a newspaper the public investment attraction announcement for an open bidding process to acquire Dongbu, providing equal access and free competition for all interested parties. KG Dongbu's Initial Questionnaire Response at 38 Exhibit B-19, Exhibit B-20, Exhibit B-21.

Third, regarding whether the highest bid was accepted, as mentioned above, Commerce admits in the *Final Results* that "the KG Consortium acquired Dongbu Steel through an open bidding process *as the highest bidder*." Final Decision Mem. at 60 (emphasis added). Nevertheless, Commerce seeks to distract from this factor by focusing again on whether the sale was for fair market value and discussing the interest rate reductions and fourth D/E swap as evidence that the creditors committee did not maximize its return when selling Dongbu. *See id.* In particular, Commerce discusses the fact that the creditors committee paid KRW 25,000 per share while the KG Consortium paid KRW 5,000 and states this is relevant because, according to the *Final Modification*, Commerce will "scrutinize any sale where the face or exchange value of a financial or other instrument given as payment differs from its fair market value." *Id.* at 60. Commerce then concludes that, even though the KG Consortium paid "the highest bid price through the bidding process, the face or exchange value of the sale, in the form of the debt-to-equity swaps paid by the {c}reditors {committee}, was not for fair market value." *Id.* Commerce's explanation makes no sense. Whether the price paid by the creditor committee was fair market value is not relevant to whether the acquirer—the KG Consortium—paid fair market value for the target company. Commerce's focus on the price paid in the fourth D/E swap by the creditors, rather than the bid from the KG Consortium, is a strawman and irrelevant to whether the highest bid was accepted.

The *Final Modification* analysis asks, "was the highest bid accepted and was the price paid in cash or close equivalent?" *Final Modification*, 68 Fed. Reg. at 37,127. Therefore, the *Final Modification* is concerned with the face or exchange value of the instrument used to pay the highest bid price, not concurrent subsidies offered by the seller such as the fourth D/E swap, which increase rather than decrease the bid price. *Final Modification*, 68 Fed. Reg. at 37,137. Indeed, the *Final*

*Modification* states that its "primary consideration" is "whether the *government* maximized its return on what it sold," and the highest bid factor "is an important consideration in whether the *government* acted like a private, commercial *seller*." *Final Modification*, 68 Fed. Reg. at 37,132 (emphasis added). Similarly, it states that the "cash or close equivalent" element is "concerned with… forms of payment to which the *government* ascribes a value that is different from the monetary value that a private, commercial *seller* would ascribe to the payment." *Id.* (emphasis added). Here, the highest bid was accepted by the creditors committee as the seller, Final Decision Mem. at 60, and the KG Consortium **[ ]**. KG Dongbu's Initial Questionnaire Response at 42 ("The KG Consortium fully paid its investment amount and registered the capital increase to Dongbu's court register."), Exhibit B-26 ("**[ ]**.").

<u>Fourth</u>, Commerce's analysis of the committed investment factor also reveals a fundamental misunderstanding of its own *Final Modification*. Specifically, in the *Final Results*, Commerce determined that the creditors committee made a committed investment that was not reflected in the KG Consortium's bid price. Final Decision Mem. at 61. In particular, Commerce determined that the creditors committee agreed "to extend existing loans and reduce the interest rates" and that the "agreement functioned as an inducement that private commercial sellers would not seek in a fair market value transaction and distorted the value that the bidders were willing to pay for what was being sold." *Id.* But Commerce's focus on committed investments imposed by the private buyer, in its independent offer, is contrary to the *Final Modification*, which focuses on committed investments that the government seller *imposes* on buyers of privatized companies. *See Final Modification*, 68 Fed. Reg. at 37,133 (clarifying that "by the term committed investment, we are referring to a range of possible restrictions or requirements that the *government, as the seller*,

