**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., Plaintiff, v. UNITED STATES, Defendant, and NUCOR CORPORATION and THE GOVERNMENT OF THE REPUBLIC OF KOREA, Defendant-Intervenors. | Court No. 23-00055 |

**DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF**


JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-7568
Sosun.Bae@usdoj.gov

Of Counsel:

BRIEN STONEBREAKER
Attorney
Department of Commerce

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

FACTUAL AND PROCEDURAL BACKGROUND ..... 1

I. KG Dongbu's Acquisition and Commerce's Final Results ..... 1

II. The Federal Circuit's Decision in *Dongbu IV* ..... 5

SUMMARY OF ARGUMENT ..... 6

ARGUMENT ..... 7

I. Commerce's Determination That the Benefits from the First Three Debt-To-Equity Conversions Passed Through to KG Dongbu Is Supported by Substantial Evidence and in Accordance With Law ..... 7

A. The Federal Circuit Has Already Upheld Commerce's Pass-Through Analysis ..... 7

B. Commerce's Fair Market Value Analysis Is Supported by Substantial Evidence ..... 9

C. Commerce's Analysis of the Non-Exhaustive Factors Is Supported by Substantial Evidence and in Accordance with Law ..... 16

II. Commerce's Calculation of the Uncreditworthy Benchmark and Unequityworthy Discount Rates Should be Sustained ..... 20

A. Legal Framework ..... 21

B. Commerce Correctly Calculated the Unequityworthy Discount Rates ..... 22

1. The Regulations Separately Define the Allocation Period and the Discount Rate ..... 22

2. Commerce Sufficiently Explained Why It Used Consistent Three-Year Variables to Construct the Discount Rates ..... 23

3. The Court's Prior Decisions Do Not Require Rejecting Commerce's Calculations Here ..... 24

C. Commerce Correctly Calculated the Uncreditworthy Benchmark ..... 26

1. Commerce Properly Selected the Three-Year Creditworthy Interest Rate ........ 27

2. Commerce Sufficiently Explained Its Use of Corresponding Three-Year Variables ........ 28

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

Cases

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) .......... 15

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
975 F.3d 1318 (Fed. Cir. 2020) .......... 20

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 6, 20

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000) .......... 10, 14

*Hyundai Steel Co. v. United States*,
19 F.4th 1346 (Fed. Cir. 2021) .......... 25

*KG Dongbu Steel Co. v. United States*,
648 F. Supp. 3d 1353 (Ct. Int'l Trade 2023) .......... 2, 5

*KG Dongbu Steel Co. v. United States*,
695 F. Supp. 3d 1338 (Ct. Int'l Trade 2024) .......... passim

*KG Dongbu Steel Co. v. United States*,
756 F. Supp. 3d 1326 (Ct. Int'l Trade 2025) .......... 5, 7, 29

*KG Dongbu Steel Co. v. United States*,
No. 22-00047, slip op. 26-130 (Ct. Int'l Trade Oct. 20, 2026) .......... 6

*KG Dongbu Steel Co., Ltd., et al. v. Nucor Corp.*,
181 F.4th 1335 (Fed. Cir. 2026) .......... passim

*Nucor Corp. v. United States*,
494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) .......... 27

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) .......... 23

*Risen Energy Co., Ltd. v. United States*,
122 F.4th 1348 (Fed. Cir. 2024) .......... 15

*Russello v. United States*,
464 U.S. 16 (1983) .......... 25

*Tenaris Bay City, Inc. v. United States*,
191 F.4th 1370 (Fed. Cir. 2026) .......... 25

*Worldwide Door Components, Inc. v. United States*,
119 F.4th 959 (Fed. Cir. 2024) .................................................................................... 20

Statutes

19 U.S.C. § 1677(5)(E)(ii) ........................................................................................... 21

Regulations

19 C.F.R. § 351.505(a)...................................................................................... passim

19 C.F.R. § 351.507(c)....................................................................................... 21, 24

19 C.F.R. § 351.524(d) ..................................................................................... passim

Other Authorities

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
87 Fed. Reg. 2,759 (Dep't of Commerce Jan. 19, 2022)............................................................ 3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
87 Fed. Reg. 47,973 (Dep't of Commerce Aug. 5, 2022) ........................................................... 2

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
88 Fed. Reg. 7,946 (Dep't of Commerce Feb. 7, 2023) ............................................................. 2

*Countervailing Duties*,
63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .......................................... 23, 24, 28

*Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't of Commerce June 23, 2003)...................... passim

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| KG DONGBU STEEL CO., LTD., | |
| Plaintiff, | |
| v. | Court No. 23-00055 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION and THE GOVERNMENT OF THE REPUBLIC OF KOREA, | |
| Defendant-Intervenors. | |

**DEFENDANT'S SUPPLEMENTAL RESPONSE BRIEF**

Defendant, the United States, respectfully submits this supplemental response brief pursuant to the Court's August 28, 2026 order. *See* ECF No. 76. In its order, the Court directed the parties to provide briefing on any different or remaining issues following the decision of the Court of Appeals for the Federal Circuit in *KG Dongbu Steel Co., Ltd., et al. v. Nucor Corp.*, 181 F.4th 1335 (Fed. Cir. 2026) (*Dongbu IV*), with plaintiff, KG Dongbu Steel Co., Ltd. (formerly Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co., Ltd.) (KG Dongbu), filing its supplemental brief first and defendant and defendant-intervenor responding. *Id.* KG Dongbu concedes that its challenge to the Department of Commerce's (Commerce) change in practice regarding earlier debt-to-equity conversions is no longer viable following *Dongbu IV*. KG Dongbu Supp. Br. at 3 (ECF No. 77). However, KG Dongbu claims that Commerce's

determination that the benefits from the debt-to-equity swaps passed through to KG Dongbu despite the change in ownership is still a live issue not controlled by *Dongbu IV,* and further argues that the calculation of the uncreditworthy benchmark rate and unequityworthy discount rate has already been rejected by the Court in litigation concerning a prior administrative review and so the Court should continue to reject Commerce's calculations here. *Id.* (citing *KG Dongbu Steel Co. v. United States*, 648 F. Supp. 3d 1353, 1360-61 (Ct. Int'l Trade 2023) (*Dongbu I*); *KG Dongbu Steel Co. v. United States*, 695 F. Supp. 3d 1338, 1353-56 (Ct. Int'l Trade 2024) (*Dongbu II*)). But Commerce's findings on both of these issues are supported by substantial evidence and otherwise in accordance with law; as such, we respectfully request that the Court sustain Commerce's final results in full, deny plaintiff's motion, and enter judgment for the United States.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. KG Dongbu's Acquisition and Commerce's Final Results[1]

This case concerns Commerce's final results of an administrative review of the countervailing duty order covering certain corrosion-resistant steel products (CORE) from the Republic of Korea. *See Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 88 Fed. Reg. 7,946 (Dep't of Commerce Feb. 7, 2023) (final results); and accompanying Issues and Decision Memorandum (IDM) (P.R. 181).