*imposes* on the future operation of, or investment in, the company or its assets.") (emphasis added). This makes sense because this analysis seeks to prevent situations where, "as a result of the *government's imposition* of requirements or restrictions that private, commercial sellers would not normally impose, a buyer might pay a lower price for a company or its assets than that buyer would otherwise pay," *i.e.*, that the sale price would be less than fair market value. *Id.* (emphasis added). Commerce has it exactly backwards. The *agreement* by the creditors committee to the debt restructuring terms proposed by the KG Consortium as a condition of its independent bid price is not a restriction or requirement imposed by the government creditors on Dongbu, its assets, or the KG Consortium. Moreover, as explained, to the extent "concurrent subsidies," such as the debt restructuring and the fourth D/E swap, have the effect of *increasing* the value of the target company this does not evidence a failure to maximize profit in the M&A transaction. *See Final Modification,* 68 Fed. Reg. at 37,137.

In conclusion, Commerce's analysis of the *Final Modification* factors fails to demonstrate that the KG Consortium's acquisition of Dongbu was not at fair market value. Commerce's explanations in the *Final Results* are illogical for the reasons explained in the *Final Modification*. Accordingly, Commerce's determination that the alleged non-recurring subsidies received by Dongbu in the first three D/E swaps were not extinguished by the KG Consortium's purchase of Dongbu is unsupported by substantial evidence and is otherwise contrary to law.

### C. *KG Dongbu III* Does Not Address The Specific Arguments That Plaintiff Raises In This Case And Is Therefore Not Dispositive As To Whether The *Final Results* In This Case Are Supported By Substantial Evidence Or Contrary To Law.

In *KG Dongbu III*, the Federal Circuit concluded that substantial evidence supported Commerce's determination that the KG Consortium's acquisition of Dongbu was not for fair market value. *KG Dongbu III*, 181 F.4th at 1346-48. However, the underlying record in that case

was fundamentally different from the record in this appeal. In that case, Dongbu had not submitted a CIO Appendix with its initial questionnaire response because, at the time of KG Dongbu's initial questionnaire response, Commerce had not countervailed any non-recurring subsidies and thus Dongbu argued that no CIO Appendix was required. *Id.* at 1346-47. The Federal Circuit found that, even if there were no non-recurring subsidies at issue, KG Dongbu should have submitted the CIO Appendix if it intended to rebut the presumption that such subsidies pass from Dongbu to KG Dongbu because it determined that KG Dongbu had sufficient notice that Commerce could, potentially, find the first three D/E swaps countervailable. *Id.* at 1347. The absence of the CIO Appendix was thus central to the Federal Circuit's decision.

The Federal Circuit viewed the record in that case as underdeveloped and lacking information and argument that it thought *necessary* for Commerce to determine that the presumption that the non-recurring subsidies passed through to KG Dongbu had been rebutted. Specifically, the Federal Circuit explained that "Dongbu did not provide any response to Commerce's change in ownership appendix, which normally provides the agency with information it needs to analyze the impact of acquisition and potentially rebut the baseline presumption of benefit pass-through." *Id*. 181 F.4th at 1340 (cleaned up). The Federal Circuit thus concluded that, "since Dongbu waived the opportunity to submit *additional information* to the agency, we cannot say that Commerce's determination of pass through based on the established presumption was error." *KG Dongbu III*, 181 F.4th at 1347 (emphasis added). By contrast, in this case KG Dongbu provided the requisite CIO Appendix and thus the record is complete. *See* KG Dongbu's Initial Questionnaire Response at Exhibit B-35. This important factual distinction renders the Federal Circuit's decision in *KG Dongbu III* not directly on point or controlling of the pass-through issue in this appeal.