In 2019, Dongbu Steel was acquired by KG Steel (*i.e.*, KG Consortium), which ultimately resulted in Dongbu Steel becoming KG Dongbu. *See Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 47,973 (Dep't of Commerce Aug. 5,

[1] We do not reiterate the entire statement of facts, but refer the Court to our response to plaintiff's motion for judgment upon the agency record for a more comprehensive discussion of the factual background. *See* Govt. Br. at 4-8 (ECF No. 32).

2022) (preliminary results) (P.R. 145), and accompanying Preliminary Decision Memorandum (PDM) at 1, 7 (P.R. 140); *see also Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 87 Fed. Reg. 2,759 (Dep't of Commerce Jan. 19, 2022) (final results and partial rescission of CVD admin review) (*CORE AR4 Final Results*), and accompanying IDM at 54; Dongbu Initial Questionnaire Resp. at Exh. B-35 (Dongbu IQR) (P.R. 69-75; C.R. 100-154).

But the circumstances that led to the acquisition had begun years earlier. *See* Equity Infusions Memo at 1-2 (C.R. 260). Beginning in 2012, Dongbu Steel had struggled financially, and so it sought to improve its financial posture. *Id.* (citing Dongbu IQR at 21, Exh. 21) (P.R. 69-75, C.R. 100-154); PDM at 12-13, 13 n.64. While Dongbu Steel had trouble securing funding on commercial terms, it was able to acquire loans from the Korea Development Bank (KDB)—a state-owned bank. Equity Infusions Memo at 2. However, Dongbu Steel was unable to repay these loans and thus had to apply for a financial restructuring program through the Korean government, headed by the Creditor Bank Committee (CBC), which was made up of several state-owned banks. *Id.* at 3. Under this program, Dongbu Steel underwent four debt-to-equity conversions to improve its financial posture and enable it to repay the KDB. *Id.* The first conversion occurred in February 2015, the second in May 2016, and the third in April 2018. PDM at 16 (citing *CORE AR4 Final Results*, 87 Fed. Reg. at 2,759, and accompanying IDM at cmt. 7, and Dongbu IQR at 31, 34, 46, 51 (C.R. 100)). The KG Consortium's acquisition of Dongbu Steel in 2019 involved a fourth debt-to-equity conversion and agreements by the creditors' committee to extend existing loans and reduce interest rates. KG Dongbu IQR at 39-42, IDM at 58.

In the final results, Commerce found that the benefits from Dongbu Steel's debt-to-equity swaps were not extinguished when the company was acquired by the KG Consortium and

became KG Dongbu. IDM at 57-61. While KG Dongbu had submitted a change-in-ownership appendix challenging the baseline presumption that non-recurring subsidies are not extinguished by a change in ownership, but rather passed through, Commerce determined that KG Dongbu's submission did not demonstrate that the acquisition was for fair market value. *Id.* As Commerce explained, the purpose of the transaction was not to maximize the creditors' profit, but rather to graduate Dongbu Steel from its restructuring program. *Id.* at 58. Commerce also considered an analysis of creditor recovery by the creditors' financial advisor PricewaterhouseCoopers (PWC), the additional debt restructuring required for the acquisition, and the higher share price paid by the creditors' committee. *Id.* at 58–61. While Commerce acknowledged that there was an open bidding process and the KG Consortium had submitted the highest bid, it found that, on the whole, the record did not support a finding that the transaction was arm's length and at fair market value; as such, Commerce concluded that KG Dongbu had not rebutted the baseline presumption. IDM at 60–61.

In addition, Commerce determined that KG Dongbu was uncreditworthy, and that it had received a non-recurring subsidy from the first three debt-to-equity conversions and allocated the benefits over the 15-year average useful life (AUL) period. PDM at 16-17 (citing Dongbu IQR at 34, 46, 51 and KG Dongbu Preliminary Calc. Memo (P.R. 141, C.R. 264)). Upon finding KG Dongbu uncreditworthy, Commerce calculated an uncreditworthy benchmark under 19 C.F.R. § 351.505(a)(3)(iii) in order to determine the benefit from KG Dongbu's restructured long-term loans and bonds, using a three-year corporate bond rate published by the Bank of Korea. *Id.* Commerce also applied unequityworthy discount rates to calculate the benefit from the debt-to-equity conversions consistent with the uncreditworthy benchmark. PDM at 16-17.

## II. The Federal Circuit's Decision in *Dongbu IV*

During litigation concerning the preceding 2019 administrative review, the Court remanded Commerce's final results with regard to Commerce's findings that the first three debt-to-equity infusions constituted countervailable subsidies and that the benefits passed through to KG Dongbu, as well as its calculation of the uncreditworthy benchmark and unequityworthy discount rates. *See generally Dongbu I*; *Dongbu II*. On remand, Commerce—under protest—found that the first three infusions did not confer a countervailable benefit and that, as a result, the pass-through issue was moot. *Dongbu IV*, 181 F.4th at 1342. Commerce also revised its uncreditworthy benchmark and unequityworthy discount rate calculations on remand. *KG Dongbu Steel Co. v. United States*, 756 F. Supp. 3d 1326, 1336–37 (Ct. Int'l Trade 2025) (*Dongbu III*). The Court sustained these remand findings.

On appeal, however, the Federal Circuit reversed this Court's judgment, holding that Commerce had acted lawfully when reexamining the first three debt-to-equity conversions, substantial evidence supported a finding of countervailable benefit, and substantial evidence also supported Commerce's finding that the subsidy benefits passed through to KG Dongbu after the acquisition.[2] *See generally Dongbu IV*. With regard to the pass-through issue, the Federal Circuit held that KG Dongbu had not submitted information in response to the change-in-ownership appendix to challenge the baseline presumption of pass-through but that, even setting aside the presumption, Commerce's pass-through determination was supported by substantial evidence. *Id.* at 1346-47. The Federal Circuit thus remanded for this Court to reinstate Commerce's final determination. *Id.* at 1348. On October 20, 2026, this Court effectuated the

[2] No party appealed Commerce's uncreditworthy benchmark or unequityworthy discount rate calculations.

mandate, reversing its prior decisions. *KG Dongbu Steel Co. v. United States*, No. 22-00047, slip op. 26-130 at 3 (Ct. Int'l Trade Oct. 20, 2026).

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's determination that the benefits from Dongbu Steel's first three debt-to-equity conversions passed through after the acquisition by the KG Consortium. While KG Dongbu claims that *Dongbu IV* does not control because KG Dongbu had not provided a change-in-ownership appendix during the prior administrative review, this ignores that the Federal Circuit upheld Commerce's pass-through determination as based on substantial evidence, independent of the failure to submit a change-in-ownership appendix in the preceding review. *Dongbu IV*, 181 F.4th at 1347. And even assuming, for argument's sake, that *Dongbu IV* somehow does not control, this Court still would need to take due consideration of the Federal Circuit's opinion.