The Federal Circuit nonetheless concluded, in the alternative, that Commerce's determination that the benefit from the first three D/E swaps passed through to KG Dongbu was supported by substantial evidence. However, that analysis is cursory and did not address the same arguments that KG Dongbu raises here. Based on the record before it, which lacked the CIO Appendix, the Federal Circuit found that substantial evidence supported Commerce's determination because it viewed KG Dongbu's argument in that case as "a contrary gloss on the record evidence." *KG Dongbu III*, 181 F.4th at 1347. As framed by the Federal Circuit, KG Dongbu had argued that the circumstances of the open bidding process and the terms of the KG Consortium's purchase demonstrated an increased fair market value for Dongbu that rebutted the presumption of pass-through. *Id.* The Federal Circuit interpreted the argument to be "an alternate interpretation" of the record that did "not discredit the substantial evidence on which Commerce relied." *Id.* The "substantial evidence" relied upon by Commerce that the Federal Circuit found sufficient were the facts (1) that the terms of the acquisition included additional debt restructuring, specifically, the fourth debt to equity swap, (2) that the per share price paid by the creditors committee was higher than the per share price paid by the KG Consortium, and (3) that the third party evaluation of the transaction focused on creditor recovery. *Id.*

In this appeal, the record is complete with the CIO Appendix and KG Dongbu does not merely offer an alternate interpretation or "gloss" of the record. Instead, as discussed above, KG Dongbu has provided detailed arguments showing that Commerce's pass-through determination is illogical and unreasonable based on the administrative record, and therefore is not supported by substantial evidence and is contrary to law. These arguments were not addressed by the Federal Circuit in *KG Dongbu III* and, in fact, were never addressed by this Court in the underlying decision. The Federal Circuit thus merely conducted a "drive-by" analysis of this issue that does

not control the outcome of this issue in this appeal. Indeed, the Federal Circuit never conclusively found that the evidence supported Commerce's pass-through determination but instead merely concluded that the evidence cited by Commerce supported its conclusion that "it is *unlikely* that the KG Consortium paid a fair market value." *KG Dongbu III*, 181 F.4th at 1347 (emphasis added).

The three facts that the Federal Circuit relied upon in its cursory analysis of the issue do not support the conclusion that Commerce's pass-through determination is supported by substantial evidence. First, the Federal Circuit points to Commerce's finding that the outside evaluations that were made to value the acquisition focused on creditor recovery. *Id*. However, as discussed above, a focus on creditor recovery is a focus on maximizing the return or profit of the creditor committee. After all, it is the creditors committee who was the seller of Dongbu and so the purpose of the evaluations they commissioned were to maximize their return on the sale of Dongbu. Certainly there is no evidence to suggest that they were not acting to maximize their recovery. Commerce provides no rational connection between the fact found—that the evaluation of the acquisition focused on creditor recovery—with the conclusion that the creditor committee did not maximize its return. Final Decision Mem. at 58. The Federal Circuit did not grapple with this internal inconsistency in Commerce's finding.

Second, the Federal Circuit cited to Commerce's finding that the acquisition involved another round of debt-to-equity swaps (*i.e.*, the fourth D/E swap) as supporting the conclusion that the transaction was not fair market value. *See KG Dongbu III*, 181 F.4th at 1347. As discussed above, Commerce itself in the *Final Modification* explained that the existence of these types of so-called "concurrent subsidies" actually increase the price that a purchaser would be willing to pay without such subsidies. In particular, Commerce explained that it "would expect that potential investors would be willing to increase the value of their offer prices to reflect the additional value"

that "concurrent subsidies are expected to contribute to the overall value of the company." *Final Modification*, 68 Fed. Reg. at 37,137. Commerce also recognized that concurrent subsidies "*increase* the value and, therefore, in a normally functioning market, *increase* the price the purchaser pays." *Id.* (emphasis added). Therefore, the Federal Circuit's reliance on the existence of the fourth D/E swap as supportive of Commerce's fair market value determination is erroneous and contradicted by the *Final Modification*.

The third fact mentioned by the Federal Circuit is Commerce's finding that the acquisition transaction was not fair market value because the creditors' committee paid higher share prices in the fourth D/E swap compared to the per share price paid by the KG Consortium. *See KG Dongbu III*, 181 F. 4th at 1347. However, as discussed above, the higher per share price paid by the creditors committee is, in and of itself, a concurrent subsidy and thus would have increased the sales price. Additionally, this fourth D/E swap was countervailed *separately from* the acquisition transaction and therefore cannot logically lead to the conclusion that the private, unaffiliated, bid price by the KG Consortium should have been higher.