Even putting aside *Dongbu IV*, Commerce still reasonably concluded that KG Dongbu had failed to rebut the baseline presumption that the benefits from the subsidies had passed through to KG Dongbu. As Commerce explained, in this review, the information KG Dongbu had provided in the change-in-ownership appendix did not enable Commerce to conclude that the acquisition had extinguished the subsidy benefits. Rather, Commerce determined that substantial evidence supported a conclusion that the acquisition was *not* made at arm's length for fair market value, specifically identifying such evidence. That KG Dongbu and the Court can draw different conclusions from the record evidence does not establish that Commerce's determination is unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-620 (1966) (holding that the ability to reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence).

Commerce also correctly calculated the uncreditworthy benchmark rate and unequityworthy discount rate used for allocating the benefits from long-term loans, bonds, and equity infusions. Consistent with the uncreditworthy benchmark formula in 19 C.F.R. § 351.505(a)(3)(iii), Commerce appropriately used a three-year Korean Won (KRW)-denominated AA-rated corporate bond rate published by the Bank of Korea as the long-term interest rate paid by a creditworthy company because it was the only long-term rate available on the record consistent with legal standards. While we recognize that the Court disagreed with that approach in the litigation concerning the prior administrative review, eventually sustaining—in *Dongbu III*—the revised calculations Commerce had made on remand, we respectfully submit that *Dongbu III* is not binding on this Court, particularly in light of the Federal Circuit's subsequent directive to reinstate Commerce's original determination, and we respectfully request that the Court reconsider the issue.

## ARGUMENT

### I. Commerce's Determination That the Benefits from the First Three Debt-To-Equity Conversions Passed Through to KG Dongbu Is Supported by Substantial Evidence and in Accordance With Law[3]

#### A. The Federal Circuit Has Already Upheld Commerce's Pass-Through Analysis

In the prior administrative review, Commerce determined that the benefits from Dongbu Steel's first three debt-to-equity conversions passed through to KG Dongbu upon its change in ownership. While this Court deemed the issue moot in light of Commerce's determination—made on remand—that KG Dongbu's first three debt-to-equity conversions did not provide a countervailable benefit, *see Dongbu III*, 756 F. Supp. 3d at 1336, the Federal Circuit squarely

[3] We do not reiterate the legal framework for determining whether a benefit from a countervailable subsidy passes through, instead referring to our prior briefing. *See* Govt. Br. at 24-26.

addressed the issue, holding that Commerce's determination that the benefit from the first three infusions was not extinguished by the acquisition was supported by substantial evidence. *Dongbu IV*, 181 F.4th at 1346–48.

This alone should be sufficient for this Court to sustain Commerce's determination. KG Dongbu, however, attempts to minimize the Federal Circuit's holding, arguing that, in the prior review, KG Dongbu had not submitted a change-in-ownership appendix to try and rebut the presumption of pass-through and that the Court's analysis was "cursory." KG Dongbu Supp. Br. at 27-28. But the Federal Circuit did not merely rely on the absence of a change-in-ownership appendix. Rather, it explicitly held that:

> Even if the presumption were considered an insufficient basis for Commerce's ultimate finding, . . . Commerce also cited substantial record evidence justifying its conclusion that KG Consortium's acquisition of Dongbu was not an arm's length transaction for fair market value. For instance, Commerce cited to outside evaluations of the acquisition, which were focused on how much money could be recovered, as well as certain terms of the acquisition, including another round of debt-to-equity swaps and higher share prices paid by the Creditors' Committee. This evidence was sufficient to support Commerce's conclusion in the Final Results that it is unlikely that the KG Consortium paid a fair market value.

*Dongbu IV*, 181 F.4th at 1347 (internal citations and quotation marks omitted).

The Court further held that KG Dongbu's alternate interpretation "did not discredit the substantial evidence on which Commerce relied to reach a contrary conclusion. *Id.* While the Federal Circuit's discussion of the issue was not particularly lengthy, it nonetheless squarely addressed, and accepted, many of the same bases on which Commerce had relied in the underlying review, including the PWC analysis, the share prices paid, and the commitments of the creditors' council. IDM at 58-61. Given that the Federal Circuit held in *Dongbu IV* that this record evidence justified Commerce's conclusion that the acquisition was not an arm's length

transaction for fair market value, this Court should also do so here. And while KG Dongbu is correct that it had not submitted a change-in-ownership appendix during the prior review, this single piece of evidence does not constitute sufficient cause for the Court to disregard the Federal Circuit's holding, especially because Commerce addressed the information provided by KG Dongbu in the change-in-ownership appendix, explaining that it did not demonstrate that the transaction was for fair market value, or rebut the presumption. *Id.*

### B. Commerce's Fair Market Value Analysis Is Supported by Substantial Evidence

Even assuming that the Federal Circuit's holding in *Dongbu IV* does not control, the Court should still sustain because Commerce reasonably found that the evidence did not, on balance, demonstrate that the acquisition was for fair market value, conducting a thorough analysis of the record and addressing the information contained in KG Dongbu's change-in-ownership appendix. Having done so, Commerce could not conclude that the sale was arm's length for fair market value and properly found that KG Dongbu had failed to rebut the baseline presumption that the benefits from Dongbu Steel's debt-to-equity conversions passed through to KG Dongbu.

As Commerce explained in the final results, "even if a transaction is made at arm's length, if the sale was not for fair market value, the prior subsidies may still pass through." *Id.*; Dongbu Br. at 26 n.6. Thus, Commerce's pass-through analysis largely centered on fair market value. Commerce determined that the seller—the KDB-led creditors' council—did not maximize profit when selling Dongbu Steel, as in a normal private-to-private transaction. To reach its determination, Commerce based its analysis on multiple considerations, including the purpose of the acquisition, the information on and conditions to which the seller agreed, and the

share prices. Commerce also considered the information proffered by Dongbu, but found that it did not rebut the presumption.