## II. Commerce Incorrectly Calculated The Uncreditworthy Benchmark Rate And The Unequityworthy Discount Rates

In the *Final Results*, Commerce found that Dongbu was uncreditworthy in 2020 and calculated the benefit from Dongbu's restructured long-term loans and bonds using an uncreditworthy benchmark rate. Final Decision Mem. at 6. Similarly, Commerce found that the four D/E swaps received by Dongbu were non-recurring subsidies that were allocable over the AUL period by adjusting the annual allocated benefit using unequityworthy discount rates. *See id.* at 6 (citing Preliminary Decision Mem. at 12-13). In doing so, Commerce incorrectly applied the formula for calculating the uncreditworthy benchmark rate and the unequityworthy discount rates. These errors render the *Final Results* unsupported by substantial evidence and otherwise not in

accordance with law. This Court remanded these same issues to Commerce for further consideration based on the exact same facts and arguments. *See KG Dongbu I*, 648 F. Supp. 3d at 1360-61; *KG Dongbu II*, 965 F. Supp. 3d at 1353-56. The Court should do the same here.

### A. Uncreditworthy Benchmark Rate

In 2019, Dongbu's outstanding long-term loans and bonds were restructured with revised interest rates and an extension of the maturity date until December 31, 2025. KG Dongbu's Initial Questionnaire Response at 48 and Exhibit B-44. They thereby became "new" loans under Commerce's practice with a term of six years (from 2019 to 2025) because they were renegotiated in 2019 and matured in 2025. *Id.* at 41-42 (noting the amended loan agreements became effective September 7, 2019 and that the loan maturity was extended to 2025); *see also Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) and accompanying Issues and Decision Mem. at 9 (treating loans that "were extended" as "new loans"); *Certain Cut-to-Length Carbon Steel Plate from Mexico Preliminary Results of Countervailing Duty Administrative Review*, 68 Fed. Reg. 52,895, 52,901 (Dep't Commerce Sept. 8, 2003) ("Pursuant to a May 2, 2000 agreement,… the terms of AHMSA's Bancomext loan were renegotiated… Thus, in keeping with the Department's practice, we find that, for purposes of these preliminary results, May 2000 was the effective issuance date of the Bancomext loan."); *Drill Pipe From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011*, 78 Fed. Reg. 47,275 (Dep't Commerce Aug. 5, 2013) and accompanying Issues and Decision Mem. at Comment 2 ("It is the Department's practice to treat the year in which the loans were renewed (i.e., the date of loan agreement) as the year of receipt.").

In calculating the benefit from these new loans, Commerce calculated the uncreditworthy benchmark interest rate used to measure the benefit of these countervailable loans and bonds, based

on a 3-year period rather than the actual 6-year (2019 to 2025) term of KG Dongbu's "new loans." *See* Mem. from Dennis McClure, International Trade Compliance Analyst, AD/CVD Operations, Office VIII through Bob Palmer, Program Manager, AD/CVD Operations, Office VIII to The File, "Final Results Calculations" at Attachment 2, tabs "UCW BM", "LT(2020)", and "Bonds(2020)" (Feb 23, 2023) (ACCESS Barcode: 4337159), CR 307-308, PR 184 ("Final Calculation Mem."). This determination was unsupported by substantial evidence and was otherwise not in accordance with law.