First, at the time of the acquisition, Dongbu Steel was effectively under the control of its creditors. Equity Infusions Memo at 12, 15 (C.R. 260).[4] The record shows that the KDB-led creditors' council had priorities other than seeking the highest market price for Dongbu Steel's assets, as they would have in a normal private, commercial transaction. IDM at 58; *see also Delverde, SrL v. United States*, 202 F.3d 1360, 1369 (Fed. Cir. 2000) ("{u}nlike a private seller who seeks the highest market price for its assets, the government may have other goals, such as unemployment, national defense, and political concerns, which may affect the terms of a privatization transaction."). Indeed, the entire purpose of the sale was to graduate Dongbu Steel from the debt restructuring program. IDM at 58 (citing Equity Infusions Memo at 12-13); Dongbu IQR at 36-38, Exhs. B-10 and B-33; Dongbu SQR1 at 7 (P.R. 102, C.R. 200); GOK IQR at 16 (P.R. 52-68, C.R. 32-51). KG Dongbu summarized the acquisition's origins and purpose:

> Because of the upcoming maturity date and termination date of the extension period for repayment of the restructured loans of December 31, 2018, the KDB, as the principal creditor bank in the {creditors' council}, appointed {Pricewaterhouse Cooper} to evaluate . . . whether Dongbu Steel **could meet the workout graduation requirement by the maturity date**. According to {Pricewaterhouse Cooper's 2018 Feasibility Report}, Dongbu Steel could not meet the workout graduation requirement . . . Based upon the Feasibility Report, the {creditors' council} held the 6th {Meeting} . . . and approved the following:
>
> 1) Confirmation of credit amount and voting rights thereon based on credit amount as of November 30, 2018.
>
> 2) Extension of loan maturity until December 31, 2020, with no other changes to the terms of the loans.

[4] The memo also cites Dongbu's IQR at 28, 31, 33, 35, 38, Exhs. 10-A, B-7, B-10, B-16, and B-30, as well as KG Dongbu's First Supplemental Questionnaire Response at 9 (Dongbu SQR1) (P.R. 102, C.R. 200).

> 3) Amendment of the Agreement for Compliance of Business Normalization Plan ("Amended Workout Agreement") … Under Article 3 of the Amended Workout Agreement approved at the 6th {Meeting}, the {creditors' council} and Dongbu Steel **agreed to proceed with the business normalization process through a merger and acquisition**.

Dongbu IQR at 36-37 (emphasis added). In light of the fact that "Dongbu Steel could not meet the workout graduation requirement by the maturity date," the focus of the acquisition was credit recovery. *Id.*; IDM at 57-58. It was under these circumstances that the acquisition took place, highlighting the distinction between profit maximization in accordance with the normal sales practices of private, commercial sellers (*i.e.*, seeking the highest market price for assets) and creditor recovery (*i.e.*, to cease further loss and recover investment). IDM at 58-59; Equity Infusions Memo at 15.

Second, the KDB-led creditors' council agreed to certain conditions for the KG Consortium to acquire Dongbu Steel. IDM at 58. One of the conditions required the creditors' council to extend existing loans and reduce interest rates. *Id*. Further, the creditors' council agreed to another round of debt-to-equity swaps, at a price of KRW 25,000 per share. *Id*. Notably, the price per share paid by the creditors' council was higher than the price per share paid by the KG Consortium for the acquisition at 5,000 KRW per share. *Id*. And although PWC evaluated the acquisition, it did so in contrast to three other scenarios, and it focused mainly on how much money Dongbu Steel's creditors could recover—not how the creditors could maximize profit. *Id*. Therefore, Commerce reasonably determined that the creditors' council did not maximize its return when selling Dongbu Steel. *Id*. at 58-59.

KG Dongbu claims that "there is absolutely no basis to conclude" certain conditions agreed to by the seller—*i.e.*, an agreement to extend existing loans and reduce interest rates—led

to KG Dongbu paying less than fair value. KG Dongbu Supp. Br. at 16. To clarify, Commerce concluded that the acquisition was not carried out to maximize profit in selling Dongbu Steel, as in a normal, private-to-private transaction, and, therefore, the transaction was not for fair market value based on the standard set forth in the *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act,* 68 Fed. Reg. 37,125, 37,127 (Dep't of Commerce June 23, 2003); IDM at 58. Commerce did not base its conclusion solely on these certain conditions, or any other single fact. Instead, Commerce considered the relevant record evidence and relied on its totality to determine that the sale was not carried out to maximize profit as in a normal, private-to-private transaction. IDM at 58-61.

For example, as Commerce acknowledged, KG Dongbu had acquired Dongbu Steel in an open bidding process as the highest bidder. IDM at 60. However, *only* KG Dongbu (*i.e.*, the KG Consortium) submitted a final bid. And, as a general rule, Commerce carefully scrutinizes any sale where the face value of a financial, or other instrument given as payment, differs from market value. *Id*. Here, the price per share paid by the creditors' council was higher (KRW 25,000) than the price per share paid by KG Dongbu (KRW 5,000). Equity Infusions Memo at 13; IDM at 58. KG Dongbu's claim that this price per share difference is irrelevant to the fair market value inquiry is illogical and ignores the standard articulated in the *Notice of Final Modification*; the key question is whether the full value of the company under prevailing market conditions was paid. IDM at 57; *Notice of Final Modification*, 68 Fed. Reg. at 37,127, 37,133. Regardless, one of the conditions for KG Dongbu to acquire Dongbu Steel was that the creditors' council agree to extend existing loans and reduce the interest rates. IDM at 58; Dongbu IQR at 39; Equity Infusions Memo at 8. The creditors' council further agreed to another round of debt-

to-equity conversions. *Id*. Nothing on the record indicates that the incentives agreed to by the seller would be part of a normal, private-to-private transaction for fair market value. IDM at 61.

Nor does KG Dongbu's final bid increase after the creditors' council agreed to KG Dongbu's conditions demonstrate that the seller maximized profit or that fair market value was tendered. After all, KG Dongbu increased its bid only after the creditors' council increased the sales value (by agreeing to the debt-to-equity swap, extension of loans and reduction of interest rates). Equity Infusions Memo at 8. The *Final Modification* recognizes that concurrent subsidies normally increase a company's value and, in a normally functioning market, the purchaser's price. *Final Modification*, 68 Fed. Reg. at 37,137. Commerce normally regards the value of the subsidies as fully reflected in the price when their nature and value were transparent to all potential bidders and reflected in final bids, they were bestowed before the sale, and no other record evidence demonstrates that their value was not fully reflected in the transaction price. *Id.* The methodology thus requires consideration of evidence bearing on whether the added value was paid for. At bottom, a purchaser's willingness to pay more for a company after additional assistance does not establish that the resulting price reflects all of the value transferred.

KG Dongbu contends that because Commerce separately countervailed the additional KRW 20,000 per share in the fourth conversion, the higher prices do not support the pass-through determination. KG Dongbu Supp. Br. at 20–21. But Commerce's treatment of the fourth conversion as a countervailable equity infusion addresses the *benefit conferred* by that infusion. In contrast, the pass-through inquiry addresses whether the acquisition eliminated previously conferred benefits. Considering the fourth conversion's terms as evidence of the

acquisition price does not itself calculate a second benefit from that conversion. *Dongbu IV*, 181 F.4th at 1347; PDM at 16–17; IDM at 58; Equity Infusions Memo at 13.