Commerce's regulations provide that in the case of a government-provided loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market. *See* 19 C.F.R. § 351.505(a)(1). In making this comparison, Commerce will normally rely on effective interest rates. *See id.* However, the regulations provide an exception for uncreditworthy companies in 19 C.F.R. § 351.505(a)(3)(iii). In the *Final Results*, Commerce determined that Dongbu was uncreditworthy and therefore used the formula provided in 19 C.F.R. § 351.505(a)(3)(iii) to calculate the benefit received from Dongbu's government-provided long term loans and bonds:

> $i_b = [(1 - q_n)(1 + i_f)^n / (1 - p_n)]^{1/n} - 1$,
> where:
> n = the term of the loan;
> $i_b$ = the benchmark interest rate for uncreditworthy companies;
> $i_f$ = the long-term interest rate that would be paid by a creditworthy company;
> $p_n$ = the probability of default by an uncreditworthy company within n years; and
> $q_n$ = the probability of default by a creditworthy company within n years.

19 C.F.R. § 351.505(a)(3)(iii).

Based on that formula, Commerce selected a long-term creditworthy interest rate (variable "$i_f$") based on the national average yield on 3-year, KRW-denominated AA-rated corporate bonds published by the Bank of Korea. Final Calculation Mem. at Attachment III, tab "UCW BM."

Even though the term of Dongbu's loans (variable "n") was *6 years*, Commerce incorrectly used *3-year* default rates as the default rates of creditworthy and uncreditworthy companies (variables "$q_n$" and "$p_n$", respectively). Final Decision Mem. at 63; Final Calculation Mem. at Attachment II and Attachment IV tab "KRW, UCW BM."

In the *Final Results*, Commerce's explanation for using a three-year instead of a six-year default rates was that:

> Commerce used a three-year AA-rated KRW interest rate as the long-term interest rate paid by a creditworthy company because it was the only long-term interest rate on the record. This three-year AA-interest rate is published by the Bank of Korea. No other long-term KRW interest rates were provided on the record by parties in this review. *Therefore, to be consistent, Commerce used three years for the term of the loan variable and the three-year creditworthy default and uncreditworthy default rates*.

Final Decision Mem. at 62 (emphasis added).

This explanation cannot reasonably justify Commerce ignoring the plain language of its own regulations. As the court has held, Commerce's determinations must be in accordance with the plain language of its regulations. *See, e.g.*, *Eregli Demir Ve Çelik Fabrikalari T.A.S. v. United States*, 415 F. Supp. 3d 1216, 1230 (Ct. Int'l Trade 2019) ("*Eregli Demir*") ("Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference."); *Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265, 1280 (Ct. Int'l Trade 2016) ("Commerce's *per se* restriction of its scope ruling to a particular interested party rather than to a particular product is contrary to the plain language of the regulation."); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations… The agency's interpretation must be given 'controlling weight unless it is plainly

erroneous or inconsistent with the regulation.'") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S. Ct. 1215, 1217 (1945)).

There is no basis to substitute the actual term of the loan, which is 6 years, for any other term in the service of purported "consistency." Commerce's regulation specifies: "if the Secretary finds that a firm that received a *government-provided long-term loan* was uncreditworthy,… the Secretary normally will calculate the interest rate… where: n = *the term of the loan*." 19 C.F.R. § 351.505(a)(3)(iii) (emphasis added). Furthermore, the *Preamble* to Commerce's regulations specifies the selection of the default rates used in calculating an uncreditworthy benchmark and provides that Commerce:

> . . . will use *the average cumulate default rate for the number of years corresponding to the length of the loan*, as reported in Moody's study of historical corporate bond default rates. In other words, we would use a five-year default rate for a five-year loan, as so forth. We believe that using a default rate that is *directly linked to the term of the loan* is a better reflection of the risk associated with long-term lending to uncreditworthy borrowers.

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't Commerce Nov. 25, 1998) (emphasis added) ("*Preamble*"). As the *Preamble* correctly notes, the default rate is a measurement of risk and the level of risk for KG Dongbu to default "within *n* years" can only be properly calculated using the actual term of the loan at issue, which is on the record (6 years). There is no basis to throw out an actual data point in favor of a 3-year term unrelated to the term of the loan. Commerce's calculation directly contradicts the plain language of its own regulations with respect to the appropriate period for the applicable default rates.