KG Dongbu further argues that the highest-bid factor concerns the form and value of the purchaser's payment, rather than the debt exchanged by the creditors. KG Dongbu Supp. Br. at 24–25. But Commerce relied on the share-price difference as part of its overall fair market value analysis, not as a rule characterizing the purchaser's payment as an overvalued financial instrument. Commerce examined that difference in its general analysis before addressing the highest-bid factor, and the Federal Circuit recognized the relevance of this consideration. *Dongbu IV*, 181 F.4th at 1347; IDM at 58, 60. There is no reason for the Court to adopt a mechanical comparison of nominal share prices to sustain Commerce's evaluation of the acquisition as a whole.

Next, KG Dongbu claims that the PWC evaluation shows that the acquisition was the "most valuable scenario available to the Creditors' Council." KG Dongbu Supp. Br. at 20. That the acquisition was the most valuable scenario for or available to Dongbu Steel's creditors does not detract from Commerce's determination. IDM at 58; *Delverde*, 202 F.3d at 1369 (stating that unlike a private seller's endeavor to seek the highest market price, the government may have other concerns which may affect the terms of a transaction). Again, the fair market value inquiry asks whether the full amount that the company or its assets (including the value of any subsidy benefits) were actually worth what was paid under prevailing market conditions was paid. *Notice of Final Modification*, 68 Fed. Reg. at 37,127. In making this determination, Commerce normally examines whether the government, in its capacity as seller, acted in a manner consistent with the normal sales practices of private, commercial sellers and a primary consideration is whether the "government failed to maximize its return on what it sold." *Id.* That the acquisition

was valuable to the company's creditors when focused on investment recovery does not demonstrate that the creditors maximized return on the sale of the company (*i.e.*, that they acted in a manner consistent with the normal sales practices of private, commercial sellers and maximized profit).

Having committed substantial capital to the company, Dongbu Steel's creditors were interested in graduating the company from the restructuring program and recovering their investments. IDM at 58-60 (citing Dongbu IQR at 36-37); Equity Infusions Memo at 15. Indeed, in its brief, KG Dongbu acknowledges the possibility of a better deal and the report's creditor recovery focus. Dongbu Br. at 19. The report's focus is not whether the acquisition represents the best deal to maximize profit, but the risk to creditor recovery in four scenarios, including acceptance of the sole, final bid from KG Dongbu and total liquidation. *Id.*; IDM at 58; Equity Infusions Memo at 8; Dongbu IQR at 38-42 and Exh. B-29. As KG Dongbu itself has recognized, the PWC report "is an analysis of the new investment as a part of Dongbu Steel's business normalization plan which analyzes the best way for creditors to maximize their recovery ratio." Dongbu IQR at 40 n.13; IDM at 58; Equity Infusions Memo at 7. Commerce reasonably found that PWC's evaluation of the acquisition focused mainly on how much money the creditors could recover from the acquisition, rather than how they could maximize profit. IDM at 58, 60 (citing Dongbu IQR at 39-40). Contrary to KG Dongbu's assertion, Commerce did not claim to rely solely on any one factor—*i.e.*, the report's creditor recovery focus—to support its conclusion that the sale was not carried out to maximize profit. IDM at 58; Dongbu Br. at 20 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

KG Dongbu complains that Commerce only speculated that it was "unlikely" that the creditors' council acted like a private, commercial seller. KG Dongbu Supp. Br. at 21 (citing

*Risen Energy Co., Ltd. v. United States*, 122 F.4th 1348, 1356 (Fed. Cir. 2024)). But while Commerce may have used the term "unlikely," its conclusion rested on specific evidence concerning recovery evaluation and acquisition terms. Govt. Br. at 28–32; IDM at 58–60. Indeed, the Federal Circuit in *Dongbu IV* reviewed Commerce's conclusion that payment of fair market value was unlikely and held that the cited evidence was sufficient to support it. 181 F.4th at 1347. The use of the term "unlikely," which only precludes absolute certainty, does not undermine the actual evidence relied on or Commerce's explanations.

Finally, Commerce considered the change-in-ownership appendix, but it concluded that the information contained therein was not sufficient to rebut the presumption. Commerce found that the change-in-ownership appendix reaffirmed that the PWC feasibility report led the creditors' committee to confirm credit amounts and voting rights, extend loan maturity through December 31, 2020, and retain final approval of the M&A terms. IDM at 59–60. Commerce considered these facts, together with the recovery-focused evaluation of the acquisition, further restructuring, and differing share prices, and reasonably concluded that the record evidence did not support a finding that the transaction was conducted at fair market value.

### C. Commerce's Analysis of the Non-Exhaustive Factors Is Supported by Substantial Evidence and in Accordance with Law

KG Dongbu also challenges Commerce's determination based on the agency's analysis of the factors listed in the *Notice of Final Modification*. But these four factors are non-exhaustive ones that Commerce *may* consider when assessing whether a transaction was for fair market value. IDM at 59-61; *Notice of Final Modification*, 68 Fed. Reg. at 37,127 (emphasis added) (stating that Commerce may consider whether: (1) an objective analysis was performed to determine appropriate sales price; (2) artificial barriers to entry were imposed on potential purchasers; (3) the highest bid was accepted; and (4) committed investment barred entry or

distorted value bidders were willing to pay). As Commerce explained, "{w}hile these factors may be used to assess whether a transaction was for fair value, they are not required by Commerce as part of its analysis" and, because the list is non-exhaustive, "Commerce may consider other facts on the record that are relevant to Commerce's determination." IDM at 59. In any event, Commerce analyzed all of the relevant factors and based its determination on the weight of the record.

In the *Notice of Final Modification*, Commerce acknowledged that it generally does not consider "any one factor in itself to be dispositive, but will consider all the relevant facts and circumstances of a privatization to determine whether the sales price was a fair market value." IDM at 59 (citing *Notice of Final Modification*, 68 Fed. Reg. at 37,131 (Commerce's fair market value analysis must be "sufficiently flexible to address the diverse factual scenarios")). Thus, Commerce's fair market value framework is not restricted to a formulaic analysis of the four non-exhaustive factors. Instead, Commerce analyzes the circumstances surrounding a particular privatization. IDM at 59 (citing *Notice of Final Modification*, 68 Fed. Reg. at 37,127).

First, Commerce examined whether there was an objective analysis, but it did not agree that price acceptance was based on an objective analysis by PWC. IDM at 59. PWC was retained by the creditors' council to evaluate the feasibility of the debt restructuring workout program in prior years, and one such feasibility evaluation prompted the acquisition. Equity Infusions Memo at 16-17. As explained above, Commerce found that the PWC report focused on how much money creditors could recover on their past loans and investments as a result of the acquisition, compared to three other scenarios. IDM at 59-60.