Therefore, since the term of the restructured long-term loans and bonds is 6 years, the term of the loan (variable "n") and default rates ("$p_n$" and $q_n$") used in the calculation must match the 6-year term of Dongbu's loans and bonds. Accordingly, Commerce's decision to ignore the plain requirements of its regulation renders its decision unlawful. *See Eregli Demir*, 415 F. Supp. 3d at

1230. The Court should thus direct Commerce to revise the calculation of the uncreditworthy benchmark rate by using the 6-year term and default rates on the record for variables "n," "$p_n$," and "$q_n$" as set out in the plain language of its regulations.

**B. Unequityworthy Discount Rates**

Once Commerce determines that a company receives a benefit through an equity infusion and that firm is unequityworthy, it will calculate the amount of the benefit as equal to the amount of the equity infusion. 19 C.F.R. § 351.507(a)(4) and (6). Commerce's regulations, at 19 C.F.R. § 351.507(d), dictate that Commerce will then allocate the benefit amount conferred by an equity infusion (a non-recurring subsidy) over the same time period as the non-recurring subsidy, in accordance with 19 C.F.R. § 351.524(d). 19 C.F.R. § 351.524(d)(1) sets out the formula to be used for allocating non-recurring benefits over time:

Ak=y/n+[y−(y/n)(k−1)]d1+dAk=y/n+[y−(y/n)(k−1)]d1+d

Where:
Ak = the amount of the benefit allocated to year k,
y = the face value of the subsidy,
n = the AUL (see paragraph (d)(2) of this section),
d = the discount rate (see paragraph (d)(3) of this section), and
k = the year of allocation, where the year of receipt = 1 and 1 ≤k ≤n.

19 C.F.R. § 351.524(d)(1).

19 C.F.R. § 351.524(d)(3)(ii) sets out an exception for selection of the discount rate for uncreditworthy firms (such as Dongbu, pursuant to Commerce's determination). For uncreditworthy firms, Commerce "will use as a discount rate the interest rate described in § 351.505(a)(3)(iii)," *i.e.*, use the same formula for the calculation of the uncreditworthy benchmark interest rate described above. 19 C.F.R. § 351.524(d)(3)(ii). In other words, the regulations require that Commerce calculate the unequityworthy discount rate (listed as variable

"d" in 19 C.F.R. § 351.524(d)(1)) using the formula from 19 C.F.R. § 351.505(a)(3)(iii) but it must use the AUL period as variable "n" as specified in 19 C.F.R. § 351.524(d).

Since the AUL period is 15 years, Commerce allocated the amounts of the 2015, 2016, 2018, and 2019 government equity infusions over 15 years pursuant to 19 C.F.R. § 351.507(c) and 19 C.F.R. § 351.524(b) and (d)(1). KG Dongbu's Initial Questionnaire Response at 7, 16. But, in determining the amount of the benefit in each year of the 15-year allocation period, Commerce incorrectly calculated the discount rates (variable "d" in Commerce's equation) based on a 3-year period, because it incorrectly applied the formula from 19 C.F.R. § 351.505(a)(3)(iii) as discussed above for the uncreditworthy benchmark interest rate. Final Calculation Mem. at Attachment IV tab "UCW BM" and "Equity Infusions."

As discussed above with respect to the uncreditworthy benchmark interest rate, Commerce's regulation and *Preamble* are clear that the default rates should be tied to the term of the loan or, in the case of an equity benefit, to the same period as a non-recurring subsidy, *i.e.*, the 15-year AUL period. *See* 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c) ("The benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy."). Thus, the "n" variable (number of years) in the formula for calculating the unequityworthy discount rates should match the 15-year allocation period, just as the "n" variable for calculating an uncreditworthy benchmark interest rate must match the term of the uncreditworthy loan. Commerce's failure to follow the plain language of its own regulations is thus unlawful. *See Eregli Demir*, 415 F. Supp. 3d at 1230. The Court should direct Commerce to revise the calculation of the unequityworthy discount rates by using the 15-year AUL period and default rates for variables "n," "$p_n$," and"$q_n$" as set out in the regulations.