In its initial questionnaire response, KG Dongbu explained that the creditors' council initiated the acquisition because of fears that Dongbu Steel "could not meet the workout

graduation requirements." Dongbu IQR at 36-37, Exh. B-35; IDM at 59-60. This assessment was derived from the PWC 2018 Feasibility Report and prompted the creditors' council's approval to proceed with the business normalization plan through an acquisition. *Id.* In this context, PWC conducted its analysis of the acquisition, considering the risk of creditor recovery in four scenarios including total liquidation. Accordingly, Commerce concluded that PWC's evaluation of the acquisition was mainly focused on how much money the creditors could recover from the acquisition, not on how profit from the sale could be maximized, and was therefore not an objective analysis to determine the appropriate sales price. IDM at 59-60. And, as outlined in the *Notice of Final Modification*, "the absence of an objective analysis {is} highly probative in determining that the transaction was not a fair market value." 68 Fed. Reg. at 37,131 n.13.

Next, although KG Dongbu acquired Dongbu Steel through an open bidding process as the highest bidder, Commerce determined the sale was not for fair market value in light of, among other things, the conditions of the sale and price per share paid. IDM at 60. As explained above, Commerce will scrutinize any sale where the face or exchange value of a financial, or other instrument given as payment, differs from its market value. *Id.* (citing *Notice of Final Modification*, 68 Fed. Reg. at 37,132). The creditors' council paid KRW 25,000 per share, yet KG Dongbu paid only KRW 5,000 per share as the highest bid. Given that the fair market value analysis centers on whether the company's value, under prevailing market conditions, was paid, the price per share difference, along with the conditions of sale, support Commerce's determination. The Federal Circuit agreed, considering KG Dongbu's reliance on the open bidding process and acquisition terms, but holding that Commerce's determination was still supported by substantial evidence. *Dongbu IV*, 181 F.4th at 1347. And even though the KG

Consortium may have been the highest bidder, this fact does not override the considerations discussed by Commerce in the final results.

Finally, the record evidence supports Commerce's committed investment analysis. In evaluating committed investment, Commerce considered, among other things, the recovery-focused evaluation, the additional restructuring required for the acquisition, and the differing share prices, which led to a finding that the transaction was not for fair market value. IDM at 58–61. As Commerce explained, the KG Consortium's bid required further debt restructuring and was not fully transparent to potential bidders, and thus the final prices paid did not fully reflect the commitment of the creditors' council. *Id.* at 61. Commerce observed that the agreement to extend existing loans and reduce interest rates functioned as an inducement and distorted the value, and found that such inducements were not indicative of a committed investment being fully reflected in the transaction price. *Id.*

KG Dongbu argues that the committed investment factor concerns restrictions imposed by a government seller on a purchaser's future operations or investment, rather than restructuring requested by the purchaser. KG Dongbu Supp. Br. at 25–26. But the *Final Modification* defines the term by reference to restrictions or requirements imposed by the government as seller on the future operation of, or investment in, the company or its assets. *Final Modification*, 68 Fed. Reg. at 37,133. Commerce correctly applied the *Final Modification*'s definition rather than expanding it such that every agreement by creditors to restructure existing debt would have to constitute a committed investment.

Upon thorough consideration of the applicable standard in light of the record facts, including the non-exhaustive factors set forth in the *Notice of Final Modification*, Commerce concluded that the creditors' council did not act in a manner consistent with the normal sales

practices of private, commercial sellers in Korea. Therefore, Commerce reasonably determined that the acquisition was not for fair market value and found that KG Dongbu had failed to rebut the pass-through presumption. That KG Dongbu can draw different conclusions from the record evidence to support its preferred outcome fails to establish that Commerce's determination is unsupported by substantial evidence. *Consolo*, 383 U.S. at 620 (holding that the ability to reach an inconsistent conclusion does not establish that Commerce's determination is unsupported by substantial evidence); *Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 968 (Fed. Cir. 2024); *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 975 F.3d 1318, 1333 (Fed. Cir. 2020) ("That {a party} can point to evidence of record which detracts from the evidence which supports the {agency's} decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive") (cleaned up).

## II. Commerce's Calculation of the Uncreditworthy Benchmark and Unequityworthy Discount Rates Should be Sustained

Commerce correctly calculated the uncreditworthy benchmark rate and the unequityworthy discount rate, consistent with its regulations and based on the available record evidence. KG Dongbu claims that Commerce incorrectly applied the formulas to calculate the uncreditworthy benchmark and unequityworthy discount rates, asserting that the Court should follow its decisions in *Dongbu I* and *Dongbu II*. Dongbu Br. at 36. While acknowledging that the Court did not accept Commerce's original calculations in those cases, we note that *Dongbu IV*—while not discussing the two calculation issues—still reversed the final judgment and directed reinstatement of Commerce's original determination. 181 F.4th at 1348. As such, even if *Dongbu I-III* were binding, which they are not, the Court could still reconsider its decisions in light of the Federal Circuit's reinstatement of Commerce's original determination in the prior administrative review, and we respectfully request that the Court do so.

### A. Legal Framework

In accordance with 19 C.F.R. § 351.507(c), the benefit conferred by an equity infusion "shall be allocated over the same period as a non-recurring subsidy." For a government-provided loan, a benefit exists to the extent that the amount the recipient pays is less than the amount it would pay on a comparable commercial loan that it could actually obtain on the market. 19 U.S.C. § 1677(5)(E)(ii); 19 C.F.R. § 351.505(a)(1). When Commerce finds that the recipient of a government-provided long-term loan is uncreditworthy, it normally calculates the benchmark interest rate using the following formula.

$$i_b = \{(1 - q_n)(1 + i_f)^n / (1 - p_n)\}^{1/n} - 1,$$

where:

$n$ = the term of the loan;

$i_b$ = the benchmark interest rate for uncreditworthy companies;

$i_f$ = the long-term interest rate that would be paid by a creditworthy company;

$p_n$ = the probability of default by an uncreditworthy company within n years; and

$q_n$ = the probability of default by a creditworthy company within n years.

19 C.F.R. § 351.505(a)(3)(iii).

The benefit conferred by an equity infusion is allocated over the same period as a non-recurring subsidy. 19 C.F.R. § 351.507(c). Section 351.524(d)(1) supplies the allocation formula and separately identifies "n" as the AUL and "d" as the discount rate. For an uncreditworthy firm, section 351.524(d)(3)(ii) directs Commerce to use as the discount rate the interest rate described in section 351.505(a)(3)(iii). The allocation period determines the years

over which the benefit is allocated; the discount rate is a separate input used to determine the amount allocated to each year. 19 C.F.R. § 351.524(d)(1).