### C. The Court Has Previously Found That Commerce Should Use the Actual Terms of the Financial Instrument or Equity Infusion at Issue.

The court remanded these same issues to Commerce for further consideration based on the exact same facts and arguments and should do the same again here. In the 2019 administrative review, Commerce had similarly determined to calculate the uncreditworthy benchmark rate and the unequityworthy discount rate based on 3-year periods instead of the actual 6-year and 15-year periods applicable to KG Dongbu's long-term loans and bonds and D/E swaps, respectively. The court found that such a calculation of the uncreditworthy benchmark rate and unequityworthy discount rate is contrary to the "plain requirements" of Commerce's regulations, which "are clear that the default rates should be tied to the term of the loan, or in the case of an equity benefit, to the same period as a non-recurring subsidy, *i.e.*, the fifteen year average useful life period." *KG Dongbu II*, 695 F. Supp. 3d at 1355-56; *see also KG Dongbu I*, 648 F. Supp. 3d at 1361. The court explained that "the default rate is a measurement of risk and the level of risk for a company to default within 'n' years, which can only be properly calculated using the actual term of the loan {or equity infusion} at issue." *KG Dongbu II*, 695. Supp. 3d at 1354-55. Commerce has made the same erroneous calculation in the instant administrative review as it did in *KG Dongbu I* and *KG Dongbu II*. The court should again remand for Commerce to justify the use of a period that is unrepresentative of the actual length of the loans and bonds or equity infusions at issue.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons set forth herein and those provided in its motion for judgment on the agency record and brief in support, KG Dongbu respectfully requests that this Court (i) hold that the *Final Results* are unsupported by substantial evidence and otherwise not in accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Please contact the undersigned if you have any questions regarding this matter.

Respectfully submitted,

/s/ Brady W. Mills

Brady W. Mills
R. Will Planert
Mary S. Hodgins
Edward J. Thomas III
Nicholas C. Duffey

TAFT STETTINIUS & HOLLISTER LLP
1333 New Hampshire Ave, N.W., Suite 800
Washington, D.C. 20036
Email: bmills@taftlaw.com
Telephone: 202.216.4116

*Counsel to Plaintiff*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 12,076 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

/s/ Brady W. Mills
Brady W. Mills
Dated: September 30, 2026

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5 of the Rules of the U.S. Court of International Trade and Administrative Order 25-01, I, Brady W. Mills, hereby certify that I served the confidential version of the foregoing submission on the following individuals. If the recipient agreed to accept service of the confidential version by electronic service, such service is being effected through secure electronic means. If no agreement for electronic service has been reached, the confidential version is being served by hardcopy mail. The public version is being served through the court's electronic filing system.

Alan Hayden Price
Wiley Rein, LLP
2050 M Street, NW.
Washington, DC 20036

Sosun Bae
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Yujin Kim McNamara
Akin, Gump, Strauss, Hauer & Feld, LLP
2001 K Street, NW.
Washington, DC 20006

/s/ Brady W. Mills
Brady W. Mills
Dated: September 30, 2026

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION and THE GOVERMNENT OF THE REPUBLIC OF KOREA,<br><br>Defendant-Intervenors. | Court No. 23-00055 |

**PROPOSED ORDER**

Upon consideration of Plaintiff KG Dongbu Steel Co., Ltd.'s ("KG Dongbu" or "Plaintiff") (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd, collectively "Dongbu") Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings here, it is hereby

**ORDERED** Plaintiff's motion is granted; and it is further

**ORDERED** that the decision of the U.S. Department of Commerce ("Commerce") in *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review, 2020*, 88 Fed. Reg. 7,946 (Dep't Commerce Feb. 7, 2023) ("*Final Results*") is not supported by substantial evidence and is otherwise not in accordance with law; and it is further

**ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion on this matter.

**SO ORDERED.**

_____________________________________
Honorable Jennifer Choe-Groves, Judge

Dated: ___________________, 2023
New York, NY