### B. Commerce Correctly Calculated the Unequityworthy Discount Rates

#### 1. The Regulations Separately Define the Allocation Period and the Discount Rate

In the underlying review, Commerce allocated the equity-infusion benefits over a 15-year AUL while using discount rates constructed from three-year variables. PDM at 6, 16–17; IDM at 62–63. This approach comports with regulation, as section 351.524(d)(1) assigns the AUL to the allocation formula, while section 351.524(d)(3)(ii) separately identifies the interest rate used as the discount rate. KG Dongbu contends that the term and default probabilities used to construct that rate must also cover 15 years. KG Dongbu Supp. Br. at 35–37. But in making this argument, KG Dongbu conflates the allocation period of the benefit, where benefit is allocated over the AUL of the assets, with the period used in the separate interest-rate formula. Commerce clearly allocated the benefits over 15 years. But Commerce also permissibly, and based on interest rate data available on the record, used a shorter period to construct the discount interest rate.

Section 351.524(d)(1) expressly assigns the AUL to "n" in the allocation formula, while assigning the discount rate to "d." Section 351.524(d)(3)(ii) then identifies the interest rate Commerce must use for "d" when the company at issue is uncreditworthy. It does not direct Commerce to substitute the AUL for the loan term in the *separate* formula used to construct that interest rate. 19 C.F.R. §§ 351.524(d)(1), (3)(ii). Commerce thus complied with the express allocation requirement by using 15 years to allocate the equity benefits, and applying a discount rate calculated from three-year data did not somehow reduce that allocation period to three years.

When a firm is uncreditworthy, section 351.524(d)(3)(ii) also requires Commerce to construct an interest rate, as described in section 351.505(a)(3)(iii). The reference to section 351.505(a)(3)(iii) identifies the methodology for constructing "d" without expressly substituting the AUL for "n." And that formula produces an annual interest rate by adjusting the creditworthy interest rate for the difference between creditworthy and uncreditworthy default probabilities over the selected term. 19 C.F.R. § 351.505(a)(3)(iii); *see also Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365–66 (Dep't of Commerce Nov. 25, 1998). The resulting rate can serve as "d" in the allocation formula even while the AUL remains 15 years. 19 C.F.R. § 351.524(d)(1), (3)(ii). Accordingly, the 15-year allocation requirement governs "n" in the allocation formula, while the periods used to calculate "d" are governed by the separate provision, as referenced in section 351.524(d)(3)(ii). KG Dongbu cannot establish that Commerce erred in allocating the equity-infusion benefits over a 15-year AUL while using discount rates constructed from three-year variables.

### 2. Commerce Sufficiently Explained Why It Used Consistent Three-Year Variables to Construct the Discount Rates

Commerce selected the three-year, Korean won-denominated, AA-rated corporate-bond rate published by the Bank of Korea because it was the only suitable long-term creditworthy interest rate on the record. Notably, no alternative long-term creditworthy interest rates were supplied by the parties. Because KG Dongbu was deemed uncreditworthy, Commerce employed the formula specified in section 351.505(a)(3)(iii) rather than using the unadjusted creditworthy rate as the discount rate. IDM at 62. This action complied with section 351.524(d)(3)(ii), which governs the exception for uncreditworthy firms. Here, Commerce used the only suitable long-term creditworthy interest rate on the record and KG Dongbu cannot now complain, given that it had the opportunity to place an alternative rate on the record but failed to do so. *QVD Food Co.*

*v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (holding that the parties bear the burden of developing an adequate record).

Commerce also adequately explained its methodological approach to use a three-year term and three-year creditworthy and uncreditworthy default probabilities to correspond to the available three-year creditworthy interest rate, rejecting the proposed use of 15-year default probabilities and a 15-year term with the three-year creditworthy interest rate because that combination would mix periods rather than construct a rate from variables covering the same period. IDM at 62–63. The availability of 15-year default data did not address Commerce's concerns, as those data do not supply a 15-year creditworthy interest rate.

KG Dongbu relies on the preamble to Commerce's final rule, *see Countervailing Duties*, 63 Fed. Reg. 65,348, 65,365 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*), for the proposition that default probabilities should correspond to the term of a loan. KG Dongbu Supp. Br. at 34, 36. But that part of the *CVD Preamble* addresses the risk of lending over the duration of a loan; it does *not* separately direct Commerce to substitute the AUL for the term used to construct every equity discount rate. *See CVD Preamble*, 63 Fed. Reg. at 65,365–66. Here, Commerce appropriately used default probabilities corresponding to the three-year term of the rate it constructed, and the AUL remained the allocation period under § 351.524(d)(1). IDM at 62-63. KG Dongbu fails to demonstrate otherwise.

### 3. The Court's Prior Decisions Do Not Require Rejecting Commerce's Calculations Here

Commerce properly retained the three-year equity discount rates because it considered matching the term and default probabilities to the available three-year creditworthy interest rate necessary to construct a consistent rate. IDM at 62–63. As we acknowledge above, the Court declined to accept Commerce's calculation in *Dongbu I* and *Dongbu II*, which concerned the use

of the same three-year variables as during the prior administrative review. There, the Court read 19 C.F.R. §§ 351.507(c) and 351.524(d) as requiring the AUL to serve as "n" in the formula used to calculate the equity discount rate, and rejected Commerce's use of three-year variables. *Dongbu II*, 695 F. Supp. 3d at 1355–56.

We respectfully disagree with the Court's reading of the regulations; as explained above, 19 C.F.R. § 351.524(d) distinguishes the two calculations, with section 351.524(d)(1) defining the allocation period for non-recurring benefits and section 351.524(d)(3)(ii) identifying the discount rate used in that allocation. Moreover, the interest rates depend on the terms of the loan rather than the AUL of a particular asset. *Compare* 19 C.F.R. §§ 351.524(d)(1), (2) (referencing AUL with respect to allocation of benefit formula) *with* 19 C.F.R. § 351.524(d)(3)(ii) *and* 19 C.F.R. § 351.505(a)(3)(iii) (providing a different formula for calculating interest rate for uncreditworthy companies, which does not reference AUL); *see Russello v. United States*, 464 U.S. 16, 23 (1983) (holding that "{Where} Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Tenaris Bay City, Inc. v. United States*, 191 F.4th 1370, 1379 (Fed. Cir. 2026) (declining to extend a requirement expressly included in one statutory subdivision to an adjacent subdivision which omitted it); *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1353–54 (Fed. Cir. 2021) (declining to extend an adjustment authorized for one statutory calculation to a separate calculation for which Congress omitted that authorization). While section 351.524(d)(3)(ii) cross-references the uncreditworthy interest rate, it does not expressly require the term to equal the AUL, and that section does expressly reference section 351.505(a)(3)(iii), which contains a different formula not tied to the AUL. It would be error to transpose the requirements of sections 351.524(d)(1)

and (2) to calculations under sections 351.524(d)(3)(ii) and 351.505(a)(3)(iii), which have distinct and specific requirements.

Again, Commerce adequately explained why it selected three-year variables to calculate the interest rate, observing that the only available long-term creditworthy interest rate was the three-year Bank of Korea rate and that combining that rate with 15-year term and default-probability variables would mix periods. IDM at 62–63. Commerce further explained that, without a 15-year creditworthy interest rate, the proposed combination would not produce a 15-year uncreditworthy discount rate and would not improve the rate's accuracy. *Id.* Given Commerce's explanation, as well as the information available on the record, the Court should sustain Commerce's use of corresponding periods to construct the discount rates and the 15-year allocation of non-recurring benefit over the AUL of renewable physical assets.

### C. Commerce Correctly Calculated the Uncreditworthy Benchmark

Commerce calculated the loan and bond benchmarks using the Bank of Korea's three-year creditworthy interest rate and corresponding three-year term and default probabilities, explaining both the exclusion of the restructured loans as commercial comparators and the use of the available creditworthy rate in the uncreditworthy formula. IDM at 62–63; Govt. Br. at 37–39. KG Dongbu's arguments conflate distinct regulatory requirements for allocation of benefit over the AUL of physical assets and the calculation of interest rate for uncreditworthy firms. *Compare* 19 C.F.R. §§ 351.524(d)(1) & (2) *with* 19 C.F.R. § 351.524(d)(3)(ii), 19 C.F.R. § 351.505(a)(3)(iii). Because the selection of that interest-rate input and the periods assigned to the other variables are distinct issues, we respectfully request that the Court revisit its reasoning from *Dongbu II*.

### 1. Commerce Properly Selected the Three-Year Creditworthy Interest Rate

At the outset, the selection of the long-term interest rate that would be paid by a creditworthy company, represented by “$i_f$,” is different than the selection of “n” (the term of the loan) and the associated default probabilities. Commerce found that the private creditors’ loans made through Dongbu Steel’s restructuring were not comparable commercial loans and that the restructuring was controlled by a creditors’ committee that was itself controlled by Korean government policy banks, including the Korea Development Bank. PDM at 14-16. The renegotiated loans were also made by members of the successor creditors’ committee as part of that government-influenced restructuring. Dongbu IQR at 28, Exh. B-44. Due to the substantial government influence and the fact that they were part of a government program, these loans do not constitute “comparable commercial loans” suitable for a benchmark calculation under 19 C.F.R. § 351.505(a)(2).

Notably, the Court has sustained Commerce’s exclusion of loans made through a government-controlled restructuring on the basis that those loans were non-commercial and part of a government program. *Nucor Corp. v. United States*, 494 F. Supp. 3d 1377, 1381–82 (Ct. Int’l Trade 2021) (“The court concludes that Commerce determined properly that Dongbu’s loans could not be used for calculating a benchmark interest rate because the loans provided under the government program were non-commercial. The Court notes that the relevant statute and regulations do not require Commerce to use every loan received by a company as benchmark.”). Simply because there was private participation in the lending did not mean that Commerce was required to use those loan rates as commercial benchmarks. Commerce reasonably selected the available Bank of Korea corporate-bond rate—the only long-term interest rate on the record that was also consistent with the legal standard—as the creditworthy

interest-rate input. IDM at 62. KG Dongbu takes issue with the term and default probabilities used with that input, KG Dongbu Supp. Br. at 32–35, but the dispute over those variables does not establish that the restructured loans must themselves serve as commercial benchmarks or that the selected creditworthy interest rate was improper. Accordingly, the Court should sustain.

**2. Commerce Sufficiently Explained Its Use of Corresponding Three-Year Variables**

In using three-year term and default-probability variables (again, the only available long-term creditworthy interest rate was the three-year Bank of Korea rate), Commerce explained that the periods used to construct the uncreditworthy benchmark should correspond to that rate, rather than combine a three-year creditworthy rate with a six-year term for an uncreditworthy company and default-probability variables. IDM at 62–63. This rationale does not constitute a finding that the contractual maturity of each restructured loan was three years. KG Dongbu argues that the restructuring created six-year loans and that "n" and the corresponding default probabilities must therefore also cover six years. KG Dongbu Suppl. Br. at 32–35. But this argument does not pass muster, given that the regulation identifies "n" as the term of the loan, and the preamble links default probabilities to the loan's duration. 19 C.F.R. § 351.505(a)(3)(iii); *CVD Preamble*, 63 Fed. Reg. at 65,365–66. Commerce reasonably concluded that the available three-year creditworthy interest rate could not be combined with six-year term and default-probability variables to produce a six-year uncreditworthy interest rate. IDM at 62–63.

We acknowledge that, in *Dongbu II*, the Court rejected a similar explanation from Commerce, holding that the actual loan term should determine "n" and the default-probability periods, rather than those variables being determined by the three-year period associated with the available creditworthy interest rate, and directing Commerce to either use the six-year term and corresponding default probabilities or to provide cogent reasoning for an alternative calculation.

*Dongbu II*, 695 F. Supp. 3d at 1353–55. Again, we respectfully disagree with the Court's decision and submit that Commerce provided an adequate explanation in the underlying review, stating that it had selected the available long-term creditworthy rate after excluding government influenced loans as commercial comparators, then used corresponding periods in constructing the uncreditworthy benchmark. IDM at 62–63.

Commerce used the three-year term and default probabilities to match the available creditworthy interest rate so that the calculations in the formula would be made on equal basis and without distortion; it did not find that KG Dongbu's loans had three-year terms. Moreover, the available six-year default probabilities do not supply the missing six-year creditworthy interest rate. As Commerce explained, it could not calculate a six-year uncreditworthy interest rate under the regulatory formula without a six-year creditworthy interest rate, applying the same reasoning it used for the equity discount rate. IDM at 62–63. The focus should be on whether Commerce's explanation supports the selected calculation periods under the regulation, not whether the record contains the 2025 maturity date.

In the remand redetermination sustained in *Dongbu III*, Commerce retained the three-year creditworthy interest rate but used the actual duration of each loan or bond and corresponding default probabilities. 756 F. Supp. 3d at 1332, 1336. For the restructured six-year loans, that approach combined a three-year creditworthy interest rate with a six-year loan term and six-year default probabilities. *Id.* However, changing the term and default-probability variables without a corresponding six-year creditworthy interest rate mixes periods rather than producing a six-year uncreditworthy interest rate. IDM at 62–63. While the Court sustained the remand calculations as complying with its instructions, *Dongbu III*, 756 F. Supp. 3d at 1336, the approach employed by Commerce in the final results is superior to the one sustained in *Dongbu*

*III* because the original approach minimizes potential distortions by making calculations on equal basis and is based on the best information available on the record.

**CONCLUSION**

For these reasons, and those contained in our original response brief, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's final results, and enter final judgment for the United States.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7568
Fax: (202) 514-7965
Sosun.Bae@usdoj.gov

OF COUNSEL:

Brien C. Stonebreaker
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, D.C. 20230

November 18, 2026

*Attorneys for Defendant